Jonathan Donnellan
Ravi V. Sitwala
THE HEARST CORPORATION
300 West 57th Street, 40th Floor
New York, NY 10019
Telephone: (212) 649-2020
Facsimile: (212) 649-2035
*Attorneys for Plaintiff*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

HEARST HOLDINGS, INC.,

                    Plaintiff,

           v.

TROPICO DIFFUSION,

                    Defendant.

----------------------------------------------------------------x

**Judge Pauley**

08 CV 1546

Civ. _____

**COMPLAINT**

Jury Trial Demanded

**ECF CASE**

    Plaintiff Hearst Holdings, Inc. ("Hearst Holdings" or "King Features"), by its undersigned counsel, alleges:

## INTRODUCTION

    1.    Defendant Tropico Diffusion ("Tropico") entered into several successive license agreements with the King Features Syndicate division of Hearst Holdings for the right to manufacture and sell various items embodying BETTY BOOP in France and its territories.  BETTY BOOP, the first animated femme fatale, was created by Max Fleischer in a series of works beginning in 1930, and has become one of the most well-known comic icons and an extremely valuable licensing property.  In July 2007, after a breakdown in negotiations to extend the then-existing license agreement (the

"License Agreement" or "Agreement," annexed hereto as Exhibit A), which was set to expire on December 31, 2007, King Features notified Tropico of its decision not to renew the license.  Later, in September 2007, King Features elected to terminate the Agreement after Tropico failed to pay certain amounts owed to King Features.  Notwithstanding the Agreement's termination, Tropico continued to and continues to market and sell BETTY BOOP items in violation of the License Agreement.  In addition, in direct violation of the forum selection clause contained in the License Agreement, which designates New York as the exclusive jurisdiction  for litigating related disputes, Tropico recently instituted a suit against Hearst Holdings in France for improper termination of the license.  (*See* Ex. B.)  Plaintiff therefore seeks:  (1) enforcement of the forum selection clause in the Agreement and an injunction against prosecution of the French action; (2) a declaration that King Features properly declined to renew the Agreement and properly terminated the contract for cause; (3) enforcement of the Agreement's provision against sale of covered goods after its termination or expiration, in the form of damages and an injunction.

## JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), as the amount in controversy exceeds $75,000 and the parties are diverse.  The Court has jurisdiction to issue a declaratory judgment under 28 U.S.C. § 2201.

3.    This Court has personal jurisdiction over Tropico, as it agreed to submit to this Court's jurisdiction in the License Agreement.  (Ex. A, License Agreement Standard Terms ¶ 22.)

4.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(d) as the defendant is an alien.  Venue is also proper under 28 U.S.C. § 1391(a), because a substantial portion of the acts giving rise to this case occurred within this district, and, in any event, because defendant Tropico is subject to personal jurisdiction here and agreed to venue here in the License Agreement.

## THE PARTIES

5.     Plaintiff Hearst Holdings is a corporation organized under the laws of the State of Delaware, with its principal place of business in New York, New York. Plaintiff, through its King Features Syndicate division, is, among other things, engaged in the business of producing, distributing, and licensing a wide variety of comic strips and characters.

6.     On information and belief, defendant Tropico is a corporation organized and existing under the laws of France, having its principal place of business at 26/28 rue Auguste Perret, Parc d'activitié de la Petite Bruyère, 94800 Villejuif Cedex, France.

## PLAINTIFF'S RIGHTS TO BETTY BOOP

7.     Plaintiff directly or indirectly controls all of the merchandising rights to the Betty Boop character throughout the world, in its role as the exclusive licensing agent for Fleischer Studios, the owner of such rights.

## THE PARTIES' PRIOR BUSINESS RELATIONSHIP

8.     In 1993, King Features entered into a non-exclusive license agreement with Tropico allowing Tropico to manufacture and sell BETTY BOOP products in France and its territories beginning in 1994.

3

9.    The 1993 agreement contains a set of basic provisions as well as a set of standard terms.

10.    Among the standard terms are a term-extension provision, termination provisions, and an applicable law and disputes provision.

11.    The termination provisions provide:

In addition to any rights King [Features] may have hereunder, at law or in equity:

(a) King [Features] shall have the right to terminate this entire Agreement by giving written notice to Licensee, if Licensee: . . . (iv) fails to make timely payment of Royalties or any other payments to King [Features] when due. . . .

12.    The applicable law and disputes provisions provide:

This Agreement shall be governed by the laws of the State of New York applicable to agreements fully executed and performed therein.  Any claims arising hereunder or relating hereto shall be prosecuted only in the appropriate court of the State of New York or in the United States District Court for the Southern District of New York and neither party shall make any claim or demand in any other jurisdiction or forum.  The parties consent to the personal jurisdiction of such courts and to the service of process by mail.

13.    The parties renewed the relationship through 1998, and, in 1999, the parties entered into a new license under substantially the same terms, including those set forth in paragraphs 11-12 above.

14.    King Features renewed the 1999 license in 2002, expanding the territories covered to include France and its territories, Spain, Portugal, the Benelux countries, Germany, and Switzerland.

15.    In 2005, the license was again renewed, but only as to France and its territories, resulting in the License Agreement that was set to expire at the end of 2007.

16.     The 2005 renewal terms specify that Tropico has the option to renew for an additional year, but only "subject to the approval of King [Features]."

17.     Beginning in 2006, Tropico sought to vastly expand its rights under the License Agreement through a long-term exclusive license covering all of Europe.

18.     King Features did not agree with Tropico's plans, and ultimately the parties could not agree on mutually acceptable renewal terms.

19.     By July 2007, King Features, through its French agent, notified Tropico of its intent not to renew the License Agreement, and, on August 2, 2007, King Features sent Tropico official notice of the non-renewal.

20.     In August 2007, King Features' French agent sought to collect certain amounts due from Tropico, but Tropico failed to remit the amounts.

21.     Accordingly, on September 28, 2007, King Features terminated the License Agreement according to its terms.

22.     Although not required to do so under the Agreement, King Features offered to rescind the termination (but not the non-renewal) in exchange for Tropico's recognition of expiration of the License Agreement at the end of 2007, but Tropico never responded.

23.     The License Agreement terminated on September 28, 2007, and in any event, expired by its terms on December 31, 2007.

## TROPICO'S CONTINUED SALE OF BETTY BOOP GOODS

24.     Notwithstanding the termination of the License Agreement, on information and belief, Tropico continues to market and sell BETTY BOOP goods.

25.     BETTY BOOP goods are currently advertised for sale on the website of Tropico's *Avenue of the Stars* website, as shown in Exhibit C.

26.     In addition, the website shows BETTY BOOP goods appearing on retail shelves.  (*See* Ex. D.)

## TROPICO'S FRENCH LAWSUIT

27.     Early this year, Tropico filed suit against Hearst Holdings before the Commercial Court of Paris seeking over 3 million euros (approximately $4.4 million) in damages as a result of King Features' termination and non-renewal of the License Agreement.  (*See* Ex. B.)

## FIRST CAUSE OF ACTION:  BREACH OF CONTRACT

28.     Plaintiff incorporates by reference paragraphs 1-27 above.

29.     The License Agreement contains a choice of forum clause specifying the courts of the State of New York and this Court as the sole and exclusive fora for disputes arising under or relating to the License Agreement.

30.     The License Agreement specifically bars the parties from instituting suit in any other jurisdiction.

31.     Tropico has breached the License Agreement by suing in France for damages arising out of and relating to the License Agreement.

32.     Tropico's breach of the Agreement was willful.

33.     Plaintiff has suffered and continue to suffer damages due to Tropico's breach, including irreparable harm and injury for which there is no adequate remedy at law.

## SECOND CAUSE OF ACTION:  DECLARATORY JUDGMENT OF PROPER TERMINATION OF THE LICENSE AGREEMENT

34.    Plaintiff incorporates by reference paragraphs 1-27 above.

35.    An actual controversy has arisen and now exists between Plaintiff and Defendant concerning their respective rights and duties under the License Agreement in that Plaintiff contends that the License Agreement was terminated in September 2007, whereas Defendant disputes these contentions and has filed suit against Plaintiff in France asserting that the termination of the License Agreement by King Features was improper and continues to sell and offer for sale BETTY BOOP goods.

36.    Tropico failed to timely remit payment under the License Agreement for the second quarter of 2007.

37.    The License Agreement expressly allows for termination if Tropico does not timely make quarterly royalty payments.

38.    By agreement of the parties, the License Agreement is governed by New York law, which allows for the enforcement of contracts and permits termination under the described circumstances.

39.    French law is inapplicable to the License Agreement and, in the alternative, does not bar termination under the described circumstances.

40.    Plaintiff seeks a declaratory judgment that it properly terminated the License Agreement due to Tropico's failure to timely make royalty payments and that the termination was not in violation of any applicable laws.

## THIRD CAUSE OF ACTION:  DECLARATORY JUDGMENT OF EXPIRATION OF THE LICENSE AGREEMENT

41.    Plaintiff incorporates by reference paragraphs 1-27 above.

42.    An actual controversy has arisen and now exists between Plaintiff and Defendant concerning their respective rights and duties under the License Agreement in that Plaintiff contends that the License Agreement not only was terminated in September 2007, but in any case expired by its terms in December 2007, whereas Defendant disputes these contentions and has filed suit against Plaintiff in France asserting that the non-renewal of the License Agreement by King Features was improper and continues to sell and offer for sale BETTY BOOP goods.

43.    The License Agreement expired on December 31, 2007, and could only be renewed by mutual agreement by the parties.

44.    The parties could not agree to a renewal term.

45.    Plaintiff gave timely and proper notice of non-renewal by August 2, 2007. In fact, although under no contractual or legal obligation to do so, Plaintiff provided Tropico six months of advance notice.

46.    The License Agreement is governed by New York law, which allows for the enforcement of contracts and does not bar non-renewal under the described circumstances.

47.    French law is inapplicable to the License Agreement and, in the alternative, does not bar non-renewal under the described circumstances.

48.    Plaintiff seeks a declaratory judgment that it properly declined to renew the License Agreement and that the non-renewal was not in violation of any applicable laws.

### FOURTH CAUSE OF ACTION:  BREACH OF CONTRACT

49.    Plaintiff incorporates by reference paragraphs 1-27 above.

50.    The License Agreement was terminated in September 2007.

51.    Because the License Agreement was terminated under its termination provisions, Tropico was not entitled to any sell-off period.  Its right to market and sell BETTY BOOP goods ceased upon termination of the License Agreement.

52.    Tropico continued to market and sell BETTY BOOP goods after termination and indeed continues to do so to this day.

53.    Tropico's marketing and sale of BETTY BOOP goods constitutes breach of the terms of the License Agreement.

54.    Tropico's breach of the Agreement was and continues to be willful.

55.    Plaintiff has suffered and continue to suffer damages due to Tropico's breach, including irreparable harm and injury for which there is no adequate remedy at law.

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

A.    Preliminarily and permanently enjoining and restraining Defendant, its respective officers, agents, servants, employees and attorneys, and all those in active concert or participation with them, from:

(1)    Maintaining, prosecuting, and pursuing litigation arising out of or relating to the License Agreement outside of the courts of the State of New York or this Court, including the action currently pending before the Commercial Court of Paris;

(2)    Marketing, manufacturing, developing, offering for sale, and selling BETTY BOOP goods;

B.    Declaring that:

(1)    Plaintiff's termination of the License Agreement was valid and proper and not in violation of any applicable laws;

(2)    Plaintiff's non-renewal of the License Agreement was valid and proper and not in violation of any applicable laws;

(3)    Defendant's filing of suit in the Commercial Court of Paris breached the License Agreement;

(4)    Defendant's continued marketing, manufacturing, offering for sale, and sale of BETTY BOOP goods after termination and/or expiration of the License Agreement breached the License Agreement;

C.    Directing that Defendant delivers for impoundment:

(1)    All BETTY BOOP goods in its or its agents' possession;

(2)    All advertising, promotional and other material that includes or embodies the BETTY BOOP name and/or image; and

(3)    All digital files, plates, molds, matrices, heat transfers, printing, silk-screening or other apparatus or equipment utilized in making or copying any goods incorporating the BETTY BOOP name and/or image.

D.    Directing such other relief as the Court may deem appropriate to prevent further breach of the License Agreement.

E.    Ordering an accounting of and entering judgment against Defendant for:

(1)    All profits received from the sale of BETTY BOOP goods after the termination or expiration of the License Agreement; and

(2)    All damages suffered by Plaintiff as a result of:

   (a)    Defendant's filing of the action before the Commercial Court of Paris, including legal fees and costs incurred in responding to that action;

   (b)    Defendant's marketing and sale of BETTY BOOP goods after the termination or expiration of the License Agreement; and

   (c)    Defendant's failure to remit royalty and other payments due under the License Agreement.

F.    Awarding Plaintiff its costs in this action, including reasonable attorneys' fees and investigative fees.

G.    Awarding Plaintiff punitive damages for Defendant's willful breaches of contract.

H.    Directing that the Court retains jurisdiction over this action for the purpose of enabling Plaintiff to apply to the Court at any time for such further orders and directions as may be necessary or appropriate for the interpretation or execution of any order entered in this action, for the modification of any such order, for the enforcement or compliance therewith, and for the punishment of any violations thereof.

I.    Awarding to Plaintiff such other and further relief as the Court may deem just and proper.

Dated:    New York, New York
          February 14, 2008

_____
Jonathan Donnellan
Ravi V. Sitwala
THE HEARST CORPORATION
300 West 57th Street, 40th Floor
New York, NY 10019
Telephone: (212) 649-2020
Facsimile: (212) 649-2035
JDonnellan@hearst.com

*Attorneys for Plaintiff*

# Exhibit A

Contract No. <u>101751</u>

**Hearst Holdings, Inc.**
King Features Syndicate Division
888 Seventh Avenue
New York, New York 10019

Dated as of January 26, 2005

Tropico
Parc d'Activités de la Petite Bruyére
26/28 Rue Auguste Perret
94808 - Villejuif Cedex
France

Re:    Agreement dated August 10, 1999, as renewed January 8, 2002, and as amended February 18, 2004, May 22, 2003, and October 11, 2000, between Tropico ("Licensee") and King Features Syndicate Division ("King") concerning a merchandising license featuring the cartoon character BETTY BOOP ("Agreement").

Dear Sirs:

This letter confirms our mutual understanding and agreement to renew the Agreement as follows:

Products:

(a) The Products listed on Schedule B1, attached hereto, for sale only to gift shops.

(b) The Products listed on Schedule B2, attached hereto, for sale only to hypermarket retail stores and mail order companies.

Renewal Term:    January 1, 2005 - December 31, 2007

Renewal Options:    One (1) renewal option for one (1) consecutive year, subject to the approval of King.

Territory:    France/Dom-Tom

Advances:    €42,000 payable upon execution of this Agreement by Licensee and applicable towards the sale of Products in France/Dom-Tom.

Royalty:    10% of the Gross Wholesale Price for all Products sold, provided that in the event Products are sold for export, the Royalty shall be 12% of the Gross Wholesale Price of all such Products sold. ROYALTIES SHALL BE REPORTED SEPARATELY BY COUNTRY AND ONLY ROYALTIES EARNED FROM THE SALE OF PRODUCTS IN FRANCE/DOM-TOM SHALL BE

*OA*

APPLICABLE AGAINST THE ADVANCE SPECIFIED ABOVE
OR TOWARDS THE GUARANTEED MINIMUM ROYALTY
SPECIFIED FOR BELOW.

<u>Guaranteed</u>
<u>Minimum Royalty</u>:

€125,000 payable as follows: €42,000 as the Advance specified
above, €42,000 on or before November 1, 2005, and €41,000 on or
before June 1, 2006.

<u>Copyright/Trademark</u>
<u>Notice</u>:

Until such time as King otherwise notifies Licensee, the notice
shall be in the following form:

© (year) King Features Syndicate, Inc./Fleischer Studios, Inc.
™ Hearst Holdings, Inc./Fleischer Studios, Inc.

Licensee shall also affix to the Product or Promotional and
Packaging Material the design(s) attached hereto as Exhibit A.

Except as expressly set forth above, all terms and conditions of the Agreement shall remain in
full force and effect.

Please indicate your acceptance of this renewal letter by signing where indicated below.

Very truly yours,

Agreed and Accepted:
Tropico

By:
Name: _Ouly AMAR_
Title: _President_

Hearst Holdings, Inc.
King Features Syndicate Division

By:
T. R. Shepard III, President

## Schedule B1

Only the following Products shall be sold to gift shops:

**STATIONERY**
Address books
Ball point pens and fountain ball pens
Diaries
Letter and card holders in resin / wood
Letter openers
Memo pad holders in wood and resin
Memo/message spindle resin and metal / wood / cork
Paperweight in resin / acrylic
Pencil pots in resin / wood / acrylic
Penholders in resin / wood / acrylic
Photo album
Staplers
Tape dispensers in resin
Writing paper sets
Wrapping paper
Sharpeners
Rulers
Erasers
Book marks

**TABLE WEAR / DECORATION**
Aprons and mitts
Bowls
Butter dishes
Butter spreaders
Ceramic and resin boxes
Ceramic banks
Ceramic cookie jars
Cereal bowls
Coffee cup and saucers
Container in glass with a candle inside
Cooking thermometer
Cooking timer
Cups and saucers
Egg-Cups
Flower vases
Glassware + Cookie and condiments Jar
Kitchen chalkboards + Spice rack with jars + Paper towel holder + Utensils holders
Lamps
Melamine trays
Metal boxes
Metal cookie boxes

Metal or enamel signs
Colander Metal / PVC
Plates
Salt and pepper shakers
Shopping bags, small bags
Spoons
Sugar and cream pots
Tea filters
Tidy
Wooden coat racks in resin
PVC and metal coasters
Resin candle holders
Placemats PVC/silicone
Magazine racks
Paper napkins
Metal napkin dispensers
Fleece throws

**APPAREL**
Boxers
Buttons down shirts
Denim jackets
Denim pants and shorts
Denim shirts
Gloves
Hats knitted in wool
Knitted sweaters
Nightwear
Overalls
Polo shirts
Printed one piece pajamas
Printed sweatshirts
Printed tee shirts
Printed Turkish slippers
Printed underpants
Scarves
Sportswear jackets
Sweaters
Sweatshirts
Tee shirts
Vests
Windbreakers
Wool, leather, suede or combination jackets
Silk and polyester ties
Caps
Terrycloth wristbands and headbands

Flip-flops
Pareos
Swimsuits
Belts
Toe socks

## CLOCKS / JEWELLERY / PHONE
Desk clocks (including alarm clocks)
Eyeglass cases in metal
Mobile phone cases
Musical boxes in resin
Wall clocks
Wristwatches

## HANDBAGS / LEATHER GOODS / KEYCHAIN
Backpacks
Bell pouches
Cosmetic bags
Fabric key chains
Hand bags
Key rings
Purses
Toilet cases
Toilet cover
Vanity cases
Wallets
Plush key chains
Nylon mini suitcases sold in sets of three (3) suitcases each consisting of one (1) 40 cm x 20 cm x 11 cm suitcase, one (1) 45 cm x 29 cm x 13 cm suitcase, and one (1) 48 cm x32 cm x 15 cm suitcase.

## OTHERS / GADGET
Book ends in resin
CD holders
Diplomas in a frame, in wood or PVC also without frame
Door plaques in resin, metal, and PVC
Magnets
Make up remover pad dispenser
Snow globes
Statuettes without functions
Mini safes and lockers
Shower curtains
Plastic bathroom items to consist of liquid soap dispensers, soap holders, toothbrush holders
Plastic boxes with drawers
Scales

Mini freezers
Soda/beverage vending machines for home use only
Popcorn machines, ice cream machines, Gumball machines and cotton candy machines
Cereal dispensers
Bubble soap machines
Hair driers
Nail driers
Adult and teen furniture made of neutral wood and plastic to consist of bookshelves, tables, stools, lockers, bins, cabinets, and flip-down desks.
Transistor radios
Espresso coffee machines
Fans
Cocktail shakers
Aluminium and PVC thermal bottles
Metal mail boxes
Hot water bottles
Travel irons
Brooms and dustpans
Water dispensers
Toasters
Sugar dispensers in bowls
PVC and metal magnets
Children's furniture in metal
Bottle openers
PVC calculators
Metal wastepaper baskets with seat cushions
Shopping caddies and trolleys
Thermometers
Beach chairs
Sunglasses
Beach towels packaged on tubes
Bathroom carpet
Sponge in 2D / 3D
Canvas beach bags
Venetian blinds
Straw mats
Woven beach mats
Cushions
Mouse pads
Frames (including PVC in 2D frames, metal frames, wooden and acrylic frames)
Resin figurines (a minimum of 12-centimeters in height)
Ashtrays
Doormats
Playing cards

## Schedule B2

Only the following Products shall be sold to hypermarket retail stores and mail order companies:

T-shirts, sweat shirts, nightwear, boxers, sweaters, tableware, glassware, mini-stationery, writing instruments, clocks (including alarm clocks), and mini fashion bags.

Exhibit A



Contract No. <u>101751</u>

<div align="center">

Hearst Holdings, Inc.
King Features Syndicate Division
888 Seventh Avenue
New York, New York 10019

</div>

Dated as of February 18, 2004

Tropico
Parc d'Activités de la Petite Bruyére
26/28 Rue Auguste Perret
94808 - Villejuif Cedex
France

Re:    Agreement dated August 10, 1999, as amended May 22, 2003, January 8, 2002, and
October 11, 2000, between Tropico ("Licensee") and King Features Syndicate Division
("King") concerning a merchandising license featuring the cartoon character BETTY
BOOP ("Agreement").

Dear Sirs:

This letter confirms our mutual understanding and agreement to amend the above referenced
Agreement as follows:

Schedule B1 incorporated by reference in the January 8, 2002 renewal letter of the
Agreement shall now be replaced with the revised Schedule B1, attached hereto.

Except as expressly set forth above, all terms and conditions of the Agreement shall remain in
full force and effect.

Please indicate your acceptance of this amendment letter by signing where indicated below.

Very truly yours,

Agreed and Accepted:
Tropico

By: _____

Name: ___Oulg AHAR___

Title: ___President___

March 11/04

Hearst Holdings, Inc.
King Features Syndicate Division

By: _____
T. R. Shepard III, President

## Schedule B1

# Only the following Products shall be sold in France/Dom-Tom:

**STATIONERY**
Address books
Ball point pens and fountain ball pens
Diaries
Letter and card holders in resin
Letter openers
Memo pad holders in wood and resin
Memo/message spindle resin and metal
Paperweight in resin
Pencil pots in resin
Penholders in resin
Photo album
Staplers
Tape dispensers in resin
Writing paper sets
Wrapping paper
Sharpeners
Rulers
Erasers

**TABLE WEAR / DECORATION**
Aprons and mitts
Bowls
Butter dishes
Butter spreaders
Ceramic and resin boxes
Ceramic banks
Ceramic cookie jars
Cereal bowls
Coffee cup and saucers
Container in glass with a candle inside
Cooking thermometer
Cooking timer
Cups and saucers
Egg-Cups
Flower vases
Glassware
Kitchen chalkboards
Lamps
Melamine trays
Metal boxes



Metal cookie boxes
Napkin ring in resin
Plates
Salt and pepper shakers
Shopping bags, small bags
Spoons
Sugar and cream pots
Tea filters
Three dimensional bottle toppers
Tidy
Wooden coat racks in resin
PVC and metal coasters
Resin candle holders


## APPAREL

Boxers
Buttons down shirts
Denim jackets with or without terry cloth inserts
Denim pants and shorts
Denim shirts
Gloves
Hats knitted in wool
Knitted sweaters
Nightwear
Overalls
Polo shirts
Printed one piece pajamas
Printed sweatshirts
Printed tee shirts
Printed Turkish slippers
Printed underpants
Scarves
Sportswear jackets
Sweaters
Sweatshirts
Tee shirts
Vests
Windbreakers
Wool, leather, suede or combination jackets
Silk and polyester ties
Caps
Terrycloth wristbands and headbands
Flip-flops
Pareos
Swimsuits

Belts

## CLOCKS / JEWELLERY / PHONE
Desk clocks (including alarm clocks)
Eyeglass cases in metal
Mobile phone cases
Musical boxes in resin
Wall clocks
Wristwatches

## HANDBAGS / LEATHER GOODS / KEYCHAIN
Backpacks
Bell pouches
Cosmetic bags
Fabric key chains
Hand bags
Key chain with a mini diary
Key rings
Purses
Toilet cases
Vanity cases
Wallets
Plush key chains

## OTHERS / GADGET
Book ends in resin
CD holders
Diplomas in a frame, in wood or PVC
Door plaques in resin, metal, and PVC
Magnets
Make up remover pad dispenser
Snow globes
Statuettes (minimum 13 cm high)
Mini safes and lockers
Shower curtains
Plastic bathroom items to consist of liquid soap dispensers, soap holders, toothbrush holders
Plastic boxes with drawers
Scales
Mini freezers
Water dispensers
Toasters
Sugar dispensers in bowls
Telephones
PVC and metal magnets



Children's furniture
Bottle openers
PVC calculators
Metal wastepaper baskets with seat cushions
Shopping caddies and trolleys
Thermometers
Beach chairs
Sunglasses
Beach towels packaged on tubes
Canvas beach bags
Venetian blinds
Straw mats
Woven beach mats
Cushions
Rag dolls
Mouse pads
Frames (including PVC in 2D frames, metal frames, and wooden frames)
Resin figurines (a maximum of 12-centimeters in height)
Ashtrays
Doormats
Playing cards

Contract No. 101751

Hearst Holdings, Inc.
King Features Syndicate Division
888 Seventh Avenue
New York, New York 10019

Dated as of May 22, 2003

Tropico
Parc d'Activités de la Petite Bruyére
26/28 Rue Auguste Perret
94808 - Villejuif Cedex
France

Re:     Agreement dated August 10, 1999, and as amended January 8, 2002 and October 11,
        2000, between Tropico ("Licensee") and King Features Syndicate Division ("King")
        concerning a merchandising license featuring the cartoon character BETTY BOOP
        ("Agreement").

Dear Sirs:

This letter confirms our mutual understanding and agreement to amend the above referenced
Agreement as follows:

1.  Schedule B1 incorporated by reference in the January 8, 2002 renewal letter of the
    Agreement shall now be replaced with the revised Schedule B1, attached hereto.

2.  King's Agent for receipt of payments and statements set forth in the January 8, 2002 renewal
    letter shall now read as follows:

    King's Agent for receipt
    of payments and statements: All payments and Royalty statements shall be made quarterly
    within fifteen (15) days after the end of each Royalty Period (as defined in the Standard
    Terms and Conditions of the Agreement). All monies payable to King hereunder shall be
    paid to and in the name of King's agent and all statements shall be sent to such agent as
    follows:

        King's agent:

            RMP Licensing
            91, Boulevard Saint-Germain
            75006 Paris, France



A copy of all statements shall be sent to the attention of King's **VICE PRESIDENT OF INTERNATIONAL LICENSING** at King's address specified in the heading of this renewal letter. King reserves the right to change the party to whom payments are to be made and statements are to be sent upon written notice to Licensee.

Except as expressly set forth above, all terms and conditions of the Agreement shall remain in full force and effect.

Please indicate your acceptance of this amendment letter by signing where indicated below.

Very truly yours,

Agreed and Accepted:
Tropico

By:

Name: O. AMAR

Title: President

Sept 4th -03

Hearst Holdings, Inc.
King Features Syndicate Division

By:

T. R. Shepard III, President

## Schedule B1

Only the following Products shall be sold in France/Dom-Tom:

**STATIONERY**
Address books
Ball point pens and fountain ball pens
Diaries
Letter and card holders in resin
Letter openers
Memo pad holders in wood and resin
Memo/message spindle resin and metal
Paperweight in resin
Pencil pots in resin
Penholders in resin
Photo album
Staplers
Tape dispensers in resin
Writing paper sets
Wrapping paper
Sharpeners
Rulers
Erasers

**TABLE WEAR / DECORATION**
Aprons and mitts
Bowls
Butter dishes
Butter spreaders
Ceramic and resin boxes
Ceramic banks
Ceramic cookie jars
Cereal bowls
Coffee cup and saucers
Container in glass with a candle inside
Cooking thermometer
Cooking timer
Cups and saucers
Egg-Cups
Flower vases
Glassware
Kitchen chalkboards
Lamps
Melamine trays



Metal boxes
Metal cookie boxes
Napkin ring in resin
Plates
Salt and peppershakers
Shopping bags, small bags
Spoons
Sugar and cream pots
Tea filters
Three dimensional bottle toppers
Tidy
Wooden coat racks in resin

**APPAREL**
Boxers
Buttons down shirts
Denim jackets with or without terry cloth inserts
Denim pants and shorts
Denim shirts
Gloves
Hats knitted in wool
Knitted sweaters
Nightwear
Overalls
Polo shirts
Printed one piece pajamas
Printed sweatshirts
Printed tee shirts
Printed Turkish slippers
Printed underpants
Scarves
Sportswear jackets
Sweaters
Sweatshirts
Tee shirts
Vests
Windbreakers
Wool, leather, suede or combination jackets
Silk and polyester ties
Caps

**CLOCKS / JEWELLERY / PHONE**
Desk clocks
Eyeglass cases in metal
Mobile phone cases



Musical boxes in resin
Wall clocks

## HANDBAGS / LEATHER GOODS / KEYCHAIN
Backpacks
Bell pouches
Cosmetic bags
Fabric key chains
Hand bags
Key chain with a mini diary
Key rings
Purses
Toilet cases
Vanity cases
Wallets

## OTHERS / GADGET
Book ends in resin
CD holders
Diplomas in a frame, in wood or PVC
Door plaques in resin
Frame in PVC in 2D
Magnets
Make up remover pad dispenser
Metal frames
Snow globes
Statuettes (minimum 13 cm high)
Wooden frame



Contract No. <u>101751</u>

Hearst Holdings, Inc.
King Features Syndicate Division
888 Seventh Avenue
New York, New York 10019

Dated as of January 8, 2002

Tropico
Parc d'Activités de la Petite Bruyère
26/28 Rue Auguste Perret
94808 - Villejuif Cedex
France

Re:    Agreement dated August 10, 1999, and as amended October 11, 2000, between Tropico ("Licensee") and King Features Syndicate Division ("King") concerning a merchandising license featuring the cartoon character BETTY BOOP ("Agreement").

Dear Sirs:

This letter confirms our mutual understanding and agreement to renew the Agreement as follows:

Products:                (a) The Products listed on Schedule B1, attached hereto, for sale only in France/Dom-Tom

(b) The Products listed on Schedule B2, attached hereto, for sale only in Portugal, Benelux, Germany, and Switzerland

(c) The Products listed on Schedule B3, attached hereto, for sale only in Spain

All Products shall be for sale to gift boutiques and department stores only.

Renewal Term:            January 1, 2002 - December 31, 2004

Renewal Options:         One (1) renewal option for one (1) consecutive year, subject to the approval of King.

Territory:               France/Dom-Tom, Spain, Portugal, Benelux, Germany, and Switzerland

OA

Advances:                    €71,824 payable upon execution of this Agreement by Licensee and applicable as follows:

€40,654 towards the sale of Products in France/Dom-Tom.

€18,200 towards the sale of Products in Spain.

€3,815 towards the sale of Products in Portugal.

€5,340 towards the sale of Products in Benelux.

€3,815 towards the sale of Products in Germany and Switzerland.

Royalty:                     12% of the Gross Wholesale Price for all Products sold, provided that the Royalty shall be 10% of the Gross Wholesale Price for all Products sold in France/Dom-Tom. ROYALTIES SHALL BE REPORTED SEPARATELY BY COUNTRY AND ONLY ROYALTIES EARNED FROM THE SALE OF PRODUCTS IN FRANCE/DOM-TOM, SPAIN, PORTUGAL, BENELUX, GERMANY, AND SWITZERLAND RESPECTIVELY SHALL BE APPLICABLE AGAINST THE ADVANCE SPECIFIED FOR EACH COUNTRY ABOVE OR TOWARDS THE GUARANTEED MINIMUM ROYALTY SPECIFIED FOR EACH COUNTRY BELOW.

Guaranteed
Minimum Royalty:             €153,130 payable and applicable as follows:

€121,960 for the sale of Products in France/Dom-Tom payable as follows: €40,654 payable as the Advance specified above, €40,653 payable on or before November 1, 2002, and €40,653 payable on or before June 1, 2003.

€18,200 for the sale of Products in Spain payable as the Advance specified above.

€3,815 for the sale of Products in Portugal payable as the Advance specified above.

€5,340 for the sale of Products in Benelux payable as the Advance specified above.

€3,815 for the sale of Products in Germany and Switzerland payable as the Advance specified above.

OA

<u>Currency</u>:                        All payments to King hereunder shall be payable in Euros.

<u>King's Agent for receipt of payments and statements</u>: All monies payable to King hereunder shall be paid to and in the name of King's agent and all statements shall be sent to such agent as follows:

King's agent:

RMP Licensing
91, Boulevard Saint-Germain
75006 Paris, France

A copy of all statements shall be sent to the attention of King's **VICE PRESIDENT OF INTERNATIONAL LICENSING** at King's address specified in the heading of this Agreement. King reserves the right to change the party to whom payments are to be made and statements are to be sent upon written notice to Licensee.

<u>Copyright/Trademark Notice</u>:                        Until such time as King otherwise notifies Licensee, the notice shall be in the following form:

**For Spain use:**

© (year) King Features Syndicate, Inc./Fleischer Studios, Inc.
™ King Features Syndicate, Inc.

Licensee shall also affix to the Product or Promotional and Packaging Material the design(s) attached hereto as Exhibit A.

**For Benelux use:**

© (year) King Features Syndicate, Inc./Fleischer Studios, Inc.
™ Fleischer Studios

Licensee shall also affix to the Product or Promotional and Packaging Material the design(s) attached hereto as Exhibit A.

**For all other countries use:**

© (year) King Features Syndicate, Inc./Fleischer Studios, Inc.
™ Hearst Holdings, Inc./Fleischer Studios, Inc.

Licensee shall also affix to the Product or Promotional and Packaging Material the design(s) attached hereto as Exhibit A.

Except as expressly set forth above, all terms and conditions of the Agreement shall remain in full force and effect.

Please indicate your acceptance of this renewal letter by signing where indicated below.

Very truly yours,

Agreed and Accepted:
Tropico

By: _____

Name: ____OuRi__AMAR____

Title: _____President_____

12/02/09

Hearst Holdings, Inc.
King Features Syndicate Division

By: _____
    T. R. Shepard III, President

**Exhibit A**



OA

### Schedule B1

Only the following Products shall be sold in France/Dom-Tom:

**STATIONERY**
Address books
Ball point pens and fountain ball pens
Diaries
Letter and card holders in resin
Letter openers
Memo pad holders in wood and resin
Memo/message spindle resin and metal
Paperweight in resin
Pencil pots in resin
Penholders in resin
Photo album
Staplers
Tape dispensers in resin
Writing paper sets

wraffing paper    OA
Sharpeners
Rulers
erasers

**TABLE WEAR / DECORATION**
Aprons and mitts
Bowls
Butter dishes
Butter spreaders
Ceramic and resin boxes
Ceramic banks
Ceramic cookie jars
Cereal bowls
Coffee cup and saucers
Container in glass with a candle inside
Cooking thermometer
Cooking timer
Cups and saucers
Egg-Cups
Flower vases
Glassware
Kitchen chalkboards
Lamps
Melamine trays
Metal boxes
Metal cookie boxes
Napkin ring in resin
Plates



Salt and peppershakers
Shopping bags, small bags
Spoons
Sugar and cream pots
Tea filters
Three dimensional bottle toppers
Tidy
Wooden coat racks in resin

**APPAREL**
Boxers
Buttons down shirts
Denim jackets with or without terry cloth inserts
Denim pants and shorts
Denim shirts
Gloves
Hats knitted in wool
Knitted sweaters
Nightwear
Overalls
Polo shirts
Printed one piece pajamas
Printed sweatshirts
Printed tee shirts
Printed Turkish slippers
Printed underpants
Scarves
Sportswear jackets
Sweaters
Sweatshirts
Tee shirts
Vests
Windbreakers
Wool, leather, suede or combination jackets

**CLOCKS / JEWELLERY / PHONE**
Desk clocks
Eyeglass cases in metal
Mobile phone cases
Musical boxes in resin
Wall clocks

**HANDBAGS / LEATHER GOODS / KEYCHAIN**
Backpacks
Bell pouches



Cosmetic bags
Fabric key chains
Hand bags
Key chain with a mini diary
Key rings
Purses
Toilet cases
Vanity cases
Wallets

**OTHERS / GADGET**
Book ends in resin
CD holders
Diplomas in a frame, in wood or PVC
Door plaques in resin
Frame in PVC in 2D
Magnets
Make up remover pad dispenser
Metal frames
Snow globes
Statuettes (minimum 13 cm high)
Wooden frame

OA

## Schedule B2

Only the following Products shall be sold in Portugal, Benelux, Germany, and Switzerland:

(a) Ceramic tableware to consist of bowls, cereal bowls, butter dishes, butter spreaders, coffee cups and saucers, plates, salt and pepper shakers, spoons, sugar and cream pots, tea filters, three-dimensional bottle toppers, cookie jars, egg cups, and flower vases.

(b) Glassware

(c) Melamine trays

(d) Resin statues 10cm -100cm in size

(e) Keychains to consist of fabric keychains, mini diary keychains and key rings. = all kinds    OA

(f) Wall clocks and desk clocks + alarm clocks    OA

(g) Ceramic savings banks and resin savings banks

(h) Photo frames to consist of metal photo frames, two dimensional PVC photo frames, and wooden photo frames. + Resin 3S Photo Frames = all kinds    OA

(i) Lamps

(j) Wallets, and bags to consist of backpacks, cosmetic bags, handbags, purses, toilet cases, and vanity cases.

(k) Apparel items to consist of boxers, buttons down shirts, denim jackets with or without terry cloth inserts, denim pants and shorts, denim shirts, gloves, hats knitted in wool, knitted sweaters, nightwear, overalls, polo shirts, printed one piece pajamas, printed sweatshirts, printed tee shirts, printed Turkish slippers, printed underpants, scarves, sportswear jackets, sweaters, sweatshirts, T-shirts, vests, windbreakers, and wool, leather, suede or combination jackets.

(l) wrapping paper + rulers + erasers + sharpeners    OA.

OA

## Schedule B3

Only the following Products shall be sold in Spain:

(a) Ceramic tableware to consist of bowls, cereal bowls, butter dishes, butter spreaders, coffee cups and saucers, plates, salt and pepper shakers, spoons, sugar and cream pots, tea filters, three-dimensional bottle toppers, cookie jars, egg cups, and flower vases.

(b) Glassware

(c) Melamine trays

(d) Resin statues 10cm -100cm in size

(e) Keychains to consist of fabric keychains, mini diary keychains and key rings. = all kinds  OA

(f) Wall clocks and desk clocks

(g) Ceramic savings banks and resin savings banks

(h) Photo frames to consist of metal photo frames, two dimensional PVC photo frames, and wooden photo frames. + Resin 3D Photo frames = all kinds  OA

(i) Lamps

(j) Wallets, and bags to consist of backpacks, cosmetic bags, handbags, purses, toilet cases, and vanity cases.

(k) Apparel items to consist of boxers, buttons down shirts, denim jackets with or without terry cloth inserts, denim pants and shorts, denim shirts, gloves, hats knitted in wool, knitted sweaters, nightwear, overalls, polo shirts, printed one piece pajamas, printed sweatshirts, printed tee shirts, printed Turkish slippers, printed underpants, scarves, sportswear jackets, sweaters, sweatshirts, T-shirts, vests, windbreakers, and wool, leather, suede or combination jackets.

(l) Alarm clocks

j) wrapping paper + rulers + sharpeners + erasers       OA

OA

Contract No. 101751

Hearst Holdings, Inc.
King Features Syndicate Division
235 East 45th Street
New York, New York 10017

Dated as of October 11, 2000

Tropico
Parc d'Activites de la Petite Bruyere
26/28 Rue Auguste Perret, 94808
Villejuif Cedex, France

Re:    Agreement dated August 10, 1999, between Tropico ("Licensee") and King Features
Syndicate Division ("King") concerning a merchandising agreement featuring the cartoon
character BETTY BOOP ("Agreement").

Dear Sir:

This letter confirms our mutual understanding and agreement to amend the above referenced
Agreement as follows:

The Licensee shall have the right to incorporate the Property and Trademarks on mobile phone
straps, hands-free headsets for mobile phones, and mobile phone rests.

Paragraph 2 of the Basic Provisions of the Agreement shall now read as follows:

Products:

a)  See attached Schedule B.

b)  Mobile phone straps, hands-free headsets for mobile phones, and
mobile phone rests.

Except as expressly set forth above, all terms and conditions of the Agreement shall remain in
full force and effect.

Please indicate your acceptance of this amendment letter by signing where indicated below.

Very truly yours,

Agreed and Accepted:                    Hearst Holdings, Inc.
Tropico                                 King Features Syndicate Division

By:                                     By:
Name:  Ouri Amar                        T. R. Shepard III, President
Title:  President

Contract No.   101751

## LICENSING AGREEMENT - FOREIGN

AGREEMENT made as of  August 10, 1999 between Hearst Holdings, Inc., King Features Syndicate Division, a Delaware corporation ("King"), with offices at 235 East 45th Street, New York, New York  10017, and Tropico ("Licensee"), a _____ corporation with offices at Parc d'Activites de la Petite Bruyere, 26/28 Rue Auguste Perret, 94808 -- Villejuif Cedex, FRANCE.

King and Licensee agree as follows:

### BASIC PROVISIONS

1.    Property and Trademarks:

BETTY BOOP

2.    Products:            See attached Schedule B

3.    Territory:           France/Dom-Tom

4.    Language:            French

5.    Term:

(a)    Basic Term:    The "Basic Term" of this Agreement and the license granted hereunder shall commence on January 1, 2000 and continue until December 31, 2001, subject to the provisions hereof.

(b)    Term Extensions (if any) and Minimum Earned Royalties:    If Licensee earns the specified Minimum Earned Royalties, Licensee shall have the following options if any, to extend the Basic Term (such extensions herein called "Term Extension(s)"):

Licensee shall have one (1) renewal option for one (1)  consecutive year each.

"Term" means the Basic Term and all Term Extensions.

OA

6.    <u>Advance, Royalties, Minimum Royalties Guarantee, etc</u>:

(a)    <u>Advance</u>:

(i)    Licensee shall pay King a non-refundable advance ("Advance") of FF480,000 payable as follows:

FF120,000 upon the execution of this Agreement
FF120,000 on or before April 30, 2000
FF120,000 on or before September 30, 2000
FF120,000 on or before December 31, 2000

(ii)    Licensee shall pay King an additional non-refundable Advance for each Term Extension period as follows:

FF480,000

(iii)    Unless specified otherwise herein, Advances shall be paid on or before the first day of the applicable period of the Term.

(iv)    The Advance shall be recoupable by Licensee out of Royalties payable to King pursuant to subparagraph (b).

(b)    <u>Royalty</u>:    Licensee shall pay King a royalty ("Royalty") of 9% based upon the Gross Wholesale Price (as defined in the Standard Terms and Conditions) of all Products sold.  A Product shall be deemed "sold" as of the date on which such Product is shipped, invoiced, billed or paid for, whichever first occurs.

(c)    <u>Guaranteed Minimum Royalty</u>:

(i)    Licensee hereby guarantees that the Royalty paid to King during the Basic Term shall be at least FF480,000.  Licensee hereby guarantees that the Royalty paid to King during each Term Extension shall be at least the following amounts:

FF480,000

(ii)    If the Royalties paid to King during the Basic Term or any Term Extension shall be less than the Guaranteed Minimum Royalties for such period the balance shall be payable in full on the last day of the applicable period.

Ok

(d)    King's Agent for receipt of payment and statements:

All Royalty payments and statements shall be made quarterly commencing April 30, 2000. All monies payable to King hereunder shall be paid to and in the name of King's agent and all statements shall be sent to such agent as follows:

King's agent:

RMP LICENSING
79, Rue du Faubourg Poissonnière
75009 Paris, France
Attention: Pierre Gaucher

A copy of all statements shall be sent to the attention of King's **VICE PRESIDENT OF INTERNATIONAL LICENSING** at King's address specified in the heading of this Agreement. King reserves the right to change the party to whom payments are to be made and statements are to be sent upon written notice to Licensee.

(e)    Contract Reference:    All payments and statements shall reference the Contract No. set forth at the top of this Agreement.

(f)    Currency:    All payments to King hereunder shall be payable in French Francs.

7.    Marketing Date:    January 1, 2000

8.    Advertising, Marketing Requirements:    Not Applicable

9.    Copyright/Trademark Notice: Until such time as King otherwise notifies Licensee, the notice shall be in the following form:

© (year) King Features Syndicate, Inc./Fleischer Studios, Inc.
™ The Hearst Corporation/Fleischer Studios, Inc.

Licensee shall also affix to the Product or Promotional and Packaging Material the design(s) attached hereto as Exhibit A.

Additionally, Licensee shall execute and return to King the trademark registration document either attached hereto as Exhibit B or provided by King hereafter.

OA

10.   <u>Samples</u>:  Licensee shall provide King with the following quantities of Production Samples of each Product and all Promotional and Packaging Materials (pursuant to paragraph 6(g) of the Standard Terms and Conditions attached hereto):

Twelve (12) of each Product

11.   <u>Standard Terms and Conditions</u>:   This Agreement includes all the Standard Terms and Conditions annexed hereto.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

Tropico

By: _____
Name: _____ ᴅᴜᴅⁱ ᴀᴍᴀᴿ _____
Title: _____ Pᴿᵉˢⁱᵈᵉⁿᵗ _____

Hearst Holdings, Inc.,
King Features Syndicate Division

By: _____
T. R. Shepard III, President

## SCHEDULE B

1. Clocks
2. Desk clocks
3. Frame in PVC in 2D
4. Lamps
5. Statuettes
6. Wall Clocks
7. Ceramic cookie jars
8. Metal cookie boxes
9. Cooking thermometer
10. Cooking timer
11. Glassware
12. Melamine trays
13. Backpacks
14. Boxers
15. Button down shirts
16. Denim jackets with or without terry cloth inserts
17. Denim pants and shorts
18. Denim shirts
19. Hats knitted in wool
20. Overalls
21. Polo shirts
22. Sportswear jackets
23. Sweaters
24. Sweatshirts
25. Tee-shirts
26. Vests
27. Wool, leather, suede or combination jackets
28. Knitted sweaters
29. Printed one piece pajamas
30. Printed sweatshirts
31. Printed Tee shirts
32. Printed turkish slippers
33. Printed underpants
34. Socks
35. Nightwear
36. Blinds and carpets
37. Bowls
38. Butter dishes
39. Butter spreaders
40. Ceramic banks
41. Cereal bowls
42. Coffee cup and saucers
43. Cups and saucers
44. Cushions

45. Wooden coat racks
46. Resin figurines imported from Westland Giftware
47. Egg-cups
48. Flower vases
49. Key rings
50. Metal boxes
51. Kitchen chalkboards
52. Metal frames
53. Mirror ashtrays
54. Movie clip boards
55. Windbreakers
56. Paper napkins
57. Aprons and mitts
58. Plates
59. Salt and pepper shakers
60. Snow globes
61. Spoons
62. Sugar and cream pots
63. Tea filters
64. Tidy
65. Umbrellas
66. Wooden coat racks
67. Wooden frames
68. Address books
69. Backpacks
70. Belt pouches
71. CD holders
72. Cosmetic bags
73. Diaries
74. Fabric keychains
75. Hand bags
76. Keychain with a mini diary
77. Mini purses
78. Mobile phone cases
79. Needlework boxes
80. Purses
81. Shopping bags
82. Toilet cases
83. Vanity cases
84. Wallets
85. Writing paper sets
86. Bath plugs
87. Drawer pulls and knobs
88. Door plaques in resin
89. Bathroom Tumblers

90. Glycerol soap with Betty Boop mini figurine inside
91. Liquid soap dispensers
92. Towel hangers
93. Make up remover pad dispenser
94. Nailbrush
95. Resin and/or plexi-glass soap dishes
96. Shower curtains
97. Three dimensional toothbrushes
98. Tooth brush holders
99. Anti stress foam (squeezies)
100. Ball point pens and fountain ball pens
101. Bandannas
102. Book ends in resin
103. Letter and card holders in resin
104. Ceramic and resin boxes
105. Desk blotters in PVC.
106. Diplomas in a frame in wood or PVC
107. Formal jewelry
108. Hair accessories
109. Magnets
110. Memo pad holders in wood and resin
111. Memo/message spindle resin and metal
112. Message stickers
113. Letter openers
114. Paper weight in resin
115. Pen holders in resin
116. Pencil pots in resin
117. Pencils with figurines attached
118. Staplers
119. Staple removers
120. Straws with figurines attached
121. Strings of lights
122. Tape dispensers in resin
123. Three dimensional bottle toppers

OA

EXHIBIT A



# EXHIBIT A

LICENSEE NAME:

1.    Manufacturer:

      Address:

      Products Manufactured:

2.    Manufacturer:

      Address:

      Products Manufactured:

3.    Manufacturer:

      Address:

      Products Manufactured:

4.    Manufacturer:

      Address:

      Products Manufactured:

*EXHIBIT C*

*Manufacturer's Agreement*

Agreement dated as of _____ between _____ ("Contractor") and (NAME OF MANUFACTURER) ("Manufacturer").

Name and Address of Manufacturer: (NAME/ADDRESS)

Property and Trademarks: (PROPERTY AND TRADEMARKS AS DEFINED IN LICENSE AGREEMENT)

Products: (PRODUCTS AS DEFINED IN LICENSE AGREEMENT)

Territory: (COUNTRY/TERRITORY)

Expiration of Manufacturer's Agreement (unless sooner terminated or extended): (DATE)

1.      Contractor hereby engages Manufacturer to manufacture such quantities of the Products as Contractor may specify from time to time.

2.      Upon the failure of Manufacturer to comply with any of this Agreement, Contractor may elect to terminate this Agreement forthwith and require that portion of all copies and molds or other devices used to manufacture the Products in possession of Manufacturer be immediately delivered to Contractor or be destroyed.

3.      Manufacturer agrees that:

(a)  it will not manufacture the Products for or supply the Products to anyone but Contractor;

(b)  it will not deliver the Products in any territory other than the Territory listed above;

(c)  it will not manufacture any merchandise utilizing the Property and Trademarks other than the Products,     nor will it produce any Products in excess of the quantity stipulated by Contractor; and

(d)  the Products manufactured by it shall invariably and without exception bear a copyright notice as stipulated by Contractor, accompanied by such other information or notice as may be prescribed by the laws applicable to the Territory, or as Contractor may instruct in writing.

4.      Manufacturer hereby acknowledges the proprietary rights of Contractor's licensor, Hearst Holdings, Inc., King Features Syndicate Division ("King") in and to such Property and Trademarks. Manufacturer also acknowledges that it acquires no proprietary rights whatsoever in the Property and Trademarks, the Products, or any trademarks or copyrights associated therewith and that all materials it produces or creates, including any molds, engraving or other devices used to reproduce the Products shall be the exclusive property of King.

5.      Manufacturer further acknowledges that King is the intended third-party beneficiary of this Agreement and King shall be entitled to initiate enforcement proceedings as may be appropriate against Manufacturer in the event of any breach hereof, including but not limited to seeking injunctive relief. The Manufacturer agrees that its failure to comply with its obligations hereunder would cause irreparable injury to King not wholly compensable with monetary damages. In addition, Manufacturer shall be responsible to Contractor and King for damages, including costs and attorneys' fees, caused by any unauthorized use of such molds, engravings or other devices used to reproduce the Property and Trademarks.

6.      Upon notice from Contractor or King, Manufacturer will immediately cease manufacturing the Products and at Contractor's or King's election either turn over to Contractor or King any molds, engravings or other devices used to reproduce the Property and Trademarks and Products or will give satisfactory evidence of their destruction so that they can no longer be used to reproduce said Property and Trademarks.

CONTRACTOR                                              MANUFACTURER
(NAME)                                                  (NAME)


By_____                                      By_____
Name_____                                     Name_____
Title_____                                     Title_____

# King Features

## Licensed Merchandise Approval Form

Licensee Name :

Reference :

Address :

City :                    State :                    Zip :            Country :

### Description of Product to be Approved:

Property:

Marketing Date:

Product :

Design :

Number of Designs :          Hangtag/Label/Sticker :

Copyright:

Trademark :

---

Concept Review :

Date R'cvd.:

Approved :

Rejected :

Review by :

---

Rough Artwork Review :

Date R'cvd.:

Approved :

Rejected :

Review by :

---

Finish Artwork Review :

Date R'cvd. :

Approved :

Rejected :

Review by :

---

Strike Off/Prototype Review :

Date R'cvd. :

Approved :

Rejected :

Review by :

---

Production Sample Review :

Date R'cvd. : :

Approved :

Rejected :

Review by :

ec.98

# KING FEATURES
## STANDARD TERMS AND CONDITIONS

1. **LICENSE GRANTED:**

(a) King hereby grants to Licensee a non-exclusive, non-transferable and non-assignable license ("License"), without the right to grant sub-licenses, to use the Property and the Trademarks solely for the manufacture, sale, advertising and promotion (collectively "Sale") of the Products solely within the Territory and in the Language. All rights in and to the Property and the Trademarks not expressly granted to Licensee hereunder shall remain with King.

(b) If and to the extent that the Laws of the European Community (the "EC") limit the enforceability of any territorial restrictions contained in other provisions of this Agreement, such provisions shall be deemed modified to the minimum extent necessary to comply with the legal requirements. In any event, Licensee shall not solicit sales of any Products outside the Territory nor establish any branch, sales office, production plant or depot outside the Territory for the distribution of Products without King's prior written consent. Further, the labels and packaging on each Product shall be solely in the Language specified in the Basic Provisions of this Agreement. Should Licensee receive a request for export to another EC country, Licensee undertakes to inform King prior to exportation, and Licensee further undertakes to supply King with payments and separate sales statements covering such export sales for all Products and for all and each EC country concerned.

2. **TERM EXTENSIONS:**

If Licensee is granted any option(s) to extend the Term, each such option must be exercised by notifying King in writing at least sixty (60) days prior to the expiration of the then-current period of the Term. As a precondition to Licensee's effective exercise of any such option, Licensee must have fully performed all of its obligations hereunder, and specifically must have paid all payments then due and must have earned any Minimum Earned Royalties specified in the Basic Provisions of this Agreement.

3. **ROYALTIES:**

(a) Royalties shall be paid by Licensee to King on all Products sold by Licensee, even if not invoiced or billed (such as introductory offers, samples, promotions and the like in excess of commercially reasonable quantities to prospective customers, and sales to affiliates, associates or subsidiaries of Licensee), and shall be based upon Licensee's usual Gross Wholesale Price for such Products sold during the period.

(b) Licensee shall pay to King on execution of this Agreement, and on the commencement of each Term Extension period, if any, a non-refundable Advance against Royalties ("Advance") in the amount specified in the Basic Provisions of this Agreement. For the Basic Term and each Term Extension period, if any, Licensee shall also pay to King a non-refundable, "Guaranteed Minimum Royalty" in the amount specified in the Basic Provisions of this Agreement. If, upon termination or expiration of the Term, the total Royalties paid by Licensee to King during the period of the Term immediately preceding expiration or termination, including the Advance, is less than the Guaranteed Minimum Royalty for such period, Licensee shall immediately pay such difference to King. Royalty payments made for any period of the Term (e.g., Basic Term or any Term Extension period) shall be credited against the Guaranteed Minimum Royalty for such period of the Term.

(c) "Gross Wholesale Price" shall mean Licensee's invoiced billing price to its customers or distributors less returns for damaged goods. No other deductions shall be made in computing the Gross Wholesale Price whether for cash or other discounts, commissions, uncollectible accounts, taxes, fees, assessments, impositions, payments or expenses of any kind. If the billed price to a purchaser for any Products is less than the usual Gross Wholesale Price charged by the Licensee for such Products in the ordinary course of its normal business, the Royalty payment shall be based upon the Licensee's usual Gross Wholesale Price. Royalties from foreign countries shall be computed and paid without deduction of any tax except that: (i) if any country imposes a withholding tax on any Royalty payment; and (ii) such tax is paid by Licensee, it may deduct the amount of such withholding tax from said Royalties provided it furnishes to King: (A) an original receipt of the taxing authority for the amount of the tax paid (and a translation, if the receipt is in a foreign language) and (B) a report setting forth the Royalties with respect to which the withholding tax was paid, the amount paid, and the date paid.

4. **STATEMENTS AND PAYMENTS:**

(a) Licensee shall provide King within thirty (30) days after the end of each calendar quarter (the "Royalty Period"), a complete and accurate statement of its sales of the Products for the Royalty Period. Said statement shall be certified as accurate by the Licensee and include the number, description and Gross Wholesale Price of each Product (including each separate type, style and kind of Product) sold during the Royalty Period, information as to discounts given and returns actually credited and any other information King may from time to time request. Statements shall be furnished to King whether or not any Products have been sold and whether or not Royalties have been earned during the Royalty Period. If the Territory includes more than a single country, the statement shall be broken down by country and all Sales shall be stated in the currency of the country where they were made. If payments hereunder are to be made in United States currency (as specified in the Basic Provisions of this Agreement) each statement shall also include the United States currency equivalent of each local currency figure in such statement and the exchange rate applied. Statements shall be in a form acceptable to King. The amount due King for the Royalty Period shall be paid simultaneously with the submission of such statements. All payments shall be in such currency as is specified in the Basic Provisions of this Agreement. If no other currency is specified in the Basic Provisions of this Agreement, all payments shall be in United States currency drawn on a United States bank. In no event shall the amount credited for returns during any Royalty Period exceed the Licensee's Royalty obligation for such Royalty Period or be used as a credit against past or future Royalty obligations of the Licensee.

(b) Licensee shall send its quarterly statements and all amounts payable to King or its agent, whichever is specified in the Basic Provisions of this Agreement. King reserves the right to change its designation of: (i) agent; (ii) agent's address; or (iii) King's address by giving written notice thereof to Licensee.

(c) The receipt or acceptance by King of any statement or payment (or its cashing of any Royalty checks) shall not preclude King from questioning the correctness thereof at any time and any inconsistencies or mistakes shall immediately be rectified.

(d) Time is of the essence with respect to all payments to be made hereunder by Licensee, and interest at a rate of twelve percent (12%) per year, compounded daily, or, if less, the maximum lawful interest rate, shall accrue from the date payment is due until the date payment is received. The preceding provision shall also apply to any amounts found to be unpaid following an examination of Licensee's books and records.

(e) If Licensee shall be prohibited or restricted from making payment of any monies to King when due and payable hereunder, by reason of any laws or currency regulations within the Territory, Licensee shall promptly advise King in writing. King may then: (i) terminate this Agreement; or (ii) direct Licensee to deposit to the credit of King in a bank designated by King in the Territory or to pay promptly to anyone King may designate, all monies accruing to King hereunder.

5. **AUDIT:**

(a) Licensee shall keep accurate books of account and records at its principal place of business covering all transactions relating to the License granted herein. King and its duly authorized representatives shall have the right, during reasonable business hours, to examine Licensee's said books of account and records and all other documents and material relating to the subject matter and the terms of this Agreement and to make copies and extracts thereof. If any underpayment is greater than $500 for any Royalty Period, the Licensee shall reimburse King for the costs and expenses of such audit. If any country in which the audit is to take place prohibits King or its duly authorized representative from conducting such examination, the examination shall be conducted by such person or party as is permitted under the law of such country.

(b) Upon request by King, but not more than once each year, Licensee shall, at its own cost, furnish to King within thirty (30) days after such request a detailed statement, prepared by an independent certified public accountant acceptable to King, setting forth the number of Products manufactured from the later of the commencement of this Agreement or the date of any previous such statement up to and including the date of King's request therefore and also setting forth the pricing information for all Products (including the number and description of the Products) shipped, distributed or sold by Licensee during the aforementioned time period.

(c) All books of account and records of Licensee covering all transactions relating to the License shall be retained by the Licensee until at least two (2) years after the expiration or termination of the Term for possible inspection by King.

6. **QUALITY, NOTICES, APPROVALS AND SAMPLES:**

(a) The quality of the Products and all promotional, advertising and packaging material which includes the Property or the Trademarks (the "Promotional and Packaging Material") shall be at least as high as the best quality of similar products and promotional, advertising and packaging material presently shipped, distributed, sold or used by Licensee in the Territory and shall be in full conformance with all applicable laws and regulations.

0A

(b) Licensee may not manufacture, use, sell, advertise, promote, ship or distribute any Product or any Promotional and Packaging Material until it has been approved in writing by King. Such approval may be granted or withheld as King, in its sole discretion, may determine. If King fails to approve in writing a submission by the Licensee within fourteen (14) days from the date of its receipt by King, such submission shall be deemed disapproved. King agrees to act in a timely manner to review each submission.

(c) Before commencing or authorizing third parties to commence the design or development of Products or of Promotional and Packaging Material which have not been previously approved in writing by King, Licensee shall submit at its own cost to King for approval the following material in the following sequence: (i) a description of the concept, including full information on the nature and function of the proposed item and a general description of how the Property, Trademarks and other material will be used thereon; (ii) complete layouts and descriptions of the proposed Products and Promotional and Packaging Material showing exactly how and where the Property, Trademarks and all other artwork and wording will be used; (iii) pre-production models or prototype samples of the proposed Products and Promotional and Packaging Material; and (iv) actual production samples of the proposed Products and Promotional and Packaging Material (the "Production Samples"). Licensee shall not proceed beyond any stage where approval is required without first securing such approval. Licensee shall use the form annexed hereto as Schedule A in connection with its submission. Licensee's failure to adhere to the aforesaid approval requirements shall constitute a material breach of this Agreement. No such approval by King shall act to waive, diminish or negate Licensee's indemnification to King as set forth below.

(d) All Products and all Promotional and Packaging Material shall contain permanently affixed, non-removable appropriate legends, markings and notices as required from time to time by King, to give appropriate notice to the public of King's rights therein. Unless otherwise expressly approved in writing by King or until such time as King advises Licensee otherwise, each usage of the Trademarks shall be followed by either the ™ or the ® Trademark Notice symbol or the word "Trademark", as appropriate, and initially the notices and legends as set forth in the Basic Provisions of this Agreement shall appear at least once on each Product and on each piece of Promotional and Packaging Material.

(e) Where patent protection is either pending or has been granted for any portion of the Property, the Licensee shall further include the appropriate patent notice on all Products and on all pieces of Promotional and Packaging Material.

(f) (i) Licensee shall use no markings, legends or notices on or in association with the Products or Promotional and Packaging Material other than the above specified legend and such other markings, legends and notices as may from time to time be specified by King without first obtaining King's prior written approval. Licensee hereby represents and undertakes that it will not at any time without King's prior written consent assign, sub-license, sub-contract or otherwise deal with all or any part of the rights hereby granted or amend, revise, develop, or vary all or any part of the Property. (ii) If Licensee shall, with or without the prior written consent of King, create or acquire derivative designs, whether amendments, revisions, developments or variations of all or any part of the Property (hereinafter called the "Derivative Works") (without prejudice to King's rights against the Licensee in the event of the unauthorized creation of any Derivative Work) King or its designee shall automatically acquire (and Licensee shall execute such assignments or other documents as King may request) all rights of every kind, nature and description (including without limitation the entire copyrights throughout the world and all extensions thereof) in and to all such Derivative Works and the Licensee does hereby agree and undertake:

(1) Prior to the creation or acquisition of any Derivative Work in accordance with section 6(f)(i) to obtain from the proposed draftsman, artist, designer or the creator of the Derivative Work or the person to whom in law or in fact the rights in the Derivative Work shall belong a written absolute sale and assignment of all of that person's rights whether present or future in the Derivative Work in favor of King;

(2) The Derivative Work shall at all times both before and after approval by King be King's sole and exclusive property.

(g) Upon commencement of manufacture, shipment and distribution of the Products or Promotional and Packaging Material after all required approvals have been given by King, Licensee shall submit to King, at its own cost, the number of aforementioned Production Samples of the Products and Promotional and Packaging Material set forth in the Basic Provisions of this Agreement.

(h) King may periodically during the Term require that Licensee submit to King, at no cost to King, additional sets of Production Samples of the Products and Promotional and Packaging Material as reasonably requested by King to enable King to review continued compliance by Licensee with the requirements of this Agreement.

(i) Licensee shall not depart from approved Production Samples in any respect without the prior written approval of King. Licensee shall make submissions to King and obtain approvals in the manner required above each time new or revised concept, layouts, descriptions, artwork, models, prototype samples or Production Samples are created or developed.

(j) To assure that the provisions of this Agreement are being observed, Licensee shall allow King or its designees to enter Licensee's premises and, to the extent within Licensee's power, the premises where the Products are being manufactured during regular business hours and upon not less than five (5) days' notice, for the purpose of inspecting the Products and Promotional and Packaging Material and the facilities in which the Products and Promotional and Packaging Material are being manufactured and in which the Products are being packaged.

(k) If the quality standards or trademark, patent and copyright usage and notice requirements hereinabove referred to are not met or maintained throughout the Term then, upon receipt of written notice from King, Licensee shall immediately discontinue all Sales or other activity or dealing with respect to the non-conforming Products or Promotional and Packaging Material.

7. **ARTWORK:**

(a) The form and content of all artwork for use in all media shall be submitted to King for its prior written approval. Licensee shall also submit to King for approval, samples of the proposed use of such artwork on each Product and Promotional and Packaging Material, even if the artwork itself has already been approved.

(b) All artwork and designs involving the Property or Trademarks shall, notwithstanding their invention or use by Licensee, be and remain the property of King who shall be entitled to use and license others to use such artwork and designs, subject to the provisions of this Agreement.

8. **OWNERSHIP OF RIGHTS:**

(a) King owns or has the exclusive right to license the rights in the Property and the Trademarks herein licensed to Licensee.

(b) Licensee understands that King is not granting any rights whatsoever with respect to any music, whether such music is independent of or associated with the Property and Trademarks. If Licensee shall, with or without King's consent, incorporate any such music in the Products or Promotional and Packaging Material, Licensee acknowledges that it is its sole responsibility to obtain such consents, releases or licenses and to pay all costs which result from Licensee's use thereof and King shall have no obligation, financial or otherwise, relating thereto. Licensee will obtain and to the extent required pay for all necessary music synchronization and performing rights from the copyright holders of such music and such other persons, firms or associations, societies or corporations as may own or control the performing rights thereto. In addition, Licensee agrees to pay for all re-use fees required by applicable collective bargaining and individual contracts. Upon King's request, Licensee shall deliver to King, copies of all consents, releases and licenses required herein.

(c) As between King and Licensee, all right, title and interest in the Property and the Trademarks are reserved by King for use except for the rights specifically licensed to Licensee hereunder.

(d) No license other than for Sale of the Products in the Territory is being granted hereunder, and King reserves for use as it may determine all other rights of any kind. Licensee recognizes that King may already have entered into, and may in the future enter into, license agreements with respect to the Property or the Trademarks for products which fall into the same product category as one or more of the Products and which may be similar or identical to one or more of the Products in terms of manufacture, design, appearance and the like, and Licensee hereby expressly concedes that the existence of said licenses shall not constitute a breach of this Agreement by King.

(e) Licensee shall not use King's name, the Property or the Trademarks other than as permitted hereunder and, in particular, shall not incorporate King's name, the Property or the Trademarks in Licensee's corporate or business name in any manner whatsoever. Licensee will in no way represent that it has any right, title or interest in the Property or the Trademarks other than those expressly licensed to Licensee hereunder. Licensee will not use or authorize the use, either during or after the Term, of any configuration, trademark, trade name or other designation confusingly similar to King's name, the Property or the Trademarks.

9. **GOOD WILL AND PROMOTIONAL VALUE:**

(a) Licensee recognizes the value of the good will associated with the Property and the Trademarks and acknowledges that the Property, Trademarks and all rights therein and the good will pertaining thereto belong exclusively to King. Licensee acknowledges that the Property and the Trademarks have acquired secondary meaning in the mind of the public. Licensee will not attack the title or any rights of King in the Property or the Trademarks or the validity of the License being granted herein either during or after the Term.

(b) Licensee's use of the Property and the Trademarks shall inure to the benefit of King and Licensee shall not, at any time, acquire any rights in the Property or the Trademarks by virtue of such use.

(c) Licensee acknowledges that: (i) King is entering into this Agreement not only in consideration of the Royalties to be paid hereunder but also for the promotional value to be secured by King for the Property and the Trademarks as a result of the Sale of the Products by Licensee; and (ii) its failure to manufacture, sell, advertise or promote the Products in accordance with the provisions of this Agreement or to fulfill any of Licensee's other obligations hereunder will result in immediate and irreparable injury to King, and King will have no adequate remedy at law. Therefore, King, in addition to all other remedies it may have, shall be entitled to injunctive relief against any such breach.

10. **TRADEMARK, PATENT AND COPYRIGHT PROTECTION:**

(a) The License granted hereunder is conditioned upon Licensee's compliance with the applicable provisions of the trademark, patent and copyright laws of the United States and each foreign country in the Territory. Licensee shall keep records of and advise King when each of the Products is first sold in each country in the Territory.

(b) Licensee shall cooperate with King in protecting and defending the Property and Trademarks including the execution of any documents as requested by King. If any claim or problem arises with respect to the protection of the Property or the Trademarks in the Territory, Licensee shall promptly advise King in writing of the nature and extent of same. King shall have the right but not the obligation to take any action whatsoever, with counsel of its own choice, if any claim or problem arises with respect to the protection of the Property or the Trademarks.

(c) Licensee shall not at any time apply for copyright, trademark or patent protection nor file any document with any governmental authority nor take any other action which could affect King's rights in the Property or the Trademarks.

11. **INFRINGEMENTS:**

(a) Licensee shall assist King in the enforcement of any rights of King in the Property or the Trademarks. King may commence or prosecute any claims or suits in its own name or in the name of Licensee or join Licensee as a party thereto. Licensee shall notify King in writing of any infringements or imitations by third parties of the Property, the Trademarks, the Products or the Promotional and Packaging Material which may come to the Licensee's attention. King shall have sole right to determine whether or not any action shall be taken on account of any such infringement or imitation. Licensee shall not contact the third party, nor make any demands or claims, nor institute any suit nor take any other action on account of such infringements or imitations without first obtaining the prior written permission of King. All costs and expenses, including attorneys' fees, incurred in connection with any suit instituted by Licensee without the consent of King shall be borne solely by Licensee.

(b) With respect to all claims and suits, including suits in which Licensee is joined as a party, King shall have the sole right to employ counsel of its choice and to control the litigation and any settlement thereof. King shall be entitled to receive and retain all amounts awarded as damages, profits or otherwise in connection with such suits.

12. **INDEMNIFICATION:**

(a) King shall defend, indemnify and hold Licensee harmless against any claims, liabilities, judgments, losses, costs and expenses, including reasonable attorneys' fees, arising solely out of third party assertion of rights in the Property or Trademarks based solely on the use of the Property or the Trademarks by the Licensee as authorized in this Agreement, provided that Licensee shall notify King of any such claim, demand, cause of action or judgment within ten (10) days after Licensee acquires knowledge hereof, and further provided that King shall have the right to undertake and conduct the defense of any cause of action so brought and to handle any such claim or demand. In no event shall King have any liability for loss of profits or consequential damages.

(b) Licensee shall defend, indemnify and hold King and its parent, subsidiary, related companies and agents harmless against any and all claims (including, without limitation, claims based upon negligence and strict liability), liabilities, judgments, losses, costs and expenses, including, without limitation, reasonable attorneys' fees, arising out of the breach or claimed breach by Licensee of any of the provisions hereof or out of Licensee's design, manufacture, distribution, shipment, advertising, promotion or sale of the Products or the Promotional and Packaging Material. King shall have the right to defend any such action or proceeding with attorneys of its own selection.

13. **INSURANCE:**

Licensee shall throughout the Term obtain and maintain at its own cost from a qualified insurance company licensed to do business in the State of New York, separate policies for: (i) standard Product Liability Insurance; and (ii) Advertisers' Liability Insurance, the form of which must be acceptable to King, naming King as an additional named insured. The Product Liability Insurance policy shall provide protection against all claims, demands and causes of action arising out of any defects or failure to perform, alleged or otherwise, of the Products or any material used in connection therewith or any use thereof. The amount of coverage under each policy shall be a minimum of One Million Dollars ($1,000,000) combined single limit, with no deductible amount, for each single occurrence for bodily injury and/or for property damage. Each policy shall provide for ten (10) days notice to King from the insurer by Registered or Certified Mail, return receipt requested of any modification, cancellation or termination. Licensee shall furnish to King a certificate of insurance evidencing same within thirty (30) days after execution of this Agreement and, in no event, shall the Licensee manufacture, offer for sale, sell, advertise, promote, ship or distribute the Products prior to receipt by King of such evidence of insurance.

If the Territory does not include any part of the United States, its territories, possessions, commonwealths or Canada, King agrees to negotiate in good faith at Licensee's request changes in the requirements of this section to conform to local insurance practice.

14. **EXPLOITATION BY LICENSEE:**

(a) Licensee shall commence the Sale of the Products in commercially reasonable quantities in each of the countries within the Territory by the Marketing Date set forth in the Agreement.

(b) During the entire Term, Licensee will use its best efforts diligently and continuously to distribute, ship, sell, promote and meet the demand for all of the Products in all countries in the Territory.

(c) Products will be sold, shipped and distributed outright, at a competitive price that does not exceed the price generally and customarily charged the particular purchaser by the Licensee, and not on an approval, consignment, sale or return basis. Licensee will not discriminate against the Products by granting commissions/discounts to salesmen, dealers or distributors in favor of Licensee's other products. Products will only be sold to retail stores and merchants for sale, shipment and distribution direct to the public.

(d) Licensee shall sell to King, if it so requests, additional quantities of each Product at eighty percent (80%) of Licensee's customary Gross Wholesale Price.

15. **PREMIUMS, PROMOTIONS AND SECONDS:**

(a) King reserves the sole and exclusive right to utilize or license third parties to utilize any Product in connection with any premium, giveaway, mail order, in-theatre sales, promotional arrangement or fan club (collectively referred to as "Promotional Products"), which retained right may be exercised by King concurrently with the rights licensed to the Licensee hereunder.

(b) Licensee shall not sell, ship, advertise, promote, distribute or use for any purpose whatsoever (or permit anyone else to do so) any Products or Promotional and Packaging Material which are damaged, defective, seconds or otherwise fail to meet the specifications or quality standards or trademark, patent and copyright usage and notice requirements of this Agreement.

16. **ASSIGNABILITY AND SUBLICENSING:**

(a) The License granted hereunder is and shall be personal to Licensee and shall not be assigned by any act of Licensee or by operation of law. Licensee shall have no right to grant any sublicenses without King's prior written approval. Any attempt by Licensee to sublicense or assign to third parties its rights under this Agreement shall be null and void and shall constitute a material breach of this Agreement.

(b) King shall have the right to assign its rights and obligations under this Agreement without Licensee's approval.

(c) Licensee may have the Products manufactured by a third party on condition that Licensee: (i) obtains King's prior approval of the identity of each such third party manufacturer; (ii) provides King with a list of the names and addresses of each such third party manufacturer; (iii) enters into a written agreement with each such third party manufacturer (a copy of which shall be made available to King) in substantially the form annexed hereto as Exhibit C; and (iv) shall indemnify King against any loss or damage arising as a result of any breach by any third party manufacturer of its obligations under the Agreement or otherwise arising out of acts or omissions by any third party manufacturer, in derogation of King's rights in and to the Properties and Trademarks.

0A

## 17. TERMINATION.

In addition to any other rights King may have hereunder, at law or in equity:

(a) King shall have the right to terminate this entire Agreement by giving written notice to Licensee, if Licensee: (i) manufactures, sells, advertises, promotes, ships, distributes or uses in any way any Product or Promotional or Packaging Material without having the prior written approval of King as provided hereunder or uses or continues to use such approval after notice from King that the quality of same, or (ii) or any of its controlling shareholders, officers, directors or employees uses in connection with the manufacture, sale, advertising, promotion, shipment or distribution of the Products or the Promotional and Packaging Material which damages or reflects adversely upon King, the Property or the Trademark(s), (iii) breaches any of the provisions of this Agreement relating to the unauthorized assertion of rights in the Property or the Trademark(s); (iv) fails to maintain the standards of quality specified by King under this Agreement or the provisions of this Agreement subsisting or otherwise manufacturing this Agreement within 30 days, or (v) fails to obtain or maintain product liability and advertising insurance as required by the provisions of this Agreement; (vi) files a petition in bankruptcy, or is adjudicated a bankrupt or insolvent, or makes an assignment for the benefit of creditors, or an arrangement pursuant to any bankruptcy law, or if Licensee discontinues its business, or if a receiver is appointed for the Licensee or for the Licensee's business and such receiver is not discharged within thirty (30) days.

(b) King shall have the right to terminate upon written notice thereof to Licensee the license granted hereunder insofar as it applies to any particular country or countries in the Territory in which the Licensee, for any reason, fails to commence distribution of any Product(s) and any country or countries by the Marketing Date in accordance therewith, or if Licensee, after commencement, fails to continue to sell, ship and distribute such Product(s) in commercially acceptable quantities in such country or countries for two consecutive Royalty Periods.

(c) King shall have the right during this Agreement upon thirty (30) days' written notice to Licensee in the following events, provided that during this thirty (30) day period, Licensee fails to cure the breach: (i) if Licensee becomes subject to any material breach with respect to any of its obligations under this Agreement other than those covered in subsections (a) or (b) above; or (ii) if Licensee becomes subject to any involuntary or voluntary order of any governmental agency involving the recall of any of the Products and/or Promotional and Packaging Material because of safety, health or other hazards or risks to the public.

## 18. POST-TERMINATION AND EXPIRATION RIGHTS AND OBLIGATIONS.

After the expiration or termination of the Term:

(a) Licensee shall have no right to manufacture, offer, sell, ship, advertise, promote and distribute, use or deal with in any way the Products or Promotional and Packaging Material except as provided in subsection (c) below.

(b) If the Term is terminated prior to its normal expiration date, notwithstanding anything to the contrary herein, all unpaid Royalties and any Advance or Guaranteed Minimum Royalty that would be payable if the Term had continued shall nevertheless be payable in full upon the termination of the Term.

(c) Except upon expiration or termination of the Term pursuant to section 17 above, Licensee may dispose of all Products which are on hand or in the process of manufacture at the time notice of termination is received or upon its expiration of the then in effect Term for a period of ninety (90) days after notice of termination or its expiration, on a non-exclusive basis, provided that the Advances and Royalties with respect to that period are paid and the appropriate statements are furnished for that period. During such ninety (90) day period, King may itself use or license for use the Property in any manner in or for the world as King sees fit.

(d) All rights granted to Licensee shall forthwith revert to King which shall be free to license others to use the Property and/or the Trademarks in any manner. At King's election and in its sole discretion, Licensee shall either: (i) turn over to King all molds and other materials which reproduce the Products and Packaging Material; or (ii) cause the molds and such other materials to be destroyed and provide King satisfactory evidence of their destruction. Furthermore, upon expiration or termination of the Term (including any applicable sell-off period) as provided for in subsection (c) above, Licensee shall, at King's election in its sole discretion, either: (i) sell and transfer Products to King at Licensee's direct cost of manufacture, excluding overhead; or (ii) cease all marketing Products to King and furnish King with satisfactory evidence of their destruction. Licensee shall be responsible to King for any damages caused by the unauthorized use by the Licensee or by others of such molds, reproduction materials or Products which are not so turned over to King, sold to King or destroyed.

(e) Licensee acknowledges that its failure to cease the manufacture, offering for sale, sale, advertising, promotion, shipment, distribution or use of the Products or the Promotional and Packaging Material at the termination or expiration of the Term will result in immediate and irreparable damage to King and to the rights of any subsequent licensee of King. Licensee acknowledges that there is no adequate remedy at law for such failure and King shall be entitled to injunctive or other equitable relief in addition to all other remedies King may have.

## 19. FINAL INVENTORY UPON TERMINATION OR EXPIRATION.

Within thirty (30) days after the end of the Term, Licensee shall deliver to King a statement indicating the number and description of the Products on hand or in the process of manufacturing at the end of the Term. King shall have the right at the end of the Term to conduct a physical inventory at any time after the end of the Term in order to ascertain or verify such inventory. If Licensee refuses to permit King to conduct such physical inventory, then, without limiting any of King's other remedies, Licensee shall forfeit its rights hereunder to dispose of such inventory.

## 20. NOTICES.

All notices or other communications to either party shall be in writing and sent by mail, internationally-recognized overnight mail or courier service, facsimile or personal delivery to such party's address listed in the heading of this Agreement.

Either party may change its address by notice in writing to the other.

## 21. RELATIONSHIP OF THE PARTIES.

This Agreement does not create a partnership or joint venture between the parties and Licensee shall have no power to obligate or bind King in any manner whatsoever.

## 22. APPLICABLE LAW AND DISPUTES.

This Agreement shall be governed by the laws of the State of New York applicable to agreements fully executed and performed therein. Any claims arising hereunder or relating thereto shall be prosecuted only in the appropriate court of the State of New York or in the United States District Court for the Southern District of New York and neither party shall make any claim or demand in any other jurisdiction or forum. The parties consent to the personal jurisdiction of such courts and to the service of process by mail.

## 23. CAPTIONS.

Section captions are inserted only for convenience. Such captions shall not be given any substantive or legal effect.

## 24. WAIVER.

(a) No waiver by either party of a breach or a default hereunder shall be deemed a waiver of any other breach or default.

(b) All of King's rights and remedies hereunder or at law or in equity shall be cumulative and resort to one shall not be construed as a waiver of any other.

## 25. SURVIVAL OF RIGHTS.

Notwithstanding anything to the contrary contained herein, any obligations which remain executory after expiration of the Term of this Agreement shall remain in full force and effect until discharged by performance and such rights as pertain thereto shall remain in full force until their expiration.

## 26. SEVERABILITY.

If any provision of this Agreement shall for any reason be held invalid, illegal or unenforceable the same shall not affect the validity or any other provision hereof and this Agreement shall be interpreted and construed as if such provision, to the extent invalid, illegal or unenforceable, had not been contained herein.

## 27. INTEGRATION.

This Agreement: (i) represents the parties' entire understanding and supersedes all previous representations, understandings or agreements, oral or written, between them with respect to the subject matter hereof, and (ii) cannot be modified except by a written instrument signed by the parties hereto.

# Exhibit B




# MEANING AN ORDER AND SUMMONS ON SHORT NOTICE

## BEFORE THE COMMERCIAL COURT OF PARIS

Under an order made by Mr President of the Commercial Court of Paris on 21 december 2007 at the request presented to him, a copy of wich is attached to this act.

IN THE YEAR 2008
ON Onze ===== JANVIER a t 11 H 00

### UPON PETITION OF:

TROPICO DIFFUSION, a French simplified company with shares with capital of 1,198,176 euros, registered with the Register of Trade and Companies of Creteil, under no: B 320 268 402, having its registered office at 26/28 rue Auguste Perret, Parc d'activitié de la Petite Bruyère, 94800 Villejuif, acting through its Chairman, Mr. Ouri AMAR, domiciled in this capacity at such registered office.

Having retained as counsel:
Julien HAY, Esq.

Attorney at law, member of the Paris Bar
3 Place des Pyramides – 75001 Paris
Tel. 01 44 55 32 00 – Locker P 224

Representative before the Commercial Court
Nicole DELAY PEUCH, Esq.
Representative before the Commercial Court
29 boulevard Victor, 75015 Paris

We, SCP Philippe DUPARC and Cardole DUPARC-CRUSSARD, Sheriff of Justice Associates, Audienciers near the Commercial Court of Paris, live 1 Boulevard du Palais 75004 PARIS, by one of them undersigned,

### I – HEREBY SUMMON:

HEARST HOLDINGS, INC., King Features Syndicate Division, 888 Seventh Avenue, New York, N.Y. 10019, USA, by its legal representatives domiciled in this capacity at such registered office.

Where being and speaking to:

To have to appear in front of Mr President and Judges comprising the Tribunal de Commerce de Paris, located 1 Quai de la Corse 75004 PARIS, at the hearing to be held on **13 MARCH 2008 to 12 HOURS 00 – The 19th Chamber.**

### IMPORTANT

The parties defend themselves. They have the right to be assisted or represented by any person of their choice. The representative whether the lawyer must have a special power.
The party does not face such a decision against him solely on the evidence provided by his adversaire.
The documents on which the application was based are show at the end at the act.

**Which are denounced in the Annex to this note on 477 sheets.**

### CLAIM

### I.  FACTS

For 20 years TROPICO DIFFUSION has been manufacturing and marketing under licence decorative toys and articles.

TROPICO DIFFUSION was incorporated by Mr. Ouri AMAR, a passionate fan of comic books.

Fifteen years ago Mr. Ouri AMAR took the initiative to canvass in the United States the representatives of KING FEATURES, a subsidiary of the HEARST Group, and owners of the rights for the exploitation of 'Betty Boop'.

Indeed, Mr. AMAR was convinced of the development potential of this character which at the time in Europe was not exploited commercially on an autonomous basis.

For the first time in 1994, TROPICO DIFFUSION thus became the HEARST CORPORATION's licensee in France and the Overseas Departments and Territory for the 'Betty Boop' character.

In order to promote national development thereof, TRÓPICO DIFFUSION created a network of franchised stores under the sign «Avenue of the Stars.»

TROPICO DIFFIUSION wanted to create a national chain of stores dedicated to the universe of comic book characters where 'Betty Boop' would be deliberately emphasized, both in exhibiting the articles to the public as well as in the network's commercial and advertising documentation.

TROPICO DIFFUSION had thus worked for 15 years on the creation of this network that today consists of 26 stores.

In order to supply the network, TROPICO employed a creative team as the 19 licence agreements that succeeded each other during the 15 years of commercial relations between the parties involved only the granting of the right to reproduce and sell the 'Betty Boop' character, on a list of designated articles. TROPICO DIFFUSION had always alone been responsible for the creation of all the models, including the costumes of the character, its numerous positions, as well as the decor and texts reproduced on the articles.

TROPICO DIFFUSION's creative activity was thus invested in very varied segments:

   * Textiles,
   * Watches,
   * Kitchen-ware,
   * Table-ware,
   * School related accessories,
   * Decorative articles,
   * Fashion accessories,
   * etc.

Without the richness, diversity and constant renewal of these products, TROPICO DIFFUSION would not have been able to establish the 'Betty Boop' articles on the French market.

The press file, which is extremely extensive, and which is introduced into evidence, attests to what extent the plaintiff made all its development efforts.

This also appears from the numerous exhibits produced by TROPICO DIFFUSION, which very clearly demonstrate its activity of commercially promoting 'Betty Boop' at the time of all the major professional events such as the «House and Items» Show where, for 15 years, 'Betty Boop' had patently been the effigy of the stand rented by TROPICO DIFFUSION.

The business relation between TROPICO DIFFUSION and HEARST became so close that with the consent of the beneficiary, numerous articles were manufactured under the common trademark «*Avenue of the Stars, concept by O.A*» / «*King Features Syndicate Inc. / Fleischer Studios Inc.*»

Even if such creations are characteristic of derivate works with respect to copy right, it must be stated at this point that, even more than any other indicia in this regard, the fact that the parties used their respective trademarks in common, which was obviously demonstrated to third parties, concerning a production the revenues of which are shared between them, was characteristic, if needed, of the existence of a joint venture agreement. This *a fortiori* corroborates the fact that the business relation went well beyond the performance of successive licence agreements.

It is however true that on June 12, 2007 TROPICO DIFFUSION was a victim of HEARST's total termination of the business relation to be ended on December 31, 2007. As such a notice period was scandalously inadequate, it characterizes the commission of a civil tort that is provided for and punishable by Article 442-6-1-5 of the Commercial Code.

In addition to compensate the loss by the awarding of damages, it shall be recalled that this text of law provides for a civil fine of 2 million euros and authorizes the intervention in the proceeding of the public prosecutor and the Ministry of the Economy, once has been *«terminated, even partially, an established business relation without written notice taking into account the length of the business relation ... When the business relation involves the furnishing of products under the distributor's trademark, the minimal length of the notice is twice that which would be applicable if the product was not furnished under the distributor's trademark.»*

In contempt of the fact that in France these provisions constitute public policy, which solution has today been clearly consecrated by the Court of Cassation (*Cour de Cassation*), HEARST's representatives thought they could elude its application on the grounds of a provision excerpted from the general conditions of their licence agreements that designated the law of the State of New York as the law applicable to the agreements.

## II. CONCERNING THE APPLICATION OF FRENCH LAW

### II.1    PUBLIC POLICY

An Article 22 inserted in the general conditions that are attached to the last licence agreements entered into between the parties stipulates that:

*«This agreement shall be governed by the laws of the State of New York applicable to contracts that are performed therein.»*

The notice obligation that constitutes the basis of the case at bar has its source in a provision of law.

This is indeed what is emphasized in such matters by the most authoritative doctrine:

*«Article L.444-6 of the Commercial Code (Order no.86-1243 of December 1, 1986 – former Article 36) provides that:*

*the [party] who is responsible for (...) abusive listings and de-listings (...) incurs liability therefor and obliges it to compensate the loss that has been caused.*

*The proposal seems clear. Any wrongful behavior, and we can discuss such definition for example of unjustified discrimination or a subordinated sale, results in the tortious liability of its perpetrator.*

*Was it necessary to thus repeat the rule of Article 1382 of the Civil Code?*

*This recall of common law is not useless – it avoids that the decriminalization of these practices be interpreted as an acknowledgement of their lawfulness.*

*In addition, the implementation of the civil liability of the perpetrators specified in Article L.442-6 of the Commercial Code are governed by special rules:*

*The action for civil liability may be brought not only by the victim but also by the public prosecutor, the Minister of the Economy and the President of the Competition Council (...) (LAMY, Droit Economique «concurrence, distribution, consommation» (Economic Law, «Competition, Distribution, Consumption) edition 2005 – no. 769, pp. 251 and 252).*

*It must furthermore be stressed that Article L. 442-6 of the Commercial Code constitutes part of the «restrictive practices» of competition targeted by Chapter II of Title IV of the same Code entitled «transparency, restrictive competitive practices and other prohibited practices.»*

*Article L.442-6 punishes various restrictive competitive practices, amongst which the brutal termination of established commercial relations of paragraph 5. This article incriminates the practice often defined as abusive de-listing. It is true that the principal purpose of this text or law was initially to punish the practices of supermarket distribution with regard to its suppliers, before a unanimous and homogeneous case law in this regard applied it to all established commercial relations.*

The same learned writers thus emphasize that the brutal termination of established commercial relations indeed authorizes the public prosecutor to submit the matter to the Commercial Court, thereby superabundantly consecrating the tortious nature of HEARST's liability.

*«We believe that the public prosecutor would also be competent for transmitting the investigative minutes and reports relating to civil faults, discriminatory practices, subordinated sales, abusive listings and de-listings or sales outside of a network. Indeed, Article L.442-6 of the Commercial Code allows the public prosecutor to submit the matter to the commercial civil court. The purpose of such action by the public prosecutor shall be to obtain, if not compensation of the loss caused to the victim, at least the termination of the practice in dispute» (idem no. 778, p. 253).*

Other learned authors concur:

*«the first finding resulting from the analysis of the case law studied in respect of the brutal termination of commercial relations establishes that the termination of a relation is no longer a private matter concerning only the companies maintaining the commercial relation.*

*Indeed, courts are more and more frequently called upon to decide on the manner in which a termination took place, the relation having preceded it thereby being dissected into the slightest details. This phenomenon is accentuated by the possibility given by the texts of law to the Ministry of the Economy to intervene in connection with, or even to initiate, proceedings based on a violation of the provisions of Article L.442-6-1 of the Commercial Code.*

*This possibility, which is already provided for by Article L.470-5 of the Commercial Code, had been strengthened by the law concerning the new economic regulations by adding a paragraph III to Article L.442-6 , which provides that 'the action is instituted before the competent civil or commercial court ... by the public prosecutor, by the Minister of the Economy or by the President of the Competition Council'» (Revue LAMY, Droit des Affaires (Business Law), September 2003, no.63, p. 16).*

The obligation to not terminate without a conforming notice is therefore a legal obligation as opposed to contractual obligations whose source lies in the provisions of the contract.

As concerns the provisions of Article L.442-6-5 of the Commercial Code, the issue is knowing whether the effect of the contractual provisions that are contrary to this text of law could supplant the right to notice instituted by law.

The issue for case law was to determine whether the provisions of Article L.442-6-5 were binding on the parties or if the latter could contractually depart therefrom.

In an important decision rendered on September 25, 2007, the Commercial Division of the Court of Cassation had just held that:

*«Clauses allowing for termination without notice cannot create an obstacle to the public policy provisions of Article L.442-6-1-5 of the Commercial Code ... »*

The Court of Cassation had no difficulty in finding that the provisions of Article L.442-6-5 constitute public policy.

Indeed, certain very exceptional provisions of this text of law, such as the sanction of a civil fine or the right granted the public prosecutor to intervene in the proceeding, indeed establishes that this constitutes economic public policy law that is part of French economic public policy that the parties do not have the freedom of supplanting by means of a contract.

The decision of September 25, 2007 is a very recent application of these precise provisions of the principle according to which the provisions of public policy are binding on the parties.

Moreover, the contrary solution would be very shocking since it would thus suffice to insert a stipulation in the contract according to which such contract can be terminated without notice, or following a notice set by the contract without taking into consideration the seniority of the commercial relation – legal criteria – in order to neutralize the legal provisions. In other words, it would never be applied.

This furthermore is why Article L.442-6-5 intentionally targets the <u>commercial</u> relation and not the <u>legal</u> relation.

The importance of this distinction has been stressed on numerous occasions by doctrine and case law (cf. hereinafter, p. 14.)

The courts are thus never bound by the terms of the contract by such or such of the terms and conditions of the legal relation when it is a question of determining the notice period of which the victim of the termination has been deprived.

In the case at bar, it is relevant to emphasize the fact that the commercial relation between the parties is linked to France.

In fact, since 1994 HEARST designated the French company, RMP, as its agent in France. For 14 years this company has been entrusted with issuing all the invoices, collecting the royalties paid by TROPICO DIFFUSION, ensuring the intermediation between the parties in negotiating commercial – licensed territories, lists of articles – and financial particulars, as well as the transmission of all the approval forms for the articles.

Consequently, the provisions of the general conditions designating the law of the State of New York shall be found inapplicable in the case at bar in favor of the provisions of Article 442-6-5 of the Commercial Code.

These same general conditions also contain a jurisdiction clause that is also not applicable in the case at bar.

## II.2 CONCERNING THE COMPETENCE OF THE COMMERCIAL COURT OF PARIS

The aforesaid general conditions also contain a jurisdiction clause:

«*Any action connected to or in relation with this agreement shall be instituted exclusively before the competent court of the State of New York or before the District Court of the United States for the Southern District of New York and no party can institute any action or claim before any other court. The parties agree to the designation of the personal jurisdiction of these courts and the official notice by letter of the procedural instruments.*»

Again, this jurisdictional clause must be set aside in the case at bar.

In fact, since the applicable substantive law is a policy law, French courts are necessarily competent, unless a norm that is hierarchically superior to the law of France – such as, for example, an international treaty – requires a contrary solution.

In order to settle this issue, case law merely applied the constitutional principle of the hierarchy of the norms that causes to prevail:

International conventions and treaties ratified by France over internal policy law, internal policy law over contracts (cf. aforecited decision of the Court of Cassation of September 25, 2007) and lastly contracts over internal law when such internal law does not constitute public policy, in which case the parties recover their freedom to make an exception thereto by means of their agreement.

Thus, in 1977, in a decision rendered by the Plenary Meeting (*Assemblée* Plènière) of the Court of Cassation began by deciding that;

«*The public policy nature of the substantive law does not require setting aside a rule of jurisdiction contained <u>in an international treaty</u> whose authority is superior to that of the internal law*» (Cass. Ass. Plénière 10-14-1977 – JDI 1978, p. 304.)

The most authoritative doctrine thereafter concluded that:

«*the issue that however remains subject to debate is to know whether the mandatory jurisdiction of a court could not be correlated with the finding that a policy law of the forum – in the case, French law – should be applicable in order to avoid that the litigant too easily avert the application thereof*» (F. Patant, Principe de souveraineté et conflit de juridiction (Principle of Sovereignty and Conflicts of Jurisdiction), Etude de droit international privé (Study of International Private Law), LGDJ 1999).

In fact, the judges of the merits thereafter rallied to this position (*Cour d'Appel* (Court of Appeals) of Aix en Provence 2-28-2006 – Jurisdata no.2006-310/351; Cass. Civ. 5/23/2006, Dalloz 2006, p. 1597.)

This solution is coherent. In fact, it would be curious that, consecrating the public policy nature of the provisions of Article L.442-6-5 of the Commercial Code and for this reason setting aside the foreign law designated by the parties, the judge of the merits would then request the District Court of the United States for the Southern District of New York to apply the laws of France.

The Court shall therefore set aside the jurisdictional clause appearing in Article 22 of the general conditions of the last licence agreements entered into between the parties and shall find that it has jurisdiction, since no convention between France and the United States creates an obstacle to the application of the provisions of Article 46 paragraph 2 of the Civil Procedure Code according to which:

«*The plaintiff may bring a proceeding, at his choice, in addition to the court of the place where the defendant resides (...)*
*– in matters of tort, the court of the place of the damaging event or that in the jurisdiction in which the damage had been sustained.* »


## III. HISTORY OF THE COMMERCIAL RELATIONS AND CIRCUMSTANCES OF THE TERMINATION

The relations between TROPICO DIFFUSION and HEARST began in 1993.

TROPICO DIFFUSION did not keep the first two agreements dated March 24, 1994 and July 6, 1995.

Four different agreements were entered into between the parties in 1997. The licensed territory

continued to be France and the Overseas Departments and Territories.

The scope of exploitation of the licence successively integrated lamps and statues (January 2, 1997), a group of textile products (January 2, 1997), a vast variety of table-ware and decorative articles (August 18, 1997), an extension of the period of exploitation for the textile articles (August 19, 1997) and glass articles (August 19, 1997.)

In 1998, TROPICO DIFFUSION entered the market for bathroom accessories (agreement of April 9, 1998), then the stationary and costume jewellery market (rider of May 28, 1998), and thereafter the market for cell phone accessories and leather goods (agreement of August 10, 1999.)

In 1999, all these agreements were renewed and thus covered 123 categories of articles (agreement of August 10, 1999).

In 2001, TROPICO DIFFUSION inaugurated two new distribution channels: hypermarkets and on-line sales (agreement of February 12, 2001.)

In 2002, the territories were extended to Spain, Portugal, the Benelux countries, Germany and Switzerland (agreement of January 8, 2002.)

In 2003 and 2004, new extensions were granted by HEARST for new new categories of products.

Thereafter, and up until notice of termination, all of the exchanges between the parties tended towards the continuation of an extension of the scope of the commercial relations between them.

Thus, on July 10, 2003, HEARST, through RMP, its French agent, confirmed that the licenses of competing companies, to wit, that of DEMONS & MERVEILLES, were transferred to TROPICO DIFFISION beginning on January 1, 2004.

However, as from the end of 2003, the commercial success of the 'Betty Boop' articles began to provoke interest on the part of infringers, with an intensity which became prejudicial to TROPICO DIFFUSION. The plaintiff complained thereof for the first time in a letter of October 6, 2003 sent to RMP.

This new difficulty thus began the subject matter of numerous exchanges between the parties through RMP.

In addition to the infringement, the successor of 'Betty Boop' also provoked the import into France of articles imported from other States of the European Union by virtue of the Community principle according to which no one can prohibit the marketing on the territory of any States of the European Union of a good that has been lawfully offered for sale for the first time on the territory of another Member State.

Mr. Ouri AMAR thus wrote to HEARST on December 10, 2004:

*«the market is very saturated as concerns boutique distribution ... by importers of foreign*

*products.»*

Consequently, TROPICO DIFFUSION began to request the granting of a European licence that – one can imagine – would have at the time appeared to it to constitute the legitimate consecration of 10 years of work.

HEARST, through RMP, its French agent, however treated this request in a patently dilatory manner. Thus, on April 26, 2006 RMP again wrote to TROPICO DIFFUSION:

*«I followed up with Cathy (HEARST) in order to tell her, concerning the list of the 'Betty Boop' 'products those that it would be possible to develop on the European level. She will get back to me towards the beginning of May since they are presently moving.»*

Thus, hardly one year before the notice of the definitive termination of commercial relations, TROPICO DIFFUSION was indeed discussing the granting of a European licence with HEARST.

On June 22, 2006, Mr. Ouri AMAR, Chairman of TROPICO DIFFUSION, wrote to HEARST:

*«Knowing each other for many years, you are perfectly aware of how much this project and this licence are dear to me and I thank you to do your utmost in order to not temper my enthusiasm.»*

At the same time, HEARST let the French market be invaded by imported or infringing products, without taking any serious initiative in this regard.

For example, on July 19, 2006 RMP sent an e-mail to TROPICO DIFFUSION that reveals that HEARST limited itself to verifying the origin of the 'Betty Boop' products.

Having become patently sensitive to the numerous attacks that TROPICO DIFFUSION underwent on its market, as well as the injustice that was done to it by not granting a European licence, HEARST's French agent for the first time took the plaintiff's defense by sending its principal the report of a meeting that took place during September 2006, pursuant to the terms of which:

*«the gift market has been very disrupted in relation to two leading licenses: (...) 'Betty Boop' (...).*

*Indeed, this market is practically unique in France, particularly for the resin statutes, watches, table-ware, and mini stationary; it is a niche consisting of quality products, the prices of which are generlly fairly high.*

*Numerous manufacturers in the Netherlands, Germany, Italy, and Spain have taken out licenses with the agent in their countries, not in order to sell them on their own territory but to export them to the only promising market: France.*

*Their distributors in France have disrupted this market by proposing very low prices, whose quality is average or even low, and without a distribution strategy: these products are in the*

*boutiques but also with discounters.*

*Furthermore, there is a new approach (with the exception of Tweety for which there are no longer any foreign licensees) on the French market. Certain major distributors who know the French market well are developing with their creation studios the products that are going to please French consumers and are requesting foreign licensed companies to manufacture them.*

*Certain distributors are going as far as having the products manufactured by their Chinese suppliers and paying back a commission to the foreign licensees.*

*The result is that French companies working in gifts, which are responsible for the development of the products, their promotion and marketing, have sales that are decreasing from year to year.*

*(...)*

*Concerning 'Betty Boo', TROPICO has developed hundreds of products over many years and our wish is the following:*

*To be the exclusive licensee for a range of products, of course not for all of Europe today, but for a certain number of countries (apart from France) in order to install 'Betty Boop' in the gift with our expertise and our distribution and stop these imports into France made by companies such as INTERSAT, IMA, EX RUTTEN (I can add you to this file), STARLINE, etc.*

*It goes without saying that for certain products, we must await the expiration of the existing agreements ...*

*The requirement of the hypermarkets is that they do not want unauthorized establishments on the market.»*

On October 9, 2006, Mr. Ouri AMAR acknowledged receipt of this memorandum:

*«Dear Pierre (head of RMP),*

*Thank you for your memo.*

*In order to prepare our meeting for today, please note the following points:*

*1/ 'Betty Boop' = perhaps this is the time to speak of a 'European licence' and this from now on with Cathy (HEARST) concerning the term of the agreement = 4 years would be the good period for all the distribution channels, we imagine a guaranteed minimum of US$700,000.»*

Concerning the term, RMP answered on October 9, 2006:

*«To be discussed with Cathy but this seems long to me.»*

Noting this reply, on February 8, 2007 TROPICO DIFFUSION sought a term of 3 years and consequently pro rated its guaranteed minimum proposal of US$700,000.

On February 14, 2007, TROPICO DIFFUSION however again alerted its partner concerning the problem of parallel imports:

*«I remind you that companies such as STARIMPORT in Spain are displaying a whole stand of watches and mugs with 'Betty Boop', without being licensed. It should be noted that they do so presenting signs on the stand announcing that they are the official sub-licenses of the current Dutch licensees ...*

*One can therefore legitimately ask oneself what is the future of 'Betty Boop' for TROPICO after all these years and better understand the steady decrease in our 'Betty Boop' income in France.»*

Five days following the sending of this e-mail, i.e., on February 19, 2007, TROPICO DIFFUSION was refused the European licence, which however had been sought for two-and-a-half years without TROPICO DIFFUSION being honored with the least reply whatsoever.

HEARST patently was more interested in the division of the market and the proliferation of infringers than the consolidation of its partnership with the petitioner.

Regardless, the termination of the commercial relation that was established since 1994 was still totally unforeseeable on February 19, 2007, although it was to take place on June 12, 2007.

Mr. Ouri AMAR again wrote on March 27, 2007:

*«Concerning the existing Betty and Baby agreements, we would be desirous of adding thereto small costume jewellry products, rings, necklaces, bracelets, ...*

*Concerning the future of Betty, I am awaiting the initial results of your internal work (the foreign countries) and remain at your disposal for another meeting in order to together determine a new and last European plan that would please Cathy ...»*

On June 4, 2007 TROPICO DIFFUSION had sent to RMP a proposal for a guaranteed minimum of 60,000 euros, thus falling back on its national licence.

On June 11, 2007 TROPICO DIFFUSION was also not honored by the least reply whatsoever:

*«Dear Pierre,*

*Faced with Cathy's insistence and her notification concerning the timing, we have forced ourselves to immediately answer you in agreement with you.*

*Since, no news.*

*When do you think you will have any since our offer is also 'limited' in terms of time, budget and decision ...*

*Thanking you in advance for your concrete reply. »*

On June 12, 2007, notice of the termination was given in reply to the above e-mail.

«*Dear Ouri,*

*Following a long conversation with Cathy de la King, she confirmed to me by e-mail that TROPICO's proposal is not acceptable, that Betty's positioning does not conform with her strategy and she confirms the non-renewal of the licence after December 31, 2007» (RMP).»*

We shall point out in passing that according to the defendant's own agent, the «positioning» of TROPICO DIFFUSION proceeded from the preconceived opinion of the quality of the articles.

Patently, such «positioning» was no longer compatible with the choice of the beneficiary, which intended to draw its income from the proliferation in Europe of small operators engaged in questionable practices.

TROPICO DIFFUSION could therefore not understand the reasons for its being ousted:

«*I confess not understanding Cathy Titus' position since this proposal had been made in agreement with you on the basis of 2 years and a large number of products being removed.*

*I also confess not at all understanding the strategy of Cathy Titus since your e-mail makes reference to it ...*

*Finally, what is your proposal?*

*I am therefore awaiting your call.*» (e-mail from TROPICO to RMP of June 12, 2007).

Adopting a posture that was a bit Kafkian, HEARST's representatives continued to explain their decision by a search for quality:

«*Good evening Ouri,*

*I therefore spoke again to Cathy Titus (...) she added 'in fact, as a policy, we are pursuing higher-end'. Her responsibility is to protect the integrity of 'Betty Boop'.*» (e-mail from RMP to TROPICO of June 13, 2007).

TROPICO DIFFUSION which, precisely had always given priority to quality, could not understand the situation except as one resulting from a misunderstanding; consequently it took the initiative as of June 14, 2007 to explain its position directly to the American beneficiary.

However, on July 18, 2007, then on August 12, 2007, the termination of the established commercial relation was confirmed, which was to occur on December 31, 2007.

Thus, it has been established that since French law was applicable and the Commercial Court of Paris had jurisdiction to rule, a commercial relation was well established between the parties to the dispute since 1994, this relation being terminated at the initiative of the defendant, at the earliest on June 12, 2007 to occur on December 31st of the same year.

The examination of the decisions of the judges of the merits rendered in light of the provisions of Article L.442-6-5 of the Commercial Code shall clearly reveal that the granted notice period, which was hardly 6 months, is notably inadequate, with regard to the criteria promulgated by this text of law.

However, before examining the loss sustained by TROPICO DIFFSION a last issue must be examined:

## IV. COMMERCIAL RELATIONS/LEGAL RELATIONS

In the case at bar, it is totally irrelevant that the commercial relation established since 1993 was put into contractual form by a succession of fixed-term licence agreements.

Indeed, the reiteration of the fixed term agreements over a 15-year period was indeed characteristic of a commercial relation, the designation having been intentionally adopted by the lawmaker as opposed to what could have been a strictly a legal relation:

*«Consequently, as the Court of Cassation very recently confirmed (Cass. Com. 4-23-03, no.01-11.664), these provisions apply to all commercial relations between firms (...). In practice, the French courts, as veritable judges of the economy, do not hesitate to go beyond the contractual reality of a relation in order to keep to its commercial reality» (Revue LAMY -Droit des Affaires – September 2003, no. 63, p. 6).*

## V. CONCERNING THE LOSS

The determination of the amount of the loss results from the application of the principles established by the courts in such matters.

A determination must first be made as to the length of the notice period that the victim of the brutal termination should have been entitled to. Then the gross margin that would been made during this period is calculated by a linear projection established on the basis of the last years before the current financial year in the course of which the termination took place. There must then be deducted therefrom the margin actually made during the granted notice period.

Given the long period of the relation, a term of two years is considered as normal by the Commercial Courts, before applying the rule of doubling provided by law.

The below table shows the evolution of the amount of sales made by TROPICO DIFFUSION with the 'Betty Boop' articles, which went from 241,000 euros in 1994 to 1,200,000 euros on the average of the last two financial years, i.e., more than 12% of the total sales of the company.

| | 2006 | 2005 | 1994 | 1993 |
|---|---|---|---|---|
| TROPICO SALES | 9,518,565 | 9,759,208 | 5,990,396 | 5,426,311 |
| 'BETTY BOOP' SALES<br>% of total sales | 1,037,057<br>10.9% | 1,487,924<br>15.2% | 241,846<br>4.0% | 265,217<br>4.9% |
| 'BETTY BOOP' ROYALTIES<br>Average rate | 105,682<br>10.2% | 150,711<br>10.1% | 18,596<br>7.7% | 21,217<br>8.0% |
| AGREEMENT NO. | 101 751 | 101 751 | 6394 – 6799 –<br>7358 – 7373 - 8065 | 6394 – 6799 –<br>7358 – 7373 - 6517 |

It results moreover from the facts set out earlier that TROPICO DIFFUSION was notoriously known to be the 'Betty Boop' licensee and that the parties to the dispute had organized a veritable partnership between them, the 'Betty Boop' articles having been marketed during the last years under a common trademark using the sign of the network of the TROPICO DIFFUSION franchises: «Avenue of the Stars.»

From such situation there results the doubling of the notice period by virtue of the legal rule according to which, «the minimal term of the notice period is the double of that which would be applicable if the product was not furnished under the trademark of the distributor» (Commercial Code, Article L.442-6-5).

Consequently, TROPICO DIFFUSION prays for the awarding of a sum of 3,332,974 euros in money damages corresponding to four years of margin, taking into account the margin rate of 66% and average annual sales of 1,262,490 euros (2006/2005)

## ON THESE GROUNDS

*IN VIEW of the provisions of Article L.442-6-5,*

- Find that a commercial relation had been established between HEARST HOLDINGS and TROPICO DIFFUSION since 1993,
- Find that the products marketed by TROPICO DIFFUSION were sold under a trademark incorporating the sign of its franchise network,
- Find that this commercial relation had been terminated at the initiative of HEARST HOLDINGS at the earliest on 12 June 2007 to occur on 31 December of the same year,
- Consequently order HEARST HOLDINGS to pay TROPICO DIFFUSION the sum of 3,332,974 euros in damages,
- Order it to pay a sum of 50,000 euros pursuant to the provisions of Article 700 of the New Civil Procedure Code,
- Order it to pay all costs,
- Order the provisional enforcement of the decision to be rendered, in its entirety.

WITHOUT PREJUDICE

## LIST OF THE EXHIBITS CONNECTED TO THIS SUMMONS WITHIN A BRIEF TIME PERIOD

1. Excerpt Kbis (excerpt from the Register of Trade and companies) of TROPICO DIFFUSION,
2. Press file,
3. Advertising concerning professional shows,
4. 'Betty Boop' licence agreements between 1994 and 2007,
5. E-mail from Pierre GAUCHER (RMP) to Ouri AMAR (TROPICO) of 7/19/06,
6. E-mail from Pierre GAUCHER (RMP) to Ouri AMAR (TROPICO) of 10/2/06 and memo of the meeting of September 2006,
7. E-mail from Ouri AMAR (TROPICO) to Pierre GAUCHER (RMP) of 10/9/06,
8. E-mail from Ouri AMAR (TROPICO) to Pierre GAUCHER (RMP) of 6/12/07,
9. E-mail from Pierre GAUCHER (RMP) to Ouri AMAR (TROPICO) of 6/12/07 notifying termination of the commercial relations on 12/31/07,
10. Registered letter return receipt requested from KING FEATURES Licensing to TROPICO DIFFUSION of 8/2/07 notifying the non-renewal of the 'Betty Boop' licence agreement,
11. Article approval forms under a common trademark (8),
12. RMP/'Betty Boop' sales table,
13. Decision of the Court of Cassation of 9/25/07,
14. E-mail from Ouri AMAR (TROPICO) to Pierre GAUCHER (RMP) of 2/8/07,
15. E-mail from Pierre GAUCHER (RMP) to Ouri AMAR (TROPICO) of 3/30/07,
16. E-mail from Ouri AMAR (TROPICO) to Pierre GAUCHER (RMP) of 4/11/07,
17. E-mail from Pierre GAUCHER (RMP) to Ouri AMAR (TROPICO) of 4/25/07,
18. E-mail from Pierre GAUCHER (RMP) to Ouri AMAR (TROPICO) of 6/4/07,
19. E-mail from Ouri AMAR (TROPICO) to Pierre GAUCHER (RMP) of 6/4/07,
20. E-mail from Ouri AMAR (TROPICO) to Pierre GAUCHER (RMP) of 6/11/07,
21. E-mail from Pierre GAUCHER (RMP) to Ouri AMAR (TROPICO) of 6/12/07,
22. E-mail from Ouri AMAR (TROPICO) to Pierre GAUCHER (RMP) of 6/12/07,
23. E-mail from Pierre GAUCHER (RMP) to Ouri AMAR (TROPICO) of 6/13/07,
24. Letter from TROPICO to KING FEATURES of 6/14/07,
25. TROPICO DIFFUSION's corporate accounts for financial year 2006.




## SIGNIFICATION D'UNE ORDONNANCE ET ASSIGNATION A BREF DELAI DEVANT LE TRIBUNAL DE COMMERCE DE PARIS

En vertu d'une ordonnance rendue par Monsieur le Président du Tribunal de Commerce de PARIS en date du 21 DECEMBRE 2007 sur requête à lui présentée, dont copie est jointe au présent acte.

L'AN DEUX MILLE ~~HUIT~~ ET LE Onze ════ JANVIER  A  M HEURES ∞

### A LA DEMANDE DE :

La société **TROPICO DIFFUSION**, SAS au capital de 1.198.176 euros, immatriculée au RCS de CRETEIL sous le n° B 320 268 402, ayant son siège social 26/28 rue Auguste Perret, Parc d'activité de la Petite Bruyère 94800 VILLEJUIF, agissant poursuites et diligences de son Président, Monsieur Ouri AMAR domicilié en cette qualité audit siège.

**Ayant pour Avocat plaidant:**
Maître Julien HAY
S.C.P. CHEMOULI-DAUZIER & Associés
Avocat au Barreau de PARIS
12, Boulevard Raspail - 75007 PARIS
Tél. 01.45 49 00 19 - Vestiaire P 224

**Ayant pour Mandataire au Commerce:**
Maître Nicole DELAY PEUCH
Mandataire au Commerce
29 boulevard Victor 75015 PARIS

**Nous, SCP Philippe DUPARC et Carole DUPARC-CRUSSARD, Huissiers de Justice Associés – Audienciers près le Tribunal de Commerce de PARIS, y demeurant, 1 Boulevard du Palais – PARIS IVème, par l'un d'eux soussigné,**

### I - DONNE ASSIGNATION A :

La société **HEARST HOLDINGS, INC**, King Features Syndicate Division, 888 Seventh Avenue New York, NEW YORK, 10019, USA, prise en la personne de ses représentants légaux domiciliés en cette qualité audit siège.

Où étant et parlant à :

D'avoir à comparaître par devant Messieurs les Président et Juges composant le Tribunal de Commerce de PARIS, sis 1 Quai de la Corse 75004 PARIS, à l'audience qui se tiendra le **13 MARS 2008 A 12 HEURES 00 – 19ème Chambre.**

### IMPORTANT

Les parties se défendent elles-mêmes. Elles ont la faculté de se faire assister ou représenter par toutes personnes de leur choix. Le représentant, s'il n'est avocat doit justifier d'un pouvoir spécial.
La partie qui ne comparaît pas s'expose à ce qu'une décision soit rendue contre elle sur les seuls éléments fournis par son adversaire.
Les pièces sur lesquelles est fondée la demande son indiquées en fin d'acte.

**LESQUELLES SONT DENONCEES EN ANNEXE DU PRESENT ACTE SUR 477 FEUILLES.**

### OBJET DE LA DEMANDE

## I.    RAPPEL DES FAITS

La société TROPICO DIFFUSION fabrique et commercialise, sous licences et depuis 20 ans, des jouets et des objets de décoration.

TROPICO DIFFUSION a été créée par Monsieur Ouri AMAR, amateur passionné de bandes dessinées.

Il y a 15 ans, Monsieur Ouri AMAR a eu l'initiative de démarcher aux Etats-Unis les représentants de KING FEATURES, filiale du Groupe HEARST, et détenteurs des droits d'exploitation de « Betty Boop ».

Monsieur AMAR était en effet convaincu du potentiel de développement de ce personnage qui ne faisait à l'époque, en Europe, l'objet d'aucune exploitation commerciale autonome.

TROPICO DIFFUSION est ainsi devenue, pour la première fois en 1994, le licencié en France et dans les Dom Tom, de la HEARST CORPORATION pour le personnage « Betty Boop ».

Afin d'en promouvoir le développement au niveau national, TROPICO DIFFUSION s'est engagée dans la création d'un réseau de magasins franchisés à l'enseigne « Avenue of the Stars ».

3

TROPICO DIFFUSION voulait créer un maillage national de magasins dédiés à l'univers des personnages de la bande dessinée où celui de « Betty Boop » serait délibérément mis en avant, aussi bien dans l'exposition des objets au public que dans toute la documentation commerciale et publicitaire du réseau.

Au cours des 15 dernières années, TROPICO DIFFUSION a ainsi œuvré à la création de ce réseau qui compte aujourd'hui 26 magasins.

Pour l'alimenter, TROPICO DIFFUSION a employé une équipe de création, les 19 contrats de licences qui se sont succédés au cours des 15 années de relations commerciales entre les parties n'emportant qu'une concession du droit de reproduire et de vendre – sur une liste d'objets désignés – le personnage « Betty Boop », TROPICO DIFFUSION ayant toujours été seule en charge de la création de tous les modèles, en ce comprises la création des costumes du personnage, de ses nombreuses postures ainsi que celle des éléments de décors et de textes reproduits sur les objets.

L'activité créatrice de TROPICO DIFFUSION a ainsi investi des segments très variés :

- Le textile,
- L'horlogerie,
- Les articles de cuisine,
- La vaisselle,
- Les accessoires parascolaires,
- Les articles de décoration,
- Les accessoires de mode,
- etc …

Sans la richesse, la diversité et le renouvellement constant de ces produits, TROPICO DIFFUSION ne serait pas parvenue à installer des objets « Betty Boop » sur le marché français.

Le dossier de presse, absolument considérable - versé aux débats – atteste à quel point la requérante a fait tous ses efforts en terme de développement.

Ceci ressort également des nombreuses pièces produites par TROPICO DIFFUSION qui mettent en exergue son activité de promotion commerciale de « Betty Boop », lors de toutes les grandes manifestations professionnelles comme le Salon « Maison et Objets » où pendant 15 ans, « Betty Boop » a manifestement été l'effigie du stand loué par TROPICO DIFFUSION.

La relation commerciale entre TROPICO DIFFUSION et HEARST est devenue si étroite qu'avec l'accord de l'ayant-droit, de nombreux objets ont été fabriqués sous la marque commune « *Avenue of the Stars, concept by O.A.* » / « *King Features Syndicate Inc / Fleischer Studios Inc* ».

Si de telles créations caractérisent des œuvres dérivées au plan du droit d'auteur, il convient surtout de relever ici que, davantage encore que tout autre indice à cet égard, la mise en commun par les parties de leur marque respective, révélée ostensiblement à l'égard des tiers, sur une production dont les produits d'exploitation sont partagés entre elles, caractériserait en

4

tant que de besoin, l'existence d'un contrat de société en participation et corrobore a fortiori le fait que la relation commerciale est allée bien au-delà de l'exécution de contrats de licences successifs.

Il n'en demeure pas moins vrai que TROPICO DIFFUSION a été victime le 12 juin 2007, de la part de HEARST, d'une rupture totale de la relation commerciale à échéance au 31 décembre 2007, un tel préavis scandaleusement insuffisant, caractérisant la commission du délit civil prévu et réprimé par l'article 442-6-1-5$^{ème}$ du Code de Commerce.

Outre la réparation du préjudice par l'octroi de dommages et intérêts, rappelons que ce texte réprime d'une amende civile de 2 millions d'euros et autorise les interventions à instance du Ministère Public et du Ministère de l'Economie, dès lors qu'a été *« rompue même partiellement, une relation commerciale établie sans préavis écrit tenant compte de la durée de la relation commerciale ... Lorsque la relation commerciale porte sur la fourniture de produits sous marque de distributeur, la durée minimale de préavis est double de celle qui serait applicable si le produit n'était pas fourni sous marque de distributeur »*.

Faisant fi du fait que ces dispositions constituent en France une Loi de police, solution d'évidence consacrée aujourd'hui par la Cour de Cassation, les représentants de HEARST ont cru pouvoir en éluder l'application au motif qu'une disposition extraite des conditions générales de leurs contrats de licences désignait comme loi applicable aux contrats, la loi de l'état de New York.

## II.    SUR L'APPLICATION DE LA LOI FRANCAISE

### II.1.    L'ORDRE PUBLIC

Un article 22 inséré dans les conditions générales elles-mêmes annexées aux derniers contrats de licences conclus entre les parties stipule que :

*« Le présent contrat sera régi par les lois de l'Etat de New York applicables aux contrats qui y sont exécutés »*

L'obligation à préavis qui constitue le fondement de la présente instance trouve sa source dans une disposition de la Loi.

C'est bien ce que souligne en cette matière la doctrine la plus autorisée :

*« L'article L.442-6 du Code de Commerce (ordonnance n°86-1243 du 1$^{er}$ décembre 1986 – article 36 ancien) dispose que :*

*les (...) référencements et déréférencements abusifs (...) engagent la responsabilité de leur auteur et l'oblige à réparer le préjudice causé.*

*La proposition semble évidente. Tout comportement fautif, et l'on ne peut discuter cette qualification par exemple de la discrimination injustifiée ou de la vente subordonnée, engage la responsabilité <u>délictuelle</u> de son auteur.*

*Etait-il besoin de reprendre ainsi la règle de l'article 1382 du Code Civil ?*

*Ce rappel du droit commun n'est pas inutile : il évite que la dépénalisation de ces pratiques ne soit interprétée comme une reconnaissance de leur licéité.*

*En outre, la mise en oeuvre de la responsabilité civile des auteurs des pratiques visées à l'article L.442-6 du Code de Commerce obéit à des règles spéciales :*

*L'action en responsabilité civile peut être exercée non seulement par la victime mais encore par le Parquet, le Ministre de l'Economie et le Président du Conseil de la Concurrence (...)* (LAMY Droit Economique « concurrence, distribution, consommation », édition 2005 – n° 769 p 251 et 252).

Il convient de souligner par ailleurs que l'article L.442-6 du Code de Commerce fait partie des *« pratiques restrictives »* de concurrence visées au chapitre II du titre IV du même Code intitulé *« de la transparence, des pratiques restrictives de concurrence et d'autres pratiques prohibées ».*

L'article L.442-6 réprime différentes pratiques restrictives de concurrence, parmi lesquelles la *rupture brutale de relations commerciales établies* du paragraphe 5, qui incrimine la pratique souvent qualifiée de déréférencement abusif, tant il est vrai que ce texte avait initialement pour vocation principale de réprimer les pratiques de la grande distribution à l'égard de ses fournisseurs, avant qu'une jurisprudence unanime et homogène à cet égard n'en fasse application à toutes *les relations commerciales établies.*

Les mêmes auteurs soulignent ainsi que la rupture brutale de relations commerciales établies autorise bien le Parquet à saisir la juridiction consulaire, consacrant ainsi surabondamment le caractère délictuel de la responsabilité de HEARST :

*« Le Procureur de la République devrait également être compétent, pensons-nous, pour transmettre les procès-verbaux et rapports d'enquête relatifs à des fautes civiles, de pratiques discriminatoires, ventes subordonnées, référencement et <u>déréférencement abusifs</u> ou ventes hors réseau. En effet, l'article L.442-6<sup>e</sup> du Code de Commerce permet au Parquet de saisir le Tribunal Civil Commercial. Cette action du Parquet aura pour but d'obtenir, sinon réparation du préjudice causé à la victime, du moins, la cessation de la pratique litigieuse »* (idem n°778 p 253).

D'autres auteurs concluent dans le même sens :

*« la première constatation qui ressort de l'analyse de la jurisprudence étudiée en matière de rupture brutale des relations commerciales établies est que la rupture d'une relation n'est plus une affaire privée concernant les seules sociétés entretenant la relation commerciale.*

*Les Tribunaux sont en effet appelés, de plus en plus fréquemment, à se prononcer sur la manière dont se déroule une rupture, la relation ayant précédé se retrouvant alors disséquée dans ses moindres détails. Ce phénomène se trouve accentué par la possibilité donnée par les textes au Ministère de l'Economie d'intervenir dans le cadre, voire même d'initier, des*

6

*procédures fondées sur une violation des dispositions de l'article L.442-6-1$^{er}$ du Code de Commerce.*

*Cette possibilité déjà prévue par l'article L.470-5 du Code de Commerce a été renforcée par la loi sur les nouvelles régulations économiques en ajoutant à l'article L.442-6 un paragraphe III, qui prévoit que « l'action est introduite devant la juridiction civile ou commerciale compétente ... par le Ministère Public, par le Ministre chargé de l'Economie ou par le Président du Conseil de la Concurrence » »* (Revue LAMY, Droit des Affaires, septembre 2003, n°63 p16).

L'obligation de ne pas rompre sans un préavis d'une durée conforme est donc d'une obligation légale par opposition aux obligations contractuelles qui trouvent leur source dans les stipulations du contrat.

S'agissant des dispositions de l'article L.442-6-5 du Code de Commerce, la question s'est posée de savoir si des stipulations contractuelles contraires à celles de ce texte pouvaient avoir pour effet d'évincer le droit à préavis institué par la Loi.

Il s'est ainsi agi, pour la jurisprudence, de déterminer si les dispositions de l'article L.442-6-5 s'imposaient aux parties ou s'il était permis à celles-ci d'y déroger contractuellement.

Dans une importante décision rendue le 25 septembre 2007, la chambre commerciale de la Cour de Cassation vient de juger que :

*« Il ne peut être fait obstacle aux dispositions d'ordre public de l'article L.442-6-1-5$^{ème}$ du Code de Commerce par des clauses permettant une rupture sans préavis ... »*

La Cour de Cassation n'a pas eu de difficulté à caractériser l'ordre public qui s'attache aux dispositions de l'article L.442-6-5.

En effet, certaines des dispositions très exceptionnelles de ce texte, telle que la sanction de l'amende civile ou le droit conféré au Ministère Public d'intervenir à l'instance, établissent bien qu'il s'agit d'une loi de police économique qui participe de l'ordre public économique français que les parties n'ont donc pas la liberté d'évincer contractuellement.

L'arrêt du 25 septembre 2007 est une application très récente à ces dispositions précises du principe selon lequel les dispositions d'ordre public s'imposent aux parties.

La solution contraire serait au demeurant très choquante puisqu'il suffirait alors d'insérer dans un contrat une stipulation selon laquelle celui-ci peut être rompu sans préavis, ou à l'issue d'un préavis contractuellement fixé sans prendre en compte l'ancienneté de la relation commerciale – critère légal – pour que le dispositif législatif soit neutralisé. C'est dire qu'il ne trouverait alors jamais à s'appliquer.

C'est par ailleurs à dessein que l'article L.442-6-5 vise la relation commerciale et non pas la relation juridique.

L'importance de cette distinction a été maintes fois soulignée par la doctrine et par la jurisprudence (cf. : ci-après, p.14.)

Les Tribunaux ne sont ainsi jamais liés par les termes du contrat par telle ou telle des modalités de la relation juridique, lorsqu'il s'agit de déterminer la durée du préavis dont a été privée la victime de la rupture.

Encore faut-il souligner, en l'espèce, la pertinence du rattachement à la France de la relation commerciale entre les parties.

Depuis 1994, HEARST a en effet désigné en qualité de mandataire, en France la société de droit français RMP. Pendant 14 ans, celle-ci a été chargée de l'émission de toutes les facture, l'encaissement des redevances payées par TROPICO DIFFUSION, l'intermédiation entre les parties dans la négociation des données commerciales – territoires concédés, listes d'objets – et financières, ainsi que la transmission de tous les formulaires d'approbation des objets.

Les dispositions des conditions générales désignant la Loi de l'Etat de New York seront donc déclarées inapplicables en l'espèce, au profit des dispositions de l'article 442-6-5 du Code de Commerce.

Ces mêmes conditions générales comportent également une clause d'attribution juridictionnelle également inapplicable en l'espèce.

## II.2  SUR LA COMPETENCE JURIDICTIONNELLE DU TRIBUNAL DE COMMERCE DE PARIS

Les conditions générales précitées comportent également une clause d'attribution juridictionnelle :

*« Toute action liée ou en relation avec le présent contrat devra être engagée exclusivement devant le Tribunal compétent de l'Etat de New York ou devant la Cour de District des Etats-Unis pour le District Sud de New York et aucune partie ne pourra engager aucune action ou demande devant aucune autre juridiction. Les parties consentent à la désignation de la juridiction personnelle de ces tribunaux et à la notification officielle par courrier des actes de procédure ».*

A nouveau, cette clause d'attribution juridictionnelle doit être écartée en l'espèce.

En effet,

Dès lors que la loi de fond applicable est une loi de police, les tribunaux français sont nécessairement compétents, à moins qu'une norme hiérarchiquement supérieure à la loi française – comme un traité international par exemple – ne commande une solution contraire.

Pour régler cette question, la jurisprudence n'a fait qu'appliquer le principe constitutionnel de la hiérarchie des normes faisant prévaloir :

Les conventions et traités internationaux ratifiés par la France sur la loi de police interne, la loi de police interne sur le contrat (cf. : arrêt précité de la Cour de Cassation du 25-9-07) et enfin le contrat sur la loi interne dès lors que celle-ci ne présentant pas un caractère d'ordre public, les parties recouvrent alors la liberté d'y déroger par leur convention.

8

Ainsi, en 1977, la Cour de Cassation a commencé dans un arrêt rendu en Assemblée Plénière, par décider que :

*« le caractère d'ordre public de la loi de fond ne commande pas d'écarter une règle de compétence contenue dans un traité international dont l'autorité est supérieure à celle de la loi interne »* (Cass. Ass. Plénière 14-10-1977 –JDI 1978, p 304).

Par la suite la doctrine la plus autorisée concluait que :

*« la question demeure cependant discutée de savoir si la compétence impérative d'une juridiction ne pourrait pas être corrélée au constat qu'une loi de police du for – en l'espèce, la loi française – se veut applicable, afin d'éviter au plaideur d'en détourner trop facilement l'application »* (E.Pataut, Principe de souveraineté et conflit de juridiction, Etude de droit international privé, LGDJ 1999).

Effectivement, les juges du fond se sont par la suite ralliés à cette position (Cour d'Appel d'Aix en Provence 28-2-2006 – Jurisdata n°2006-310/351 ; Cass. Civ. 23/5/2006, Dalloz 2006, p1597).

Cette solution a le mérite de la cohérence. Il serait en effet curieux que, consacrant le caractère d'ordre public des dispositions de l'article L.442-6-5 du Code de Commerce et écartant pour cette raison la loi étrangère désignée par les parties, le Juge du fond invite ensuite la Cour de District des Etats-Unis pour le District Sud de New York à appliquer la Loi Française.

Le Tribunal écartera en conséquence la prorogation conventionnelle de compétence figurant dans l'article 22 des conditions générales des derniers contrats de licences conclus entre les parties et retiendra sa propre compétence, aucune convention entre la France et les Etats-Unis ne faisant obstacle à l'application des dispositions de l'article 46 alinéa 2 du Code de Procédure Civile selon lesquelles :

*« Le demandeur peut saisir à son choix, outre la juridiction du lieu où demeure le défendeur (…)*
*- en matière délictuelle, la juridiction du lieu du fait dommageable ou celle dans le ressort de laquelle le dommage a été subi ».*


## III.    HISTORIQUE DE LA RELATION COMMERCIALE ET CIRCONSTANCES DE LA RUPTURE

Les relations entre TROPICO DIFFUSION et HEARST se sont nouées en 1993.

Les deux premiers contrats en date des 24 mars 1994 et 6 juillet 1995 n'ont pas été conservés par TROPICO DIFFUSION.

En 1997, quatre contrats différents ont été signés entre les parties. Le territoire concédé était toujours la France et les Dom Tom.

Le champ d'exploitation de la licence a intégré successivement des lampes et statues (2 janvier 1997), un ensemble de produits textiles (2 janvier 1997), une grande variété d'articles de vaisselles et de décoration (18 août 1997), une extension de la période d'exploitation pour les articles textiles (19 août 1997), des articles en verre (19 août 1997).

En 1998, TROPICO DIFFUSION s'attaquait au marché des accessoires de salle de bain (contrat du 9 avril 1998), puis à celui de la papèterie et des bijoux fantaisies (avenant du 28 mai 1998), ensuite à celui des accessoires de téléphones portables ainsi qu'à la maroquinerie (contrat du 10 septembre 1998).

En 1999, tous ces contrats ont été renouvelés et couvraient alors un champ de 123 catégories d'articles (contrat du 10 août 1999).

En 2001, TROPICO DIFFUSION inaugurait deux nouveaux canaux de distribution : les hypermarchés et la vente en ligne (contrat du 12 février 2001).

En 2002, les territoires étaient étendus à l'Espagne, le Portugal, le Benelux, l'Allemagne, et la Suisse (contrat du 8 janvier 2002).

De nouvelles extensions étaient concédées par HEARST pour de nouvelles catégories de produits en 2003 et en 2004.

Par la suite, jusqu'à la notification de la rupture, les échanges intervenus entre les parties sont tous allés dans le sens de la poursuite d'une extension de l'étendue de la relation commerciale.

C'est ainsi que :

Le 10 juillet 2003, par l'intermédiaire de son mandataire français, la société RMP, HEARST confirmait que les licences de sociétés concurrentes, en l'occurrence, celles de la société DEMONS & MERVEILLES, étaient transférées à TROPICO DIFFUSION à compter du 1er janvier 2004.

Toutefois, à partir de la fin de l'année 2003, le succès commercial des objets « Betty Boop » commençait à susciter l'intérêt des contrefacteurs, avec une intensité qui devenait préjudiciable à l'activité de TROPICO DIFFUSION, ce que la requérante déplorait pour la première fois dans un courrier du 6 octobre 2003 adressé à RMP.

Cette nouvelle difficulté commençait alors à faire l'objet de très nombreux échanges entre les parties par l'intermédiaire de RMP.

En plus de la contrefaçon, le succès de « Betty Boop » provoquait également l'importation, en France, d'objets importés d'autres états de l'Union Européenne en vertu du principe communautaire selon lequel nul ne saurait interdire la commercialisation sur le territoire de l'un quelconque des Etats de l'Union Européenne d'un bien mis licitement en vente pour la première fois sur le territoire d'un autre état membre.

C'est ainsi que le 10 décembre 2004, Monsieur Ouri AMAR écrivait à HEARST :

*« pour la distribution en boutique, le marché est très saturé ....par des importateurs de produits étrangers ».*

TROPICO DIFFUSION commençait en conséquence à revendiquer l'octroi d'une licence européenne qui – on le conçoit – lui paraissait constituer, à l'époque, la consécration légitime de 10 années de travail.

Par l'intermédiaire de son mandataire français, RMP, HEARST traita pourtant cette demande de façon manifestement dilatoire puisque le 26 avril 2006, RMP écrivait encore à TROPICO DIFFUSION :

*« J'ai relancé Cathy (HEARST) pour lui dire, sur la liste des produits « Betty Boop », ceux qu'il serait possible de développer sur le plan européen. Elle revient vers moi début mai car ils sont en plein déménagement ».*

Ainsi, un an à peine avant la notification de la rupture définitive de la relation commerciale, TROPICO DIFFUSION était bien en discussion avec HEARST au sujet de l'octroi d'une licence européenne.

Le 22 juin 2006, Monsieur Ouri AMAR, Président de TROPICO DIFFUSION, écrivait à HEARST :

*« Nous connaissant depuis de longues années, vous savez parfaitement combien ce projet et cette licence me tiennent à cœur et je vous remercie de faire de votre mieux afin de ne pas tempérer mon enthousiasme ».*

Dans le même temps, HEARST laissait le marché français être envahi par des produits importés ou contrefaits, sans prendre à cet égard la moindre initiative sérieuse.

Le 19 juillet 2006, RMP adressait par exemple un courrier électronique à TROPICO DIFFUSION qui révèle que HEARST se contentait « de vérifier l'origine des produits « Betty Boop » ».

Devenu manifestement sensible à la question des nombreuses attaques que TROPICO DIFFUSION subissait sur son marché, ainsi qu'à l'injustice qui lui était faite en ne lui concédant pas une licence européenne, le mandataire français de HEARST prenait pour la première fois la défense de la requérante en adressant à sa mandante le compte rendu d'une réunion intervenue dans le courant du mois de septembre 2006, dans les termes suivants :

*« le marché du gift a été très perturbé par rapport par rapport à deux licences phares : (...) Betty Boop (...).*

*En effet, ce marché est, et notamment pour les figurines en résine, horlogerie, art de la table, mini papeterie, quasi unique en France ; il s'agit d'une niche avec des produits de qualité, de prix généralement assez élevés.*

11

*De nombreux fabricants en Hollande, Allemagne, Italie, Espagne ont pris des licences avec l'agent dans leurs pays, non pas pour les vendre sur leur propre territoire mais pour les exporter sur le seul marché porteur : la France.*

*Leurs distributeurs en France ont perturbé ce marché en proposant des prix très bas, avec une qualité moyenne voire faible, et sans stratégie de distribution : ces produits sont dans les boutiques mais aussi chez les discounters.*

*De plus, une nouvelle approche s'est faite (à l'exception de Tweety pour lequel il n'y a plus de licenciés étrangers) sur le marché français. Certains distributeurs importants qui connaissent bien le marché français développent avec leurs studios de création les produits qui vont plaire aux consommateurs français et demandent aux sociétés licenciées étrangères de leur fabriquer.*

*Certains distributeurs vont même jusqu'à faire fabriquer par leurs fournisseurs chinois les produits et reversent une commission aux licenciés étrangers.*

*Le résultat est que les sociétés françaises qui travaillent dans le gift, qui ont à leur charge le développement des produits, leur promotion et commercialisation, ont des chiffres d'affaires qui baissent d'année en année.*

*(...)*

*Concernant « Betty Boop », TROPICO a développé des centaines de produits depuis de nombreuses années et notre souhait est le suivant :*

*Etre le licencié exclusif pour une gamme de produits, bien sûr pas pour toute l'Europe aujourd'hui mais pour un certain nombre de pays (France étant à part) pour installer « Betty Boop » dans le gift avec notre expertise et notre distribution et arrêter ces importations en France de produits réalisés par des sociétés telles que INTERSAT, IMA , EX RUTTEN (je peux vous joindre à ce dossier), STARLINE etc ...*

*Il va de soi que pour certains produits, nous devrons attendre l'échéance des contrats existants ...*

*L'exigence des hypermarchés est qu'ils ne veulent pas des implantations sauvages sur le marché ».*

Le 9 octobre 2006, Monsieur Ouri AMAR accusait réception de ce mémorandum :

*Cher Pierre (dirigeant de RMP),*

*Merci de votre mémo.*

*Afin de préparer notre réunion de ce jour, je vous prie de bien vouloir noter les points suivants :*

*1/ Baby Boop = peut-être est-ce le moment de parler « licence européenne » et ce, dès maintenant avec Cathy (HEARST) (...) concernant la durée du contrat = 4 ans serait la bonne durée pour tous les circuits de distribution, nous imaginons un minimum garanti de 700.000 US$*

Le 9 octobre 2006, sur la durée, RMP répondait :

*« A discuter avec Cathy mais cela me semble long ».*

Prenant acte de cette réponse, TROPICO DIFFUSION sollicitait le 8 février 2007, une durée de 3 ans en proratisant en conséquence son offre de minimum garanti de 700.000 US$.

A nouveau, le 14 février 2007, TROPICO DIFFUSION alertait toutefois son partenaire sur le problème des importations parallèles :

*« Je vous rappelle que des sociétés comme STARIMPORT en Espagne exposent tout un stand de bagagerie et mugs avec « Betty Boop » sans être licenciée. Ils le font d'ailleurs savoir en présentant des pancartes sur le stand annonçant qu'ils sont des sous-licenciés officiels des actuels licenciés hollandais ...*

*On peut donc légitimement se demander quel est l'avenir de « Betty Boop » pour TROPICO après toutes ces années et mieux comprendre donc la baisse régulière de nos revenus Betty Boop en France ».*

5 jours après l'envoi de ce mail, soit le 19 février 2007, TROPICO DIFFUSION se voyait refuser la licence européenne, pourtant sollicitée depuis 2 ans et demi sans que TROPICO DIFFUSION ait été honorée de la moindre réponse.

HEARST, manifestement, avait plus intérêt au morcellement du marché et à la prolifération des contrefacteurs qu'à la consolidation de son partenariat avec la requérante.

Quoiqu'il en soit, la rupture de la relation commerciale, établie depuis 1994, était encore totalement imprévisible le 19 février 2007 alors qu'elle allait intervenir le 12 juin 2007.

Encore, le 27 mars 2007, Monsieur Ouri AMAR écrivait :

*« Concernant les contrats existants Betty et Baby, nous souhaiterions y rajouter les produits de petite bijouterie fantaisie, bagues, colliers, bracelets ...*

*Concernant le futur de Betty, j'attends les premiers résultats de votre travail en interne (les pays étrangers) et reste à votre disposition pour un prochain rendez-vous afin de déterminer ensemble un nouveau et dernier plan européen qui plairait à Cathy ... ».*

Le 4 juin 2007, TROPICO DIFFUSION faisait suivre à RMP, une proposition de 60.000 euros de minimum garanti, se repliant ainsi sur sa licence nationale.

Le 11 juin 2007, TROPICO DIFFUSION n'avait pas été honorée non plus de la moindre réponse :

*« Cher Pierre,*

*Devant l'insistance de Cathy et à sa mise en demeure concernant le timing, nous nous sommes fait violence pour vous répondre immédiatement en accord avec vous.*

*Depuis, plus de nouvelles.*

*Quand pensez-vous en avoir car notre offre est aussi « limitée » en terme de temps, de budget et de décision ...*

*Merci d'avance de votre réponse concrète ».*

La notification de la rupture intervenait en réponse au mail ci-dessus, le 12 juin 2007.

*« Cher Ouri,*

*Après une longue conversation avec Cathy de la King, celle-ci m'a confirmé par email que la proposition de TROPICO n'et pas acceptable, que le positionnement de Betty n'est pas conforme à sa stratégie et qu'elle confirme le non-renouvellement de la licence après le 31 décembre 2007 » (RMP) ».*

Relevons au passage que le « positionnement » de TROPICO DIFFUSION procédait, selon le propre mandataire du défendeur, du parti pris de la qualité des objets.

Manifestement, ce « positionnement » n'était plus compatible avec le choix de l'ayant-droit qui entendait pour sa part tirer ses revenus de la prolifération en Europe de petits opérateurs aux pratiques douteuses.

TROPICO DIFFUSION ne pouvait donc pas comprendre pas les motifs de son éviction :

*« j'avoue ne pas comprendre la position de Cathy Titus car cette proposition a été faite en accord avec vous sur la base de 2 ans et un grand nombre de produits enlevés.*

*J'avoue aussi ne pas comprendre du tout la stratégie de Cathy Titus puisque votre mail y fait référence ...*

*Finalement, quelle est votre proposition ?*

*J'attends donc votre appel. »* (mail de TROPICO à RMP du 12 juin 2007)

Adoptant une posture un peu kafkaïenne, les représentants de HEARST continuaient d'expliquer leur décision par une recherche de la qualité :

*« bonsoir Ouri,*

*J'ai donc reparlé à Cathy Titus (...) elle ajoute « in fact, as a policy, we are pursuing higher-end ». Sa responsabilité est de protéger l'intégrité de "Betty Boop".* (mail de RMP à TROPICO du 13 juin 2007).

TROPICO DIFFUSION qui, précisément, avait toujours fait le choix de la qualité, ne pouvait comprendre la situation que comme résultant d'un malentendu et prenait en conséquence l'initiative, dès le 14 juin 2007, d'expliquer sa position directement à l'ayant-droit américain.

Toutefois, le 18 juillet 2007, puis le 12 août 2007, la rupture des relations commerciales établies était confirmée, à échéance au 31 décembre 2007.

Ainsi, a-t-il été établi que, la Loi française étant applicable et le Tribunal de Commerce de PARIS ayant compétence pour en connaître, une relation commerciale était bien établie entre les parties en litige depuis 1994, cette relation ayant été rompue à l'initiative du défendeur au plus tôt le 12 juin 2007 à échéance du 31 décembre de la même année.

L'examen des décisions des Juges du fond rendues au visa des dispositions de l'article L.442-6-5 du Code de Commerce révèlera qu'à l'évidence, le délai de préavis concédé, d'à peine 6 mois, est notablement insuffisant, au regard des critères édictés par ce texte.

Toutefois, avant d'examiner le préjudice souffert par TROPICO DIFFUSION, il convient d'évacuer une dernière question :

## IV.    RELATIONS COMMERCIALES/RELATIONS JURIDIQUES

En l'espèce, il est totalement indifférent que la relation commerciale établie depuis 1993 ait été contractualisée sous la forme d'une succession de contrats de licences à durée déterminée.

En effet, la réitération de contrats à durée déterminée sur une période de 15 années caractérise bien une relation commerciale, le qualificatif ayant été adopté à dessein par le législateur par opposition à ce qu'aurait pu être une relation strictement juridique :

*Par conséquent, et comme la Cour de Cassation vient très récemment le confirmer (Cass.Com. 23-4-03, n°01-11.664), ces dispositions s'appliquent à toutes les relations commerciales entre entreprises (...). En pratique, les Tribunaux français, en véritables Juges de l'économie, n'hésitent pas à passer outre la réalité contractuelle d'une relation pour s'en tenir à sa réalité commerciale* (Revue LAMY – Droit des Affaires – Septembre 2003, n°63, p 6).

## V – SUR LE PREJUDICE

La détermination du quantum du préjudice résulte de l'application des principes établis par les Tribunaux en cette matière.

Il s'agit en premier lieu de fixer la durée du préavis dont aurait dû bénéficier la victime de la rupture brutale, puis de calculer la marge brute qui aurait été réalisée pendant cette période, par une projection linéaire établie sur la base des dernières années avant l'exercice au cours duquel la rupture est intervenue, puis de déduire de cette somme la marge effectivement réalisée pendant le préavis concédé.

S'agissant d'une relation aussi ancienne, une durée de 2 années est considérée comme normale par les juridictions consulaires, avant d'appliquer la règle du doublement prévue par la Loi.

Le tableau ci-dessous fait ressortir l'évolution du montant du chiffre d'affaires réalisé par TROPICO DIFFUSION avec les objets « Betty Boop » qui est ainsi passé de 241.000 euros en 1994 à 1.200.000 euros sur la moyenne des deux derniers exercices, soit plus de 12% du chiffre d'affaires total de l'entreprise.

|  | 2006 | 2005 | 1994 | 1993 |
|---|---|---|---|---|
| C.A TROPICO | 9 518 565 | 9 759 208 | 5 990 396 | 5 426 311 |
| C.A BETTY BOOP | 1 037 057 | 1 487 924 | 241 846 | 265 217 |
| % du C.A Total | 10,9% | 15,2% | 4,0% | 4,9% |
| ROYALTIES BB | 105 682 | 150 711 | 18 596 | 21 217 |
| Taux Moyen | 10,2% | 10,1% | 7,7% | 8,0% |
| N° CONTRAT | 101 751 | 101 751 | 6394 - 6799 - 7358 -7373 - 8065 | 6394 - 6799 - 7358 -7373 - 6517 |

Il résulte au surplus de l'exposé des faits auquel il a été procédé ci-dessus que TROPICO DIFFUSION était notoirement connue comme le licencié de « Betty Boop » et que les parties en litige avaient organisé entre elles un véritable partenariat, les objets « Betty Boop » ayant été, au cours des dernières années, commercialisés sous une marque commune reprenant l'enseigne du réseau de franchisé de TROPICO DIFFUSIO : « Avenue of the Stars ».

16

De cette situation résulte le doublement de la durée du préavis en vertu de la règle légale selon laquelle : « *la durée minimale de préavis est double de celle qui serait applicable si le produit n'était pas fourni sous marque de distributeur* » (Code de Commerce, article L.442-6-5$^{ème}$).

En conséquence, TROPICO DIFFUSION sollicite l'allocation d'une somme de 3.332.974 euros à titre de dommages et intérêts, correspondant à 4 années de marge, compte tenu d'un taux de marge de 66 % et d'un chiffre d'affaires annuel moyen de 1.262.490 euros (2006/2005).

## PAR CES MOTIFS

*VU les dispositions de l'article L.442-6-5$^{ème}$,*

- Constater qu'une relation commerciale était établie entre les sociétés HEARST HOLDINGS et TROPICO DIFFUSION depuis 1993,

- Constater que les produits commercialisés par TROPICO DIFFUSION étaient vendus sous une marque intégrant l'enseigne de son réseau de franchise,

- Constater que cette relation commerciale a été rompue à l'initiative de la société HEARST HOLDINGS au plus tôt le 12 juin 2007 à échéance du 31 décembre de la même année,

- Condamner en conséquence la société HEARST HOLDINGS à payer à la société TROPICO DIFFUSION, la somme de 3.332.974 euros à titre de dommages et intérêts,

- La condamner au paiement d'une somme de 50.000 euros par application des dispositions de l'article 700 du NCPC,

- La condamner aux entiers dépens,

- Ordonner en toutes ses dispositions, l'exécution provisoire de la décision à intervenir.

SOUS TOUTES RESERVES

**LISTE DES PIECES AFFERENTES A LA PRESENTE ASSIGNATION A BREF DELAI :**

1. Extrait kbis de TROPICO DIFFUSION,
2. Dossier de presse,
3. Publicités sur les salons professionnels,
4. Contrats de licence « BETTY BOOP » 1994 à 2007,
5. Mail de Pierre GAUCHER (RMP) à Ouri AMAR (TROPICO) du 19/7/2006,
6. Mail de Pierre GAUCHER (RMP) à Ouri AMAR (TROPICO) du 2/10/2006 et mémo réunion de septembre 2006,
7. Mail d'Ouri AMAR (TROPICO) à Pierre GAUCHER (RMP) du 9/10/2006,
8. Mail d'Ouri AMAR (TROPICO) à Pierre GAUCHER (RMP) du 12/6/2007,
9. Mail de Pierre GAUCHER (RMP) à Ouri AMAR (TROPICO) du 12/6/2007 notifiant la rupture des relations commerciales au 31-12-07,
10. Lettre RAR de KING FEATURES Licensing à TROPICO DIFFUSION du 2/8/2007 notifiant le non-renouvellement du contrat de licence « Betty Boop »
11. Formulaires d'approbation d'articles sous marque commune (8),
12. Tableau CA RMP / BETTY BOOP,
13. Arrêt de la Cour de Cassation du 25/9/2007,
14. Mail d'Ouri AMAR (TROPICO) à Pierre GAUCHER (RMP) du 8/2/2007,
15. Mail de Pierre GAUCHER (RMP) à Ouri AMAR (TROPICO) du 30/3/2007,
16. Mail d'Ouri AMAR (TROPICO) à Pierre GAUCHER (RMP) du 11/4/2007,
17. Mail de Pierre GAUCHER (RMP) à Ouri AMAR (TROPICO) du 25/4/2007,
18. Mail de Pierre GAUCHER (RMP) à Ouri AMAR (TROPICO) du 4/6/2007,
19. Mail d'Ouri AMAR (TROPICO) à Pierre GAUCHER (RMP) du 4/6/2007,
20. Mail d'Ouri AMAR (TROPICO) à Pierre GAUCHER (RMP) du 11/6/2007,
21. Mail de Pierre GAUCHER (RMP) à Ouri AMAR (TROPICO) du 12/6/2007,
22. Mail d'Ouri AMAR (TROPICO) à Pierre GAUCHER (RMP) du 12/6/2007,
23. Mail de Pierre GAUCHER (RMP) à Ouri AMAR (TROPICO) du 13/6/2007,
24. lettre de TROPICO à KING FEATURES du 14/6/2007,
25. Comptes sociaux de TROPICO DIFFUSION pour l'exercice 2006.

07-84566

070187 B0002

# REQUETE AFIN D'ASSIGNER A BREF DELAI :

## POUR :

**La société TROPICO DIFFUSION**, SAS au capital de 1.198.176 euros, immatriculée au RCS de CRETEIL sous le n° B 320 268 402, ayant son siège social 26/28 rue Auguste Perret, Parc d'activité de la Petite Bruyère 94800 VILLEJUIF, agissant poursuites et diligences de son Président, Monsieur Ouri AMAR domicilié en cette qualité audit siège.

### Ayant pour Avocat plaidant:

Maître Julien HAY
S.C.P. CHEMOULI-DAUZIER & Associés
Avocat au Barreau de PARIS
12, Boulevard Raspail - 75007 PARIS
Tél. 01.45 49 00 19 - Vestiaire P 224

### A l'honneur de vous exposer :

TROPICO DIFFUSION a développé en France, il y a 14 ans, l'exploitation commerciale du personnage d'une bande dessinée dénommé « Betty Boop ».

Depuis 1993, TROPICO DIFFUSION a créé et fabriqué des centaines d'objets différents à l'effigie de « Betty Boop » ; qu'il s'agisse d'articles textiles, d'horlogerie, articles de cuisine, de vaisselles, d'accessoires parascolaires, d'articles de décoration ou d'accessoires de mode par exemple.

TROPICO DIFFUSION a créé un réseau de franchisés à l'enseigne « Avenue of The Stars » qui comporte aujourd'hui 26 magasins sur le territoire national.

Si les dirigeants de TROPICO DIFFUSION ont toujours veillé à diversifier leurs productions de telle sorte que d'autres licences de personnages célèbres constituent, aux côtés de celle de « Betty Boop » son offre commerciale, le personnage de « Betty Boop » est véritablement associé à l'image de TROPICO DIFFUSION au point d'ailleurs qu'avec l'accord de l'ayant-droit de nombreux objets sont commercialisés sous une marque commune à savoir :

*« Avenue of the Stars, concept by O.A. » / « King Features Syndicate Inc /*
*Fleischer Studios Inc ».*

1

De même, les objets à l'effigie de « Betty Boop » ont toujours occupé une place centrale dans les magasins de la chaîne « Avenue of the Stars » ainsi que dans la documentation commerciale de ce réseau de franchises à destination des adhérents actuels ou futurs.

Or, dans le courant du mois d'août 2007, la société HEARST HOLDINGS Inc, titulaire de la propriété des droits de reproduction et d'exploitation du personnage « Betty Boop », n'a pas hésité à notifier à la requérante, la rupture de cette relation commerciale établie depuis 14 ans à effet au 31 décembre 2007.

Un tel préavis est notablement insuffisant au regard des dispositions d'ordre public de l'article L.442-6-5$^{ème}$ du Code de Commerce.

En conséquence, la requérante se trouve manifestement créancière à l'encontre de l'auteur de la « rupture brutale de la relation commerciale établie » (article L.442-6-I-5$^{ème}$ du Code de Commerce), d'une indemnité d'un montant égal à celui de la marge dont elle a été privée pendant la période du préavis dont elle aurait dû disposer, étant précisé que tous les critères légaux et jurisprudentiels sont ici réunis pour que soit fixée par le Tribunal l'indemnité la plus élevée à raison de l'ancienneté de la relation commerciale établie, de son importance pour la requérante et du fait qu'un grand nombre d'articles ait été commercialisé sous la marque du distributeur, le réseau de magasins franchisés « Avenue of the Stars ».

Il existe donc la plus extrême urgence, pour la requérante, à ce que le Tribunal statue sur sa demande indemnitaire pour que, restaurée le cas échéant dans ses droits, elle puisse investir très rapidement dans une licence de substitution et d'importance comparable.


*C'EST POURQUOI,*

*Vu l'article 858 du Nouveau Code de Procédure Civile,*
*Vu les dispositions de l'article L.442-6-I (5$^{ème}$) du Code de Commerce,*
*Vu l'ancienneté de la relation commerciale ayant existé entre les sociétés TROPICIO DIFFUSION et HEARST HOLDINGS*
*Vu l'urgence et les motifs exposés,*


La société TROPICO DIFFUSION requiert Monsieur le Président de l'autoriser à assigner à bref délai dans les termes de l'assignation ci-après transcrite, la société suivante :

**La société HEARST HOLDINGS, INC**, King Features Syndicate Division, 888 Seventh Avenue New York, NEW YORK, 10019, USA, prise en la personne de ses représentants légaux domiciliés en cette qualité audit siège.


Fait à PARIS,
Le 21 décembre 2007

2

07-84566

2.1 Assignation à bref délai

## ORDONNANCE

Nous, Président du Tribunal de Commerce de Paris,

Vu les articles 874 et 875 du Nouveau Code de Procédure Civile ;
Vu la requête qui précède, le motifs exposés et les pièces produites ;
Vu l'article 858 du Nouveau Code de Procédure Civile ;

Attendu qu'il y a urgence ;

Disons, que le requérant pourra assigner la société HEARST HOLDINGS INC, King Features Syndicate Division, 888 Seventh Avenue NEW YORK, 10019, USA, prise en la personne de ses représentants légaux domiciliés en cette qualité audit siège,

Devant ce Tribunal pour l'audience collégiale de la 19° Chambre, Le 13 mars 2008 à 12 heures, afin de statuer sur les fins de ladite requête ;

Commettons, l'un des Huissiers Audienciers de ce Tribunal pour délivrer, ou faire délivrer, l'assignation, et ce, au plus tard le avant heures;
Disons, que le requérant devra remettre au greffe, l'assignation délivrée pour ladite audience avant le 29 février 2008 à 17 heures ;
Disons, que la copie des pièces jointes à la requête, devra être notifiée avec l'assignation ;
Disons que l'affaire devra être confiée à l'examen d'un Juge rapporteur ou fixée à une date de plaidoiries devant une formation collégiale ; que l'affaire ne pourra être renvoyée qu'une seule fois et à la demande motivée du défendeur, aucun renvoi n'étant accordé à la demande du requérant, et, qu'à défaut, l'affaire sera renvoyée au Rôle d'attente du fait des parties dont elle suivra le cours normal, sans pouvoir bénéficier d'une réduction de délais de comparution.
Disons, qu'il en sera de même, si l'affaire n'est pas en état d'être jugée et que les débats ne sont pas clos à l'issue de la première audience du juge rapporteur ainsi désigné (ou à l'issue de l'audience devant une formation collégiale).
Disons que la présente ordonnance sera déposée au greffe de ce Tribunal.

Le Greffier
M. TANT

Fait à Paris, le
21 décembre 2007

le Président du tribunal

Pour le Président
Le Délégué Général
M. J.P. LUCQUIN

**Identité et adresse du destinataire**
Identity and adresse of the adressessee

La Société **HEARST HOLDINGS INC**, King Features Syndicate Division, 888 Seventh Avenue Now York, NEW YORK 10019 - USA.

TRES IMPORTANT

LE DOCUMENT CI-JOINT EST DE NATURE JURIDIQUE ET PEUT AFFECTER VOS DROITS ET OBLIGATIONS. LES «ELEMENTS ESSENTIELS DE L'ACTE» VOUS DONNENT QUELQUES INFORMATIONS SUR LA NATURE ET SON OBJET. IL EST TOUTEFOIS INDISPENSABLE DE LIRE ATTENTIVEMENT LE TEXTE MEME DU DOCUMENT. IL PEUT ETRE NECESSAIRE DE DEMANDER UN AVIS JURIDIQUE.

SI VOS RESSOURCES SONT INSUFFISANTES, RENSEIGNEZ-VOUS SUR LA POSSIBILITE D'OBTENIR L'ASSISTANCE JUDICIAIRE ET LA CONSULTATION JURIDIQUE SOIT DANS VOTRE PAYS SOIT DANS LE PAYS D'ORIGINE DU DOCUMENT.

LES DEMANDES DE RENSEIGNEMENTS SUR LA POSSIBILITES D'OBTENIR L'ASSISTANCE JUDICIAIRE ET LA CONSULTATION JURIDIQUE DANS LE PAYS D'ORIGINE DU DOCUMENT PEUVENT ETRE ADRESSEES : **BUREAU D'AIDE JURIDICTIONNELLE TRIBUNAL DE COMMERCE DE PARIS, 1 QUAI DE LA CORSE, 75004 PARIS.**

*IMPORTANT*

*THE ENCLOSED DOCUMENT IS OF A LEGAL NATURE AND MAY AFFECT OUR RIGTS AND OBLIGATIONS. THE SUMMARY OF THE DOCUMENT TO BE SERVED WILL GIVE YOU SOME INFORMATION ABOUT ITS NATURE AND PURPOSE. YOU SHOULD HOWVER READ THE DOCUMENT ITSELF CAREFULLY. IT MAY BE NECESSARY TO SEEK LEGAL ADVICE.*

*IF YOUR FINANCIAL RESOURCES ARE INSUFFICIENT YOU SHOULD SSEK INFORMATION ON THE POSSIBILITY OBTAINING LEGAL AID OR ADVISE EITHER IN THE COUNTRY WHERE YOU LIVE OR IN YHE COUNTRY WHERE THE DOCUMENT WAS ISSUED.*

*ENQUIRIES ABOUT THE AVAILABILITY OF LEGAL AID OR ADVICE IN THE COUNTRY WHERE THE DOCUMENTS WAS ISSUED MAY BE DIRECTED TO:..............*

----------------------------------

Il est recommandé que les mentions imprimées dans cette note soient rédigées en langue française et en langue anglaise et le cas échéant, en outre, dans la langue ou une des langues officielles de l'Etat d'origine de l'acte. Les blancs pourraient être remplis soit dans la langue de l'Etat où le document doit être adressé, soit en langue anglaise.

*It is recommended that the standard termes in the notice be written in English end French and where appropriate also in the official language, or in one of the official languages of the State in which the document oiginated.The blanks could be completed either in the language of the State to which the document is to be sent, or in English or French.*

----------------------------

# Exhibit C



## AVENUE OF THE STARS
### TROPICO Créateur & Editeur





**La star du mois...**

**Tweety For Me...**

**Édito**

**Bienvenue sur notre site**

*Nous avons le plaisir de vous faire découvrir notre univers, un monde de couleur et de rêve pour un drôle d'intérieur...*

*À travers des tendances de décoration bien actuelles, vous allez découvrir des produits hauts en couleurs et pleins de petits bonheurs, qui habilleront votre intérieur d'une note de style à la fois unique et ludique.*

*Vous rencontrerez des objets du quotidien, malicieux, conviviaux, esthétiques ou tout simplement pratiques, qui afficheront clairement votre goût du design et votre tendance à l'humour.*

*De la cuisine au salon, dès le petit déjeuner et jusqu'au bureau... vous avez enfin la preuve que le design peut tirer parti du quotidien et égayer chacun des moments de la vie !*

Par Ouri AMAR
Président-Directeur général

**Nouvelles Tendances**

Découvrez le concept Tweety For Me, ses différentes gammes...

**Notre Show room**

**Visitez notre show room**

Entrez dans notre univers : vue panoramique.





**DÉCOUVREZ LA COLLECTION COMPLÈTE**





**Les magasins AOTS**

**Où trouver nos produits ?**

Découvrez l'ensemble de nos produits et licences dans nos points de vente AVENUE OF THE STARS.

















**Les produits AOTS**

**Nos collections de produits**

Découvrez l'ensemble de nos produits et licences grâce à notre catalogue complet en ligne.



Création SAILING
Powered by WysiUp

English version

 Accueil TROPICO

  Accueil AVENUE OF THE STARS

Retour à l'accueil

Haut de la page

Personnages utilisés sous licence par Tropico-Diffusion : ©2005 KFS/FS TM HEARST/FS | ©2005 Pagot | TM & ® Warner Bros. (s05) | TM & ® Turner Entertainment Co. (s05)
TM & ® DC Comics (s05) | ©200£ Marsu | TM & ® Hanna-Barbera (s05) | ©VOOZ All rights reserved | ©2005 AT & KODANSHA Ltd | PEANUTS ® United Feature Syndicate, Inc.
by FRANQUIN © MARSU 2005 | ©2005 Those Characters From Cleveland, Inc. | © Déco & des mots | © Hachette Livre/Gautier-Languereau 2005 | © "LE PTAF" Dan Saiel - 2005
© 2005 Viacom International Inc. All Rights Reserved. Created by Stephen Hillenburg. | © 2005 2 GRRRLS, Inc. | © PILLE | TM & ® 2005 FOX MATT GROENING
© sad.F/AG:GOLDEN ARROW CO. since 2003 | ©2005 Richard Zieleskiewicz MONSIEUR Z LOGO is trademarked by Richard Zieleskiewicz and licensed with BEAUMONDE www.beaumonde-cards.com

Conditions d'utilisation



Accueil \ AVENUE OF THE STARS \ Les stars \ Betty Boop

Produits vendus uniquement en magasin.

**COLLECTION 2005**

**A la une ! ...**

**Au sommaire . . .**

- Les stars
- Le concept
- Les magasins
- Devenir partenaire
- Contact
- Communication
- Liens

**BOL BETTY COQUINE**
Référence : BB4379

**PTE MONNAIE BETTY COMIC ART (DIAMANTS)**
Référence : BB4420

IMAGE NON DISPONIBLE

PICTURE SOON AVAILABLE

**TIRELIRE METAL RDE+CADENAS (A) STAR MONEY**
Référence : BB4408

**PANIER RANGEMENT BETTY POUPEE**
Référence : BB4332

**Les thèmes . . .**

BETTY AGE ET INITIALES

CADEAU DIVERS

BETTY POUPEE

MAROQUINERIE

DECO DE LA TABLE

BETTY KISS AND COEUR

STATUE/STATUETTE

BETTY ANNIVERSAIRE

DECO DE LA MAISON

BETTY SEXY LADY

BETTY INFIRMIERE

DECO

DECO BUREAU

BETTY FAMOUS

BETTY RETRO

BETTY COQUINE

BETTY COMIC ART

**TOUS LES PRODUITS**

**Star : Betty Boop**

Date de naissance : 1930
Créateur : Max FLEISCHER

Après plusieurs apparitions dans les « Cartoons » de Max FLEISCHER, Betty Boop accède au firmament avec la création de sa propre série de dessins animés.
112 épisodes sont réalisés et la petite danseuse de cabaret devient une énorme Star. Quand on parle de Betty Boop, il est important de citer Mae QUESTREL (qui donnait sa voix au personnage) sans elle, Betty Boop n'aurait pu être la même.
Sexy et un peu provocante, Betty n'a jamais quitté les écrans depuis les années 30 jusqu'à « Qui veut la peau de Roger Rabbit ? ».

**Partenaires, identifiez-vous**

Identifiant    Mot de passe

valider

Les stars    Le concept    Les magasins    Devenir partenaire    Contact    Communication    Liens

Création SAILING
Powered by WysiUp

 English version

 Accueil TROPICO

 > Accueil AVENUE OF THE STARS    Retour à l'accueil    Haut de la page

Personnages utilisés sous licence par Tropico-Diffusion : ©2005 KFS/FS TM HEARST/FS | ©2005 Pagot | TM & © Warner Bros. (s05) | TM & © Turner Entertainment Co. (s05)
TM & © DC Comics (s05) | ©2005 Marsu | TM & © Hanna-Barbera (s05) | ©VOOZ All rights reserved | ©2005 AT & KODANSHA Ltd | PEANUTS © United Feature Syndicate, Inc.
by FRANQUIN © MARSU 2005 | ©2005 Those Characters From Cleveland, Inc. | © TROPICO/XPRESSIONS | © Hachette Livre/Gautier-Languereau 2005 | © "LE PIAF" Dan Salei -
2005
© 2005 Viacom International Inc. All Rights Reserved. Created by Stephen Hillenburg. | © 2005 2 GRRRLS, Inc. | © FILLE | TM & © 2005 FOX MATT GROENING
© sac.F/AG:GOLDEN ARROW CO. since 2003 | ©2005 Richard Zielenkiewicz MONSIEUR Z LOGO is trademarked by BEAUMONDE www.beaumonde-cards.com

Conditions d'utilisation



Produits vendus uniquement en magasin.

Accueil \ AVENUE OF THE STARS \ Les stars \ Betty Boop \ BETTY AGE ET INITIALES



## Catalogue Betty Boop

### BETTY AGE ET INITIALES

<< 1 2 >>



Au sommaire ...

Les stars

Le concept

Les magasins

Devenir partenaire

Contact

Communication

Liens







les thèmes ...

BETTY AGE ET INITIALES

CADEAU DIVERS

BETTY POUPEE

MAROQUINERIE

DECO DE LA TABLE

BETTY KISS AND COEUR

STATUE/STATUETTE

BETTY ANNIVERSAIRE

DECO DE LA MAISON

BETTY SEXY LADY

BETTY INFIRMIERE

DECO

DECO BUREAU

BETTY FAMOUS

BETTY RETRO

BETTY COQUINE

BETTY COMIC ART

**PTE CLES EMAILLE BETTY PIN UP 18 ANS**
Référence : BB4242

**PTE CLES EMAILLE BETTY PIN UP 20 ANS**
Référence : BB4243

**PTE CLES EMAILLE BETTY PIN UP 30 ANS**
Référence : BB4244






**PTE CLES EMAILLE BETTY PIN UP 40 ANS**
Référence : BB4245

**PTE CLES EMAILLE BETTY PIN UP 50 ANS**
Référence : BB4246

**MUG CONIQUE BETTY PIN UP 18 ANS**
Référence : BB4247

**MUG CONIQUE BETTY PIN UP 20 ANS**
Référence : BB4248

**TOUS LES PRODUITS**

**MUG CONIQUE BETTY PIN UP 30 ANS**
Référence : BB4249

**MUG CONIQUE BETTY PIN UP 40 ANS**
Référence : BB4250

**MUG CONIQUE BETTY PIN UP 50 ANS**
Référence : BB4251

**VERRE MM SABLE BETTY PIN UP 18 ANS**
Référence : BB4252

<< 1 2 >>

**Partenaires, Identifiez-vous**

Identifiant    Mot de passe

valider

Les stars   Le concept   Les magasins   Devenir partenaire   Contact   Communication   Liens

Création SAILING
Powered by WysiUp


English version


Accueil TROPICO ‹ TROPICO Sailing & Sea

STARS › Accueil AVENUE OF THE STARS    Retour à l'accueil    Haut de la page

**Personnages utilisés sous licence par Tropico-Diffusion :** ©2005 KFS/FS TM HEARST/FS | ©2005 Paget | TM & © Warner Bros. (s05) | TM & © Turner Entertainment Co. (s05)
TM & © DC Comics (s05) | ©2005 Marsu | TM & © Hanna-Barbera (s05) | ©VOOZ All rights reserved | ©2005 AT & KODANSHA Ltd | PEANUTS © United Feature Syndicate, Inc.
by FRANQUIN © MARSU 2005 | ©2005 Those Characters From Cleveland, Inc. | © Déco & des mots | © TROPICO/XPRESSIONS | © Hachette Livre/Sautier-Languereau 2005 | © "LE PIAF" Dan Saïel - 2005
© 2005 Viacom International Inc. All Rights Reserved. Created by Stephen Hillenburg. | © 2005 2 GRRRLS, Inc. | © PILLE | TM & © 2005 FOX MATT GROENING
© sad.F/AG:GOLDEN ARROW CO. since 2003 | ©2005 Richard Zielenkiewicz MONSIEUR Z LOGO is trademarked by Richard Zielenkiewicz and licensed with BEAUMONDE www.beaumonde-cards.com

Conditions d'utilisation

http://www.avenueofthestars.fr/index.php?ID=1016034&cat=BB-9



AVENUE OF THE STARS

http://www.avenueofthestars.fr/index.php?ID=1016034&cat=BB-79



Produits vendus uniquement en magasin.

Accueil \ AVENUE OF THE STARS \ Les stars \ Betty Boop \ BETTY POUPEE



**Catalogue Betty Boop**

**BETTY POUPEE**

<< 1 2 >>



Au sommaire . . .

Les stars

Le concept

Les magasins

Devenir partenaire

Contact

Communication

Liens



**SET ENFANT BOL/MUG/ASS/COUV.BETTY POUPEE**
Référence : BB4013



**BOITE MINI VALISETTE RECT.BETTY POUPEE**
Référence : BB4329



**BOL BETTY POUPEE**
Référence : BB4333

**les thèmes . . .**

BETTY AGE ET INITIALES

CADEAU DIVERS

BETTY POUPEE

MAROQUINERIE

DECO DE LA TABLE

BETTY KISS AND COEUR

STATUE/STATUETTE

BETTY ANNIVERSAIRE

DECO DE LA MAISON

BETTY SEXY LADY

BETTY INFIRMIERE

DECO

DECO BUREAU

BETTY FAMOUS

BETTY RETRO

BETTY COQUINE

BETTY COMIC ART



**COFFRET BIJOUX CARTONNE BETTY POUPEE**
Référence : BB4375



**TIRELIRE METAL RONDE+CADENAS BETTY POUPEE**
Référence : BB4226



**PORTE PHOTOS MULTI CARTONNE BETTY POUPEE**
Référence : BB4376



**MUG LARGE BETTY POUPEE**
Référence : BB4334





**CARNET SECRET CARTONNE BETTY POUPEE**
Référence : BB4377



**ASSIETTE DESSERT BETTY POUPEE**
Référence : BB4336



**CADRE GM VERRE BETTY POUPEE**
Référence : BB4230

**MUG SMALL BETTY POUPEE**
Référence : BB4337

**TOUS LES PRODUITS**

  

<< 1 2 >>

**Partenaires, identifiez-vous**

Identifiant    Mot de passe

valider

Les stars  Le concept  Les magasins  Devenir partenaire  Contact  Communication  Liens

Création SAILING
Powered by WysiUp

English version

Accueil TROPICO   TROPICO   STARS   ▶ Accueil AVENUE OF THE STARS   ◀ Retour à l'accueil   Haut de la page

Personnages utilisés sous licence par Tropico-Diffusion : ©2005 KFS/FS TM HEARST/FS | ©2005 Pagot | TM & © Warner Bros. (s05) | TM & © Turner Entertainment Co. (s05) TM & © DC Comics (s05) | ©2005 Marsu | TM & © Hanna-Barbera (s05) | ©VOOZ All rights reserved | ©2005 AT & KODANSHA Ltd | PEANUTS © United Feature Syndicate, Inc. by FRANQUIN © MARSU 2005 | ©2005 Those Characters From Cleveland, Inc. | © Déco & des mots | © TROPICO/XPRESSIONS | © Hachette Livre/Gautier-Languereau 2005 | © "LE PIAF" Dan Salel - 2005
© 2005 Viacom International Inc. All Rights Reserved. Created by Stephen Hillenburg. | © 2005 2 GRRRLS, Inc. | © PILLE | TM & © 2005 FOX MATT GROENING
© sad.F/AG:GOLDEN ARROW CO. since 2003 | ©2005 Richard Zielenkiewicz MONSIEUR Z LOGO is trademarked by Richard Zielenkiewicz and licensed with BEAUMONDE www.beaumonde-cards.com
Conditions d'utilisation

AVENUE OF THE STARS

http://www.avenueofthestars.fr/index.php?ID=1016034&cat=BB-8



Accueil \ AVENUE OF THE STARS \ Les stars \ Betty Boop \ MAROQUINERIE

Produits vendus uniquement en magasin.

**Catalogue Betty Boop**

**MAROQUINERIE**

Au sommaire ...

Les stars
Le concept
Les magasins
Devenir partenaire
Contact
Communication
Liens

SAC SHOPPING VINYL
BETTY JAPON
Référence : BB4314

SAC A MAIN MN BETTY
MADEMOISELLE
Référence : BB4316

PTE FEUILLE PM BETTY
MADEMOISELLE
Référence : BB4317

PTE MONNAIE BETTY
MADEMOISELLE
Référence : BB4318

PTE CLE/MONNAIE BETTY
MADEMOISELLE
Référence : BB4319

PTE FEUILLE ROSE BIG
KISS BETTY/4848
Référence : BB4331

PTE
CLES/MONNAIE-PRES.16PCE-2MOD-BB
MLLE
Référence : BB4345

Les thèmes ...

BETTY AGE ET
INITIALES
CADEAU DIVERS
BETTY POUPEE
MAROQUINERIE
DECO DE LA TABLE
BETTY KISS AND
COEUR
STATUE/STATUETTE
BETTY
ANNIVERSAIRE
DECO DE LA MAISON
BETTY SEXY LADY
BETTY INFIRMIERE
DECO
DECO BUREAU
BETTY FAMOUS
BETTY RETRO
BETTY COQUINE
BETTY COMIC ART

**TOUS LES
PRODUITS**

Partenaires,
identifiez-vous

Identifiant    Mot de passe

valider

Les stars   Le concept   Les magasins   Devenir partenaire   Contact   Communication   Liens

Création SAILING
Powered by WysiUp

English version


Accueil TROPICO

Accueil AVENUE OF THE STARS

Retour à l'accueil

Haut de la page

**Personnages utilisés sous licence par Tropico-Diffusion :** ©2005 KFS/FS TM HEARST/FS | ©2005 Pagot | TM & © Warner Bros. (s05) | TM & © Turner Entertainment Co. (s05)
TM & © DC Comics (s05) | ©2005 Marsu | TM & © Hanna-Barbera (s05) | ©VOOZ All rights reserved | ©2005 AT & KODANSHA Ltd | PEANUTS © United Feature Syndicate, Inc.
by FRANQUIN © MARSU 2005 | ©2005 Those Characters From Cleveland, Inc. | © Déco & des mots | © TROPICO/XPRESSIONS | © Hachette Livre/Gautier-Languereau 2005 | © "LE PIAF" Dan Saléi - 2005
© 2005 Viacom International Inc. All Rights Reserved. Created by Stephan Hillenburg. | © 2005 2 GRRRLS, Inc. | © PILLE | TM & © 2005 FOX MATT GROENING
© sad.F/AG:GOLDEN ARROW CO. since 2003 | ©2005 Richard Zielenkiewicz MONSIEUR Z LOGO is trademarked by Richard Zielenkiewicz and licensed with BEAUMONDE www.beaumonde-cards.com

Conditions d'utilisation



Produits vendus uniquement en magasin.

Accueil \ AVENUE OF THE STARS \ Les stars \ Betty Boop \ DECO DE LA TABLE



**Catalogue Betty Boop**

**DECO DE LA TABLE**



Au sommaire . . .

Les stars

Le concept

Les magasins

Devenir partenaire

Contact

Communication

Liens

**les thèmes . . .**

BETTY AGE ET
INITIALES

CADEAU DIVERS

BETTY POUPEE

MAROQUINERIE

DECO DE LA TABLE

BETTY KISS AND
COEUR

STATUE/STATUETTE

BETTY
ANNIVERSAIRE

DECO DE LA MAISON

BETTY SEXY LADY

BETTY INFIRMIERE

DECO

DECO BUREAU

BETTY FAMOUS

BETTY RETRO

BETTY COQUINE

BETTY COMIC ART

**TOUS LES
PRODUITS**



**Partenaires,
identifiez-vous**

Identifiant    Mot de passe

valider

Les stars   Le concept   Les magasins   Devenir partenaire   Contact   Communication   Liens

Création SAILING
Powered by Wysiiup           English version           Accueil TROPICO        Accueil AVENUE OF THE STARS          Retour à l'accueil          Haut de la page

Personnages utilisés sous licence par Tropico-Diffusion : ©2005 KFS/FS TM HEARST/FS | ©2005 Pagot | TM & © Warner Bros. (s05) | TM & © Turner Entertainment Co. (s05)
TM & © DC Comics (s05) | ©2005 Marsu | TM & © Hanna-Barbera (s05) | ©VOOZ All rights reserved | ©2005 AT & KODANSHA Ltd | PEANUTS © United Feature Syndicate, Inc.
by FRANÇUIN © MARSU 2005 | ©2005 Those Characters From Cleveland, Inc. | © Déco & des mots | © TROPICO/XPRESSIONS | © Hachette Livre/Gautier-Languereau 2005 | © "LE PIAF" Dan Salel –
2005
© 2005 Viacom International Inc. All Rights Reserved. Created by Stephen Hillenburg. | © 2005 2 GRRRLS, Inc. | © PILLE | TM & © 2005 FOX MATT GROENING
© sad.F/AG:GOLDEN ARROW CO. since 2003 | ©2005 Richard Zielenkiewicz MONSIEUR Z LOGO is trademarked by Richard Zielenkiewicz and licensed with BEAUMONDE www.beaumonde-cards.com

Conditions d'utilisation





Accueil \ AVENUE OF THE STARS \ Les stars \ Betty Boop \ BETTY KISS AND COEUR

Produits vendus uniquement en magasin.



## Catalogue Betty Boop

### BETTY KISS AND COEUR





Référence : BB3543

**CADRE EN TOILE GM
BETTY PIN UP (35x50)**
Référence : BB4369



**REVEIL MM ALL OVER
BETTY KISS**
Référence : BB4370



**HORLOGE VERRE 30 cm
BETTY BOOP COEURS**
Référence : BB4372

**Au sommaire . . .**

Les stars
Le concept
Les magasins
Devenir partenaire
Contact
Communication
Liens

**les thèmes . . .**

BETTY AGE ET INITIALES
CADEAU DIVERS
BETTY POUPEE
MAROQUINERIE
DECO DE LA TABLE
BETTY KISS AND COEUR
STATUE/STATUETTE
BETTY ANNIVERSAIRE
DECO DE LA MAISON
BETTY SEXY LADY
BETTY INFIRMIERE
DECO
DECO BUREAU
BETTY FAMOUS
BETTY RETRO
BETTY COQUINE
BETTY COMIC ART

**TOUS LES PRODUITS**



**Partenaires,
identifiez-vous**

Identifiant          Mot de passe

valider

Les stars   Le concept   Les magasins   Devenir partenaire   Contact   Communication   Liens

Création SAILING
Powered by WysiUp

 English version

 Accueil TROPICO ◄    ► Accueil AVENUE OF THE STARS   Retour à l'accueil   Haut de la page

**Personnages utilisés sous licence par Tropico-Diffusion :** ©2005 KFS/FS TM HEARST/FS | ©2005 Pegot | TM & © Warner Bros. (s05) | TM & © Turner Entertainment Co. (s05)
TM & © DC Comics (s05) | ©2005 Marsu | TM & © Hanna-Barbera (s05) | ©VOOZ All rights reserved | ©2005 AT & KODANSHA Ltd | PEANUTS © United Feature Syndicate, Inc.
by FRANQUIN © MARSU 2005 | ©2005 These Characters From Cleveland, Inc. | © Déco & des mots | © TROPICO/XPRESSIONS | © Hachette Livre/Gautier-Languereau 2005 | © "LE PIAF" Dan Salér - 2005
© 2005 Viacom International Inc. All Rights Reserved. Created by Stephen Hillenburg. | © 2005 2 GRRRLS, Inc. | © PILLE | TM & © 2005 FOX MATT GROENING
© sad.F/AG:GOLDEN ARROW CO. since 2003 | ©2005 Richard Zielenkiewicz MONSIEUR Z LOGO is trademarked by Richard Zielenkiewicz and licensed with BEAUMONDE www.beaumonde-cards.com

Conditions d'utilisation

AVENUE OF THE STARS

http://www.avenueofthestars.fr/index.php?ID=1016034&cat=BB-5





Accueil \ AVENUE OF THE STARS \ Les stars \ Betty Boop \ STATUE/STATUETTE

Produits vendus uniquement en magasin.

**Catalogue Betty Boop**

**STATUE/STATUETTE**

Au sommaire . . .

Les stars

Le concept

Les magasins

Devenir partenaire

Contact

Communication

Liens





STATUETTE CERAM.BETTY
FEMME D'AFFAIRES
Référence : BB4060



STATUETTE CERAM.BETTY
COUSSIN
Référence : BB4061



STATUETTE BETTY AVION
31cm / BB1058
Référence : BB3955





STATUETTE CERAM.BETTY
ROCK N ROLL
Référence : BB4064



STATUETTE RES.BB
BALLERINE
SUSPENSION-15
Référence : BB4006

STATUETTE RESINE BETTY
ROBE NOIRE-H.15cm
Référence : BB4010

STATUETTE RESINE BETTY
PROMENADE 15 cm
Référence : BB4029



STATUETTE BETTY
SEVENTIES / 4539
Référence : BB4051

STATUETTE BETTY
CHOPPER
GM+TIRELIRE/1980
Référence : BB4194

STATUETTE BB CHOPPER
GM+PENDULETTE/1990
Référence : BB4105

STATUETTE BETTY FAIRY /
909
Référence : BB4279

Les thèmes . . .

BETTY AGE ET
INITIALES

CADEAU DIVERS

BETTY POUPEE

MAROQUINERIE

DECO DE LA TABLE

BETTY KISS AND
COEUR

STATUE/STATUETTE

BETTY
ANNIVERSAIRE

DECO DE LA MAISON

BETTY SEXY LADY

BETTY INFIRMIERE
DECO

DECO BUREAU

BETTY FAMOUS

BETTY RETRO

BETTY COQUINE

BETTY COMIC ART

**TOUS LES
PRODUITS**

Partenaires,
identifiez-vous

Identifiant        Mot de passe

valider

Les stars   Le concept   Les magasins   Devenir partenaire   Contact   Communication   Liens

Création SAILING
Powered by WysiUp

 English version

 Accueil TROPICO

 Accueil AVENUE OF THE STARS

Retour à l'accueil

Haut de la page

Personnages utilisés sous licence par Tropico-Diffusion : ©2005 KFS/FS TM HEARST/FS | ©2005 Papot | TM & © Warner Bros. (s05) | TM & © Turner Entertainment Co. (s05)
TM & © DC Comics (s05) | ©2005 Marsu | TM & © Hanna-Barbera (s05) | ©VOOZ All rights reserved | ©2005 AT & KODANSHA Ltd | PEANUTS © United Feature Syndicate, Inc.
by FRANQUIN © MARSU 2005 | ©2005 Those Characters From Cleveland, Inc. | © Déco & des mots | © TROPICO/XPRESSIONS | © Hachette Livre/Gautier-Languereau 2005 | © "LE PIAF" Dan Saiel -
2005
© 2005 Viacom International Inc. All Rights Reserved. Created by Stephen Hillenburg. | © 2005 2 GRRRLS, Inc. | © PILLE | TM & © 2005 FOX MATT GROENING
© sad.f/AG:GOLDEN ARROW CO. since 2003 | ©2005 Richard Zielenkiewicz MONSIEUR Z LOGO is trademarked by Richard Zielenkiewicz and licensed with BEAUMONDE www.beaumonde-cards.com
Conditions d'utilisation

AVENUE OF THE STARS




Accueil \ AVENUE OF THE STARS \ Les stars \ Betty Boop \ BETTY ANNIVERSAIRE

Produits vendus uniquement en magasin.

**Catalogue Betty Boop**

**BETTY ANNIVERSAIRE**



Au sommaire . . .

Les stars

Le concept

Les magasins

Devenir partenaire

Contact                Y

Communication

Liens



**MUG BETTY BON ANNIVERSAIRE**
Référence : BB4000



**CADRE PVC BETTY BON ANNIVERSAIRE**
Référence : BB4020



**MIROIR PM BETTY ANNIVERSAIRE AVEC CADRE**
Référence : BB4232



**MIROIR PM BETTY 1 AN DE PLUS**
Référence : BB4270




**CADRE GM VERRE BETTY 1 AN DE PLUS**
Référence : BB4271

les thèmes . . .

BETTY AGE ET INITIALES

CADEAU DIVERS

BETTY POUPEE

MAROQUINERIE

DECO DE LA TABLE

BETTY KISS AND COEUR

STATUE/STATUETTE

BETTY ANNIVERSAIRE

DECO DE LA MAISON

BETTY SEXY LADY

BETTY INFIRMIERE

DECO

DECO BUREAU

BETTY FAMOUS

BETTY RETRO

BETTY COQUINE

BETTY COMIC ART

**TOUS LES PRODUITS**





**Partenaires, identifiez-vous**

Identifiant        Mot de passe



valider

Les stars   Le concept   Les magasins   Devenir partenaire   Contact   Communication   Liens

Création SAILING
Powered by WysiUp          English version          Accueil TROPICO       Accueil AVENUE OF THE STARS          Retour à l'accueil          Haut de la page

Personnages utilisés sous licence par Tropico-Diffusion : ©2005 KFS/FS TM HEARST/FS | ©2005 Pagot | TM & © Warner Bros. (s05) | TM & © Turner Entertainment Co. (s05) TM & © DC Comics (s05) | ©2005 Marsu | TM & © Hanna-Barbera (s05) | ©VOOZ All rights reserved | ©2005 AT & KODANSHA Ltd | PEANUTS © United Feature Syndicate, Inc. by FRANQUIN © MARSU 2005 | ©2005 Those Characters From Cleveland, Inc. | © Déco & des mots | © TROPICO/XPRESSIONS | © Hachette Livre/Gautier-Languereau 2005 | © "LE PIAF" Dan Salel – 2005
© 2005 Viacom International Inc. All Rights Reserved. Created by Stephen Hillenburg. | © 2005 2 GRRRLS, Inc. | © PILLE | TM & © 2005 FOX MATT GROENING
© sad.F/AG:GOLDEN ARROW CO. since 2003 | ©2005 Richard Zielenkiewicz MONSIEUR Z LOGO is trademarked by Richard Zielenkiewicz and licensed with BEAUMONDE www.beaumonde-cards.com
Conditions d'utilisation

AVENUE OF THE STARS

http://www.avenueofthestars.fr/index.php?ID=1016034&cat=BB-3



Produits vendus uniquement en magasin.

Accueil \ AVENUE OF THE STARS \ Les stars \ Betty Boop \ DECO DE LA MAISON

**Catalogue Betty Boop**

***DECO DE LA MAISON***



Au sommaire . . .

Les stars

Le concept

Les magasins

Devenir partenaire

Contact                    TY

Communication

Liens





**BOULE NEIGE PM BETTY BIKER / 903**
Référence : BB4120



**TIRELIRE METAL COFFRE FORT CASINO**
Référence : BB3803



**BOULE NEIGE PM BETTY INFIRMIERE / 906**
Référence : BB4122



**BOULE NEIGE PM BETTY ROCK N ROLL / 901**
Référence : BB4123



PICTURE SOON AVAILABLE

**TIRELIRE METAL RDE+CADENAS (A)STAR MONEY**
Référence : BB4408

Les thèmes . . .

BETTY AGE ET INITIALES

CADEAU DIVERS

BETTY POUPEE

MAROQUINERIE

DECO DE LA TABLE

BETTY KISS AND COEUR

STATUE/STATUETTE

BETTY ANNIVERSAIRE

DECO DE LA MAISON

BETTY SEXY LADY

BETTY INFIRMIERE

DECO

DECO BUREAU

BETTY FAMOUS

BETTY RETRO

BETTY COQUINE

BETTY COMIC ART

**TOUS LES PRODUITS**

**Partenaires, identifiez-vous**

Identifiant    Mot de passe

valider

Les stars   Le concept   Les magasins   Devenir partenaire   Contact   Communication   Liens

Création SAILING
Powered by WysiUp

 English version

Accueil TROPICO 

Accueil AVENUE OF THE STARS    Retour à l'accueil    Haut de la page

Personnages utilisés sous licence par Tropico-Diffusion : ©2005 KFS/FS TM HEARST/FS | ©2005 Pagot | TM & © Warner Bros. (s05) | TM & © Turner Entertainment Co. (s05) TM & © DC Comics (s05) | ©2005 Marsu | TM & © Hanna-Barbera (s05) | ©VOOZ All rights reserved | ©2005 AT & KODANSHA Ltd | PEANUTS © United Feature Syndicate, Inc. by FRANQUIN © MARSU 2005 | ©2005 Those Characters From Cleveland, Inc. | © Déco & des mots | © TROPICO/XPRESSIONS | © Hachette Livre/Gautier-Languereau 2005 | © "LE PIAF" Dan Saiel – 2005
© 2005 Viacom International Inc. All Rights Reserved. Created by Stephen Hillenburg. | © 2005 2 GRRRLS, Inc. | © PILLE | TM & © 2005 FOX MATT GROENING
© sad.F/AG:GOLDEN ARROW CO. since 2003 | ©2005 Richard Zielenkiewicz MONSIEUR Z LOGO is trademarked by Richard Zielenkiewicz and licensed with BEAUMONDE www.beaumonde-cards.com

Conditions d'utilisation

AVENUE OF THE STARS

http://www.avenueofthestars.fr/index.php?ID=1016034&cat=BB-81

Produits vendus uniquement en magasin.

Accueil \ AVENUE OF THE STARS \ Les stars \ Betty Boop \ BETTY SEXY LADY



**Catalogue Betty Boop**
**BETTY SEXY LADY**

Au sommaire . . .

Les stars
Le concept
Les magasins
Devenir partenaire
Contact
Communication
Liens






CADRE PVC BETTY SEXY
LADY
Référence : BB4030

VERRE MM SABLE BETTY
TROP FUN
Référence : BB4068

MIROIR PM SEXY LADY
BETTY AVEC CADRE
Référence : BB4233





PTE MEMO CLIP RESINE
BETTY BUNNY
Référence : BB4324

HOUSSE CHAUSSETTE
PORT. BETTY SEXY LADY
Référence : BB4325

BAUME LEVRE DS
BTE+MIROIR PRES.9 BB
SEXY
Référence : BB4347





Les thèmes . . .

BETTY AGE ET
INITIALES
CADEAU DIVERS
BETTY POUPEE
MAROQUINERIE
DECO DE LA TABLE
BETTY KISS AND
COEUR
STATUE/STATUETTE
BETTY
ANNIVERSAIRE
DECO DE LA MAISON
BETTY SEXY LADY
BETTY INFIRMIERE
DECO
DECO BUREAU
BETTY FAMOUS
BETTY RETRO
BETTY COQUINE
BETTY COMIC ART

**TOUS LES
PRODUITS**

**Partenaires,
identifiez-vous**

Identifiant     Mot de passe

valider

Les stars   Le concept   Les magasins   Devenir partenaire   Contact   Communication   Liens

Création SAILING
Powered by WysiUp


English version

Accueil TROPICO ›


› Accueil AVENUE OF THE STARS

Retour à l'accueil

Haut de la page

Personnages utilisés sous licence par Tropico-Diffusion : ©2005 KFS/FS TM HEARST/FS | ©2005 Pagot | TM & © Warner Bros. (s05) | TM & © Turner Entertainment Co. (s05)
TM & © DC Comics (s05) | ©2005 Marsu | TM & © Hanna-Barbera (s05) | ©VOOZ All rights reserved | ©2005 AT & KODANSHA Ltd | PEANUTS © United Feature Syndicate, Inc.
by FRANQUIN © MARSU 2005 | ©2005 Those Characters From Cleveland, Inc. | © Déco & des mots | © TROPICO/XPRESSIONS | © Hachette Livre/Gautier-Languereau 2005 | © "LE PIAF" Dan Salel -
2005
© 2005 Viacom International Inc. All Rights Reserved. Created by Stephen Hillenburg. | © 2005 2 GRRRLS, Inc. | © FILLE | TM & © 2005 FOX MATT GROENING
© sad.F/AG:GOLDEN ARROW CO. since 2003 | ©2005 Richard Zielenkiewicz MONSIEUR Z LOGO is trademarked by Richard Zielenkiewicz and licensed with BEAUMONDE www.beaumonde-cards.com

Conditions d'utilisation

AVENUE OF THE STARS

Produits vendus uniquement en magasin.



Accueil \ AVENUE OF THE STARS \ Les stars \ Betty Boop \ BETTY INFIRMIERE

**Catalogue Betty Boop**

**BETTY INFIRMIERE**



Au sommaire ...

Les stars

Le concept

Les magasins

Devenir partenaire

Contact

Communication

Liens

**Les thèmes ...**

BETTY AGE ET INITIALES

CADEAU DIVERS

BETTY POUPEE

MAROQUINERIE

DECO DE LA TABLE

BETTY KISS AND COEUR

STATUE/STATUETTE

BETTY ANNIVERSAIRE

DECO DE LA MAISON

BETTY SEXY LADY

BETTY INFIRMIERE

DECO

DECO BUREAU

BETTY FAMOUS

BETTY RETRO

BETTY COQUINE

BETTY COMIC ART

**TOUS LES PRODUITS**



**Partenaires, identifiez-vous**

Identifiant    Mot de passe

valider

Les stars   Le concept   Les magasins   Devenir partenaire   Contact   Communication   Liens

Création SAILING
Powered by WysiUp

English version

Accueil TROPICO <



> Accueil AVENUE OF THE STARS

Retour à l'accueil

Haut de la page

Personnages utilisés sous licence par Tropico-Diffusion : ©2005 KFS/FS TM HEARST/FS | ©2005 Pagot | TM & ® Warner Bros. (s05) | TM & ® Turner Entertainment Co. (s05)
TM & ® DC Comics (s05) | ©2005 Marsu | TM & ® Hanna-Barbera (s05) | ©VOOZ All rights reserved | ©2005 AT & KODANSHA Ltd | PEANUTS © United Feature Syndicate, Inc.
by FRANQUIN © MARSU 2005 | ©2005 Those Characters From Cleveland, Inc. | © Déco & des mots | © TROPICO/XPRESSIONS | © Hachette Livre/Gautier-Languereau 2005 | © "LE PIAF" Dan Salel -
2005
© 2005 Viacom International Inc. All Rights Reserved. Created by Stephen Hillenburg. | © 2005 2 GRRRLS, Inc. | © FILLE | TM & ® 2005 FOX MATT GROENING
© sad.F/AG:GOLDEN ARROW CO. since 2003 | ©2005 Richard Zielenkiewicz MONSIEUR Z LOGO is trademarked by Richard Zielenkiewicz and licensed with BEAUMONDE www.beaumonde-cards.com

Conditions d'utilisation

AVENUE OF THE STARS

http://www.avenueofthestars.fr/index.php?ID=1016034&cat=BB-11

Accueil \ AVENUE OF THE STARS \ Les stars \ Betty Boop \ DECO

Produits vendus uniquement en magasin.

**Catalogue Betty Boop**

**DECO**



**Au sommaire . . .**

Les stars

Le concept

Les magasins

Devenir partenaire

Contact

Communication

Liens



**Les thèmes . . .**

BETTY AGE ET INITIALES

CADEAU DIVERS

BETTY POUPEE

MAROQUINERIE

DECO DE LA TABLE

BETTY KISS AND COEUR

STATUE/STATUETTE

BETTY ANNIVERSAIRE

DECO DE LA MAISON

BETTY SEXY LADY

BETTY INFIRMIERE

DECO

DECO BUREAU

BETTY FAMOUS

BETTY RETRO

BETTY COQUINE

BETTY COMIC ART

**TOUS LES PRODUITS**

**Partenaires, identifiez-vous**

Identifiant      Mot de passe

valider

Les stars    Le concept    Les magasins    Devenir partenaire    Contact    Communication    Liens

Création SAILING Powered by WysiUp |  English version |  Accueil TROPICO |  | Accueil AVENUE OF THE STARS | Retour à l'accueil | Haut de la page

Personnages utilisés sous licence par Tropico-Diffusion : ©2005 KFS/FS TM HEARST/FS | ©2005 Pagot | TM & © Warner Bros. (s05) | TM & © Turner Entertainment Co. (s05)
TM & © DC Comics (s05) | ©2005 Marsu | TM & © Henna-Barbera (s05) | ©VOOZ All rights reserved | ©2005 AT & KODANSHA Ltd | PEANUTS © United Feature Syndicate, Inc.
by FRANQUIN © MARSU 2005 | ©2005 Those Characters From Cleveland, Inc. | © Déco & des mots | © TROPICO/XPRESSIONS | © Hachette Livre/Gautier-Lasguereau 2005 | © "LE PIAF" Dan Salel - 2005
© 2005 Viacom International Inc. AB Rights Reserved. Created by Stephen Hillenburg. | © 2005 2 GRRRLS, Inc. | © FILLE | TM & © 2005 FOX MATT GROENING
© sad.F/AG:GOLDEN ARROW CO. since 2003 | ©2005 Richard Zielenkiewicz MONSIEUR Z LOGO is trademarked by Richard Zielenkiewicz and licensed with BEAUMONDE www.beaumonde-cards.com

Conditions d'utilisation

AVENUE OF THE STARS





Accueil \ AVENUE OF THE STARS \ Les stars \ Betty Boop \ DECO BUREAU

Produits vendus uniquement en magasin.

**Catalogue Betty Boop**

**DECO BUREAU**

Au sommaire . . .





Les stars

Le concept

Les magasins

Devenir partenaire

Contact                ITY     LAMPE ABAT JOUR BETTY
                               RETRO/1870
Communication                  Référence : BB4114

Liens



      

**Partenaires,**
**identifiez-vous**

Identifiant    Mot de passe

valider

Les thèmes . . .

BETTY AGE ET
INITIALES

CADEAU DIVERS

BETTY POUPEE

MAROQUINERIE

DECO DE LA TABLE

BETTY KISS AND
COEUR

STATUE/STATUETTE

BETTY
ANNIVERSAIRE

DECO DE LA MAISON

BETTY SEXY LADY

BETTY INFIRMIERE

DECO

DECO BUREAU

BETTY FAMOUS

BETTY RETRO

BETTY COQUINE

BETTY COMIC ART

**TOUS LES**
**PRODUITS**

Les stars   Le concept   Les magasins   Devenir partenaire   Contact   Communication   Liens

Création SAILING
Powered by WysiUp    English version    Accueil TROPICO    ▶ Accueil AVENUE OF THE STARS    Retour à l'accueil    Haut de la page

**Personnages utilisés sous licence par Tropico-Diffusion :** ©2005 KFS/FS TM HEARST/FS | ©2005 Pagot | TM & © Warner Bros. (s05) | TM & © Turner Entertainment Co. (s05)
TM & © DC Comics (s05) | ©2005 Marsu | TM & © Hanna-Barbera (s05) | ©VOOZ All rights reserved | ©2005 AT & KODANSHA Ltd | PEANUTS © United Feature Syndicate, Inc.
by FRANQUIN © MARSU 2005 | ©2005 Those Characters From Cleveland, Inc. | © Déco & des mots | © TROPICO/XPRESSIONS | © Hachette Livre/Gautier-Languereau 2005 | © "LE PIAF" Dan Salel -
2005
© 2005 Viacom International Inc. All Rights Reserved. Created by Stephen Hillenburg. | © 2005 2 GRRRLS, Inc. | © PILLE | TM & © 2005 FOX MATT GROENING
© sad.F/AG:GOLDEN ARROW CO. since 2003 | ©2005 Richard Zielenkiewicz MONSIEUR Z LOGO is trademarked by Richard Zielenkiewicz and licensed with BEAUMONDE www.beaumonde-cards.com

Conditions d'utilisation

AVENUE OF THE STARS




Produits vendus uniquement en magasin.

Accueil \ AVENUE OF THE STARS \ Les stars \ Betty Boop \ BETTY FAMOUS



**Catalogue Betty Boop**

**BETTY FAMOUS**






| | | |
|---|---|---|
| Référence : BB4153 | Référence : BB4156 | Référence : BB4159 |








| | | |
|---|---|---|
| Référence : BB4161 | Référence : BB4185 | Référence : BB4188 | Référence : BB4189 |







Référence : BB4197




**Au sommaire . . .**

Les stars

Le concept

Les magasins

Devenir partenaire

Contact

Communication

Liens

**les thèmes . . .**

BETTY AGE ET INITIALES

CADEAU DIVERS

BETTY POUPEE

MAROQUINERIE

DECO DE LA TABLE

BETTY KISS AND COEUR

STATUE/STATUETTE

BETTY ANNIVERSAIRE

DECO DE LA MAISON

BETTY SEXY LADY

BETTY INFIRMIERE

DECO

DECO BUREAU

BETTY FAMOUS

BETTY RETRO

BETTY COQUINE

BETTY COMIC ART

**TOUS LES PRODUITS**



**Partenaires, identifiez-vous**

Identifiant    Mot de passe

valider




Les stars   Le concept   Les magasins   Devenir partenaire   Contact   Communication   Liens

Création SAILING
Powered by WysiUp      English version      Accueil TROPICO ◄      ► Accueil AVENUE OF THE STARS      Retour à l'accueil      Haut de la page

Personnages utilisés sous licence par Tropico-Diffusion : ©2005 KFS/FS TM HEARST/FS | ©2005 Paget | TM & © Warner Bros. (s05) | TM & © Turner Entertainment Co. (s05)
TM & © DC Comics (s05) | ©2005 Marsu | TM & © Hanna-Barbera (s05) | ©VOGZ All rights reserved | ©2005 AT & KODANSHA Ltd | PEANUTS © United Feature Syndicate, Inc.
by FRANQUIN © MARSU 2005 | ©2005 Those Characters From Cleveland, Inc. | © Déco & des mots | © TROPICO/XPRESSIONS | © Hachette Livre/Gautier-Languereau 2005 | © "LE PIAF" Dan Salei -
2005
© 2005 Viacom International Inc. All Rights Reserved. Created by Stephen Hillenburg. | © 2005 2 GRRRLS, Inc. | © PILLE | TM & © 2005 FOX MATT GROENING
© sad.F/AG:GOLDEN ARROW CO. since 2003 | ©2005 Richard Zielenkiewicz MONSIEUR Z LOGO is trademarked by Richard Zielenkiewicz and licensed with BEAUMONDE www.beaumonde-cards.com

Conditions d'utilisation

AVENUE OF THE STARS

http://www.avenueofthestars.fr/index.php?ID=1016034&cat=BB-55

Produits vendus uniquement en magasin.

Accueil \ AVENUE OF THE STARS \ Les stars \ Betty Boop \ BETTY RETRO

**Catalogue Betty Boop**

**BETTY RETRO**



Au sommaire . . .

Les stars

Le concept

Les magasins

Devenir partenaire

Contact

Communication

Liens



Référence : BB4199   Référence : BB4201   Référence : BB4203

Référence : BB4206   Référence : BB4214   Référence : BB4217   Référence : BB4218

Référence : BB4219   Référence : BB4221

les thèmes . . .

BETTY AGE ET INITIALES

CADEAU DIVERS

BETTY POUPEE

MAROQUINERIE

DECO DE LA TABLE

BETTY KISS AND COEUR

STATUE/STATUETTE

BETTY ANNIVERSAIRE

DECO DE LA MAISON

BETTY SEXY LADY

BETTY INFIRMIERE

DECO

DECO BUREAU

BETTY FAMOUS

BETTY RETRO

BETTY COQUINE

BETTY COMIC ART

**TOUS LES PRODUITS**

**Partenaires, identifiez-vous**

Identifiant   Mot de passe

valider

Les stars   Le concept   Les magasins   Devenir partenaire   Contact   Communication   Liens

Création SAILING
Powered by WysiUp

English version   Accueil TROPICO     Accueil AVENUE OF THE STARS   Retour à l'accueil   Haut de la page

Personnages utilisés sous licence par Tropico-Diffusion : ©2005 KFS/FS TM HEARST/FS | ©2005 Pagot | TM & © Warner Bros. (s05) | TM & © Turner Entertainment Co. (s05)
TM & © DC Comics (s05) | ©2005 Marsu | TM & © Hanna-Barbera (s05) | ©VOOZ All rights reserved | ©2005 AT & KODANSHA Ltd | PEANUTS © United Feature Syndicate, Inc.
by FRANQUIN © MARSU 2005 | ©2005 Those Characters From Cleveland, Inc. | © Déco & des mots | © TROPICO/XPRESSIONS | © Hachette Livre/Gautier-Languereau 2005 | © "LE PIAF" Dan Saiel - 2005
© 2005 Viacom International Inc. All Rights Reserved. Created by Stephen Hillenburg. | © 2005 2 GRRRLS, Inc. | © FILLE | TM & © 2005 FOX MATT GROENING
© sad.F/AG:GOLDEN ARROW CO. since 2003 | ©2005 Richard Zielenkiewicz MONSIEUR Z LOGO is trademarked by Richard Zielenkiewicz and licensed with BEAUMONDE www.beaumonde-cards.com

Conditions d'utilisation

AVENUE OF THE STARS

http://www.avenueofthestars.fr/index.php?ID=1016034&cat=BB-112



 

AVENUE OF THE STARS

http://www.avenuofthestars.fr/index.php?ID=1016034&cat=BB-118





Produits vendus uniquement en magasin.

Accueil \ AVENUE OF THE STARS \ Les stars \ Betty Boop \ BETTY BOOP

**Catalogue Betty Boop**

**BETTY COMIC ART**


Au sommaire . . .

Les stars

Le concept

Les magasins

Devenir partenaire

Contact                5)

Communication

Liens



**SAC A MAIN MM BETTY COMIC ART (DIAMANTS)**
Référence : BB4422



**PTE FEUILLE PM BETTY COMIC ART(DIAMANTS)**
Référence : BB4423





**HOUSSE PORTABLE BETTY COMIC ART(DIAMANTS**
Référence : BB4424



**PTE CLES/MONNAIE BETTY COMIC ART(DIAMANT**
Référence : BB4426



les thèmes . . .

BETTY AGE ET INITIALES

CADEAU DIVERS

BETTY POUPEE

MAROQUINERIE

DECO DE LA TABLE

BETTY KISS AND COEUR

STATUE/STATUETTE

BETTY ANNIVERSAIRE

DECO DE LA MAISON

BETTY SEXY LADY

BETTY INFIRMIERE

DECO

DECO BUREAU

BETTY FAMOUS

BETTY RETRO

BETTY COQUINE

BETTY COMIC ART

**TOUS LES PRODUITS**

**Partenaires, identifiez-vous**

Identifiant     Mot de passe

valider

Les stars   Le concept   Les magasins   Devenir partenaire   Contact   Communication   Liens

Création SAILING
Powered by WysiUp


English version


TROPICO

Accueil TROPICO <


> Accueil AVENUE OF THE STARS     Retour à l'accueil     Haut de la page

Personnages utilisés sous licence par Tropico-Diffusion : ©2005 KFS/FS TM HEARST/FS | ©2005 Pagot | TM & © Warner Bros. (s05) | TM & © Turner Entertainment Co. (s05) TM & © DC Comics (s05) | ©2005 Marsu | TM & © Hanna-Barbera (s05) | ©VOOZ All rights reserved | ©2005 AT & KODANSHA Ltd | PEANUTS © United Feature Syndicate, Inc. by FRANQUIN & MARSU 2005 | ©2005 Those Characters From Cleveland, Inc. | © Déco & des mots | © TROPICO/XPRESSIONS | © Hachette Livre/Gautier-Languereau 2005 | © "LE PIAF" Dan Salel - 2005
© 2005 Viacom International Inc. All Rights Reserved. Created by Stephen Hillenburg. | © 2005 2 GRRRLS, Inc. | © FILLE | TM & © 2005 FOX MATT GROENING
© sad.F/AG:GOLDEN ARROW CO. since 2003 | ©2005 Richard Zielenkiewicz MONSIEUR Z LOGO is trademarked by Richard Zielenkiewicz and licensed with BEAUMONDE www.beaumonde-cards.com

Conditions d'utilisation

AVENUE OF THE STARS

http://www.avenueofthestars.fr/index.php?ID=1016034&cat=BB









Personnages utilisés sous licence par Tropico-Diffusion : ©2005 KFS/FS TM HEARST/FS | ©2005 Pogot | TM & © Werner Bros. (s05) | TM & © Turner Entertainment Co. (s05)
TM & © DC Comics (s05) | ©2005 Marsu | TM & © Hanna-Barbera (s05) | ©VOGZ All rights reserved | ©2005 AT & KODANSHA Ltd | PEANUTS © United Feature Syndicate, Inc.
by FRANQUIN © MARSU 2005 | ©2005 Those Characters From Cleveland, Inc. | © Déco & des mots | © TROPICO/XPRESSIONS | © Hachette Livre/Gautier-Languereau 2005 | © "LE PIAF" Dan Saiel - 2005
© 2005 Viacom International Inc. All Rights Reserved. Created by Stephen Hillenburg. | © 2005 2 GRRALS, Inc. | © PILLE | TM & © 2005 FOX MATT GROENING
© sad.F/AG:GOLDEN ARROW CO. since 2003 | ©2005 Richard Zielenkiewicz MONSIEUR Z LOGO is trademarked by Richard Zielenkiewicz and licensed with BEAUMONDE www.beaumonde-cards.com
Conditions d'utilisation

# Exhibit D

Home \ AVENUE OF THE STARS \ The shops

Products only sold in store.



**AVENUE OF THE STARS shops**

**Discover all our products and licences in our AVENUE OF THE STARS sales outlets**

### Paris Île-de-France

**Contents...**

The stars

The concept

The shops

Become a partner    hops 1/10

Contact

Communication        is Stars

Links

Click on the image to enlarge

image précédente | image suivante



OUR PARTNERS

◊ **TORCY** ◊
Centre commercial BAY2
77200 COLLEGIEN-TORCY
Tél.: +33 (0)1 64 80 12 24

◊ **BELLE ÉPINE** ◊
Centre commercial Belle Épine
94320 THIAIS
Tél.: +33 (0)1 46 86 61 00

### Elsewhere in France and Corsica

OUR PARTNERS

◊ **VICHY** ◊
Centre commercial
des 4 Chemins
03200 VICHY
Tél.: +33 (0)4 70 97 72 89

◊ **GAP** ◊
1 rue Élisée
05000 GAP
Tél.: +33 (0)4 92 52 40 68

◊ **CANNES** ◊
6 rue des Frères Casanova
06400 CANNES
Tél.: +33 (0)4 93 39 35 69

◊ **MARSEILLE** ◊
Centre commercial Avant Cap
13480 CABRIES - MARSEILLE
Tél.: +33 (0)4 42 46 63 17

◊ **GHISONACCIA - CORSE** ◊
Avenue du 9 septembre
RN 198
20240 GHISONACCIA
Tél.: +33 (0)4 95 57 07 26

◊ **RENNES** ◊
Centre commercial Les 3 Soleils
35000 RENNES
Tél.: +33 (0)2 99 30 09 38

◊ **ANNECY** ◊
5 rue Vaugelas
74000 ANNECY
Tél.: +33 (0)4 50 51 31 54

### French Overseas

◊ **LA REUNION** ◊
52 rue François de Mahy
97410 SAINT PIERRE
Tél. : 02 62 59 14 86

◊ **LA GUADELOUPE** ◊
Espace St John Perse
11, rue Nozières
97110 POINTE A PITRE







Click on the images to see them enlarged...

**Partners, identifiez-vous**

login    password

valider

The stars   The concept   The shops   Become a partner   Contact   Communication   Links

A SAILING creation
Powered by WysiUp

Version française

 TROPICO Home ◄   ► AVENUE OF THE STARS Home   Back to Home   Top of the page

Characters used under licence by Tropico-Diffusion ©2005 KFS/FS TM HEARST/FS | ©2005 Pagot | TM & © Warner Bros. (s05) | TM & © Turner Entertainment Co. (s05)
TM & © DC Comics (s05) | ©2005 Marsu | TM & © Hanna-Barbera (s05) | ©VOOZ All rights reserved | ©2005 AT & KODANSHA Ltd | PEANUTS © United Feature Syndicate, Inc.
by FRANQUIN © MARSU 2005 | ©2005 Those Characters From Cleveland, Inc. | © Déco & des mots | © TROPICO/XPRESSIONS | © Hachette Livre/Gautier-Languereau 2005 | © "LE PIAF" Dan Salel - 2005
© 2005 Viacom | © 2005 2 GRRRLS, Inc. | © PILLE | TM & © 2005 FOX MATT GROENING | © sad.F/AGGOLDEN ARROW CO. since 2003
©2005 Richard Zielenkiewicz MONSIEUR Z LOGO is trademarked by Richard Zielenkiewicz and licensed with BEAUMONDE www.beaumonde-cards.com

Conditions of use

