UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
HEARST HOLDINGS, INC.,

                Plaintiff,                No. 08 Civ. 1546 (WHP)

     v.                                                ECF CASE

TROPICO DIFFUSION,

                Defendant.

------------------------------------------------------------X

### SUPPLEMENTAL DECLARATION OF MAITRE JULIEN HAY

       MAITRE JULIEN HAY, solemnly declares pursuant to 28 U.S.C. § 1746 and under penalty of perjury, that the following is true and correct:

       1.      My name is Julien Hay. I am an attorney at law and a member of the Paris bar. I make this declaration to supplement my declaration, dated February 28, 2008 ("February 28 Declaration"), which was submitted in opposition to the motion of Plaintiff Hearst Holdings, Inc., King Features Syndicate Division's ("King Features" or "Plaintiff"), by order to show cause, for a permanent or preliminary injunction prohibiting the Defendant Tropico Diffusion ("Tropico") from maintaining, prosecuting and pursuing the action brought by Tropico against King Features in the Commercial Court of Paris for violation of Article L.442-6-I-5 of the French Commercial Code (the "French Code Litigation"). I represent Tropico in the French Code Litigation.

       2.      The two exhibits that were attached to the February 28 Declaration were submitted in French without English translations. The English translations are provided here.

3.   A true and correct copy of the relevant provisions of Article L.442-6 of the French Commercial Code, with an English translation is attached hereto as <u>Exhibit 1</u>.

4.   A true and correct copy of a French Court decision, *Beaumont v. X "agent de service Peugeot,"* No. 06-15517 (Commercial Division of the Court of Cassation Sept. 25, 2007), with an English translation is attached hereto as <u>Exhibit 2</u>.

Dated: April 18, 2008
      Paris, France

_____
JULIEN HAY

# EXHIBIT 1

**TRANSLATION**

**Art. L. 442-6** I. –Any manufacturer, tradesman, industrialist or (*L. n° 2003-7 of Jan. 3, 2003*) any "party registered in the trade register", is held liable and is obliged to pay damages for the prejudice caused by
[...]
5° (*L. n° 2001-420 of May 15, 2001*) "suddenly terminating established commercial relations, even partially, without written notice taking account of the duration of the commercial relations and respecting the minimum notice period determined, with reference to trade practices, under inter-professional agreements. When the commercial relations concern the supply of products under the distributor's trademark, the minimum notice period is twice that which would apply if the product were not supplied under the distributor's trademark. Failing such agreements, decrees of the minister of the economy may establish, for each product category, taking account of trade practices, a minimum notice period and oversee the conditions of the termination of commercial relations, in particular in terms of the duration thereof. The foregoing provisions do not impede the right to terminate without notice in the case of the other party's failure to meet its obligations or in the case of *force majeure; [.]*" (*L. n° 2005-882 of August 2, 2005, art. 49-III*) "When termination of commercial relations is the result of a competitive computerized auctioning, the minimum duration of the notice period is twice that resulting from the application of the provisions of this paragraph in the event that the duration of the initial notice period is under six months, and one year at least in other cases;"

"III – Action is filed before the competent civil or commercial court by any party providing proof of an interest in so doing, by the public prosecutor's department, by the minister of economy or by the President of the Competition Council when he ascertains, during business falling under his authority, one of the practices mentioned in this article. – *See Enactment n° 2002-689 of April 30, 2002, art. 48, infra., under art. L. 470-8.*
"At the time of this action, the minister of economy and the public prosecutor's department may request that the court handling the case order the interruption of the practices mentioned herein. They may also see to the establishment, for all of these practices, of the invalidity of the unlawful clauses or contracts, request the refunding of the amounts unduly collected and the pronouncing of a civil fine for an amount which shall not exceed 2 million euros. Damages may also be requested for the prejudice sustained. (*L. n° 2005-882 of Aug. 2, 2005, art. 49-IV* "In all cases, it is up to the service company, the manufacturer, the tradesman, the industrialist or the person registered in the trade register who alleges that he(it) is not bound by any obligations to provide proof of the fact which has brought about the annulment of such obligations;"

"IV. – The judge ruling in summary proceedings may order the suspension of discriminatory or wrongful practices or any other provisional measure."-

Case 1:08-cv-01546-WHP    Document 13    Filed 04/18/2008    Page 5 of 11

[Stamp: OFFICIAL TRANSLATOR (H) — P. BONNEFOUS — 30 bis, rue Émile Ménier — 75116 PARIS - FRANCE — ☎ 01 45 03 28 13 — APPOINTED BY THE PARIS COURT OF APPEAL]

tenu de le respecter. ● Paris, 17 janv. 1995 : *D. 1997. Somm. 63, obs. Ferrier* ℗. ✦ Est illicite la clause d'un contrat de franchise par laquelle le franchisé l'oblige à l'égard du franchiseur « à respecter autant que faire ce peu » des marges bénéficiaires décidées par le franchiseur, celles-ci ne pouvant dès lors être considérées comme des « marges conseillées à titre indicatif », qui a pour effet de dissuader les entreprises appartenant au réseau mis en place par le franchiseur de procéder à la fixation autonome de leurs prix. ● Com. 1er juin 1993 : *Bull. civ. IV, n° 222* ; *D. 1995, somm.*, 72, *obs. Ferrier* ℗. ✦ Pour un autre exemple de prix, présentés par le fabricant comme « conseillés » aux détaillants du réseau de distribution sélective, mais constituant, en réalité, des prix imposés, en raison de menaces de rétorsions commerciales, V. ● Com. 25 nov. 1991 : ✜ *Gaz. Pal. 1992. 1. Somm. 166, obs. Doucet.* ✦ Pour des prix indicatifs « de revente qui revêtent un caractère obligatoire, compte tenu d'une clause interdisant aux revendeurs toute remise promotionnelle sur les produits de la marque sans le consentement du concédant et le système de refus systématique de telles remises, V. ● Crim. 22 août 1995 : ✜ *D. 1997. Somm. 63, obs. Ferrier* ℗ ; *RDA 1996, n° 77*.

**4. Clause d'approvisionnement exclusif.** Ayant retenu que le prix d'achat des marchandises achetées par le franchisé était déterminé par le franchiseur, que le franchisé se trouvait dans l'obligation d'appliquer à la clientèle le tarif déterminé et transmis par le franchiseur, une cour d'appel a pu en déduire, en justifiant légalement sa décision d'annulation, que par l'effet de la clause d'approvisionnement exclusif les prix étaient déterminés dans des conditions contraires à l'art. 34 [C. com., art. L. 442-5]. ● Com. 7 oct. 1997 : ✜ *Contrats Conc. Consom. 1998, n° 2, note Leveneur* ; *JCP/1998. II. 10110, note Mainguy*. – V. aussi note 30 ss. art. L. 420-1, *supra*, et note 9 ss. l'art. 2 de l'arrêté du 21 févr. 1991, *supra*, ss. art. L. 330-3.

**5. Refus de livraison.** Constitue un moyen indirect d'imposer un prix minimal au prix de revente d'un produit le refus de livrer celui-ci au motif que le prix de revente est insuffisant. ● Crim. 31 oct. 2000 : ✜ *Bull. crim. n° 326* ; *RTD com. 2001, 265, obs. Bouloc* ℗ ; *Contrats Conc. Consom. 2001, n° 73, obs. Malaurie-Vignal.*

**5 bis. Prix accepté.** Relevant qu'il résulte du contrat que le prix a été fixé à la suite d'un accord entre les parties, puisque signé, sans contrainte ni violence, et n'a donc pas été imposé, au sens des dispositions légales : ● Nîmes, 22 mai 2003 ; *Cah. dr. entr. 2003, n° 5, p. 51, obs. crit. Respaud.*

### II. TEMPÉRAMENTS

**6. Ristournes conditionnelles.** Le fait d'offrir, à l'occasion de la cession d'un produit, des rabais, remises ou ristournes dans des conditions d'attribution définies de manière objective et ne prêtant pas à discrimination, n'est pas de nature à restreindre la liberté de revente de ces produits et ne saurait constituer une pratique tendant à conférer un caractère minimal aux prix de revente. ● Crim. 30 nov. 1992 : *préc. note 6, vis-à-vis des grands distributeurs des produits de la société.* ● Paris, 29 mars 1994 : *préc. note 6.* ✦ Pour la condamnation du président d'une société à indemniser de leur préjudice moral les titulés parties civiles : ● Crim. 19 févr. 2003 : *Dr. pénal 2003, n° 87, obs. Robert.* ✦ En cet état, et dès lors que le prévenu, devant répondre des conséquences dommageables de l'infraction dont il s'est personnellement rendu coupable, ce délit eût-il été commis dans le cadre de ses fonctions de dirigeant social, engage sa responsabilité civile à l'égard des tiers auxquels cette infraction a porté préjudice. ● Même arrêt.

**7. Plancher de rémunération variable.** Un fournisseur a toujours le droit de fixer contractuellement un plancher à une rémunération variable. Ce faisant, il ne peut être accusé d'imposer un prix de revente minimal, le revendeur conservant le droit de fixer son prix en tenant compte des éléments de son prix de revient. ● T. com. Paris, 16 mai 1995 : *préc. note 2.*

**8. Tarifs maxima.** L'obligation souscrite par le franchisé d'utiliser les tarifs de base du franchiseur n'est pas illicite, dès lors qu'il s'agit de tarifs maxima que le franchiseur peut définir afin d'assurer l'homogénéité du réseau de franchise. ● Paris, 16 juin 1993 : *D. 1995. Somm. 79, obs. Ferrier* ℗. ✦ Mais la pratique de prix minimum imposé est établie lorsque les revendeurs d'un groupement de commerçants indépendants disposent d'une marge de manœuvre réduite à l'extrême par le caractère très bas des prix maximaux figurant au recueil de prix promotionnels, dans un contexte de grande tension des prix des lessives sur le marché et par les principes mêmes qui, en vertu de la charte du groupement, gouvernent les relations de celui-ci avec les franchisés, leur faisant obligation de ne pas s'éloigner dans des proportions trop importantes des prix établis dans cette chaîne de distribution développant une image de pratique de prix bas et

que le contrat de franchise souscrit par tous les revendeurs leur interdit de pratiquer des prix supérieurs au prix maximal ou encore de le baisser de manière anormale. ● Com. 27 janv. 1998 : *RJDA 1998, n° 798*.

### III. SANCTIONS

**9. Imputabilité de l'infraction.** Il entre dans les attributions du président du conseil d'administration de veiller à la bonne conduite de la politique commerciale pratiquée, notamment, vis-à-vis des grands distributeurs des produits de la société. ● Paris, 29 mars 1994 : *préc. note 6.* ✦ Pour la condamnation du président d'une société à indemniser de leur préjudice moral les constituées parties civiles : ● Crim. 19 févr. 2003 : *Dr. pénal 2003, n° 87, obs. Robert.* ✦ En cet état, et dès lors que le prévenu, devant répondre des conséquences dommageables de l'infraction dont il s'est personnellement rendu coupable, ce délit eût-il été commis dans le cadre de ses fonctions de dirigeant social, engage sa responsabilité civile à l'égard des tiers auxquels cette infraction a porté préjudice. ● Même arrêt.

**10. Sanction civile : nullité du contrat.** Justifie légalement sa décision d'annuler un contrat de franchise la cour d'appel qui a constaté que par l'effet de la clause d'approvisionnement exclusif liant les parties, les prix étaient déterminés dans des conditions contraires aux dispositions de l'art. 34 de l'ord. du 1er déc. 1986. ● Com. 7 oct. 1997 : ✜ *préc. note 4.* ✦ Doit être annulé en raison de son caractère anticoncurrentiel que le concessionnaire à l'obligation d'appliquer le tarif conseillé par le concédant et ne lui laisse aucune autonomie dans la fixation de ses prix, ce qui est contraire à l'art. 34 de l'ord. du 1er déc. 1986 (C. com., art. L. 441-5). ● Paris, 17 janv. 1995 : *préc. note 3.* ✦ Pour d'autres décisions annulant des contrats stipulant des clauses contrevenant à l'art. 34 [C. com., art. L. 330-3], V. note 9 ss. l'art. 2 de l'arrêté du 21 févr. 1991, *supra*, ss. art. L. 330-3.

---

**Art. L. 442-6** I. – Engage la responsabilité de son auteur et l'oblige à réparer le préjudice causé le fait, par tout producteur, commerçant, industriel ou (L. n° 2003-7 du 3 janv. 2003) « personne immatriculée au répertoire des métiers » :

1° De pratiquer, à l'égard d'un partenaire économique, ou d'obtenir de lui des prix, des délais de paiement, des conditions de vente ou des modalités de vente ou d'achat discriminatoires et non justifiés par des contreparties réelles en créant, de ce fait, pour ce partenaire, un désavantage ou un avantage dans la concurrence ;

2° (L. n° 2001-420 du 15 mai 2001) « *a)* D'obtenir ou de tenter d'obtenir d'un partenaire commercial un avantage quelconque ne correspondant à aucun service commercial effectivement rendu ou manifestement disproportionné au regard de la valeur du service rendu. Un tel avantage peut notamment consister en la participation, non justifiée par un intérêt commun et sans contrepartie proportionnée, au financement d'une opération d'animation commerciale, d'une acquisition ou d'un investissement, en particulier dans le cadre de la rénovation de magasins ou encore du rapprochement d'enseignes ou de centrales de référencement ou d'achat ; » [.] (L. n° 2005-882 du 2 août 2005, art. 49-I) « Un tel avantage peut également consister en une globalisation artificielle des chiffres d'affaires ou en une demande d'alignement sur les conditions commerciales obtenues par d'autres clients ; » (L. n° 2001-420 du 15 mai 2001) « *b)* D'abuser de la relation de dépendance dans laquelle il tient un partenaire ou de sa puissance d'achat ou de vente en le soumettant à des conditions commerciales ou obligations injustifiées ; » [.] (L. n° 2005-882 du 2 août 2005, art. 49-II) « Le fait de lier l'exposition à la vente de plus d'un produit à l'octroi d'un avantage quelconque constitue un abus de puissance de vente ou d'achat dès lors qu'il conduit à entraver l'accès des produits similaires aux points de vente ; »

(L. n° 2001-420 du 15 mai 2001) « 3° » D'obtenir ou de tenter d'obtenir un avantage, condition préalable à la passation de commandes, sans l'assortir d'un engagement écrit sur un volume d'achat proportionné et, le cas échéant, d'un service demandé par le fournisseur et ayant fait l'objet d'un accord écrit ;

4° D'obtenir ou de tenter d'obtenir, sous la menace d'une rupture brutale (L. n° 2001-420 du 15 mai 2001) « totale ou partielle » des relations commerciales, des prix, des délais de paiement, des modalités de vente ou des conditions de coopération commerciale manifestement dérogatoires aux conditions générales de vente ;

5° (L. n° 2001-420 du 15 mai 2001) « De rompre brutalement, même partiellement, une relation commerciale établie, sans préavis écrit tenant compte de la durée de la relation commerciale et respectant la durée minimale de préavis déterminée, en référence aux usages du commerce, par des accords interprofessionnels. Lorsque la relation commerciale porte sur la fourniture de produits sous marque de distributeur, la durée minimale de préavis est double de celle qui serait applicable si le produit n'était pas fourni sous marque de distributeur. A défaut de tels accords, des arrêtés du ministre chargé de l'économie peuvent, pour chaque catégorie de produits, fixer, en tenant compte des usages du commerce, un délai minimum de préavis et encadrer les conditions de rupture des relations commerciales, notamment en fonction de leur durée. Les dispositions qui précèdent ne font pas obstacle à la faculté de résiliation sans préavis, en cas d'inexécution par l'autre partie de ses obligations ou en cas de force majeure ; [/] » (L. n° 2005-882 du 2 août 2005, art. 49-III) « Lorsque la rupture de la relation commerciale résulte d'une mise en concurrence par enchères à distance, la durée minimale de préavis est double de celle résultant de l'application des dispositions du présent alinéa dans les cas où la durée du préavis initial est de moins de six mois, et d'au moins un an dans les autres cas ; »

(L. n° 2005-882 du 2 août 2005, art. 48-II) « 6° De participer directement ou indirectement à la violation de l'interdiction de revente hors réseau faite au distributeur lié par un accord de distribution sélective ou exclusive exempté au titre des règles applicables du droit de la concurrence ;

(L. n° 2001-420 du 15 mai 2001) « 7° De soumettre un partenaire à des conditions de règlement manifestement abusives, compte tenu des bonnes pratiques et usages commerciaux, et s'écartant au détriment du créancier, sans raison objective, du délai indiqué au (L. n° 2005-882 du 2 août 2005, art. 48-I) « huitième » alinéa de l'article L. 441-6 ; »

(L. n° 2005-882 du 2 août 2005, art. 48-II) « 8° De procéder au refus ou retour de marchandises ou de déduire d'office du montant de la facture établie par le fournisseur les pénalités ou rabais correspondant au non-respect d'une date de livraison ou à la non-conformité des marchandises, lorsque la dette n'est pas certaine, liquide et exigible, sans même que le fournisseur n'ait été en mesure de contrôler la réalité du grief correspondant. »

(L. n° 2001-420 du 15 mai 2001) « II. – Sont nuls les clauses ou contrats prévoyant pour un producteur, un commerçant, un industriel ou (L. n° 2003-7 du 3 janv. 2003) « une personne immatriculée au répertoire des métiers », la possibilité :

« a) De bénéficier rétroactivement de remises, de ristournes ou d'accords de coopération commerciale ;

« b) D'obtenir le paiement d'un droit d'accès au référencement préalablement à la passation de toute commande ;

« c) D'interdire au cocontractant la cession à des tiers des créances qu'il détient sur lui.

« L'annulation des clauses relatives au règlement entraîne l'application du délai indiqué au deuxième alinéa de l'article L. 441-6, sauf si la juridiction saisie peut constater un accord sur des conditions différentes qui soient équitables.

« III. – L'action est introduite devant la juridiction civile ou commerciale compétente par toute personne justifiant d'un intérêt, par le ministère public, par le ministre chargé de l'économie ou par le président du Conseil de la concurrence lorsque ce dernier constate, à l'occasion des affaires qui relèvent de sa compétence, une pratique mentionnée au présent article. – V. Décr. n° 2002-689 du 30 avr. 2002, art. 48, infra, ss. art. L. 470-8.

« Lors de cette action, le ministre chargé de l'économie et le ministère public peuvent demander à la juridiction saisie d'ordonner la cessation des pratiques mentionnées au présent article. Ils peuvent aussi, pour toutes ces pratiques, faire constater la nullité des clauses ou contrats illicites, demander la répétition de l'indu et le pro-

noncé d'une amende civile dont le montant ne peut excéder 2 millions d'euros. La réparation des préjudices subis peut également être demandée. (L. n° 2005-882 du 2 août 2005, art. 49-IV) « Dans tous les cas, il appartient au prestataire de services, au producteur, au commerçant, à l'industriel ou à la personne immatriculée au répertoire des métiers qui se prétend libéré du fait qui a produit l'extinction de son obligation. »

> « IV. – Le juge des référés peut ordonner la cessation des pratiques discriminatoires ou abusives ou toute autre mesure provisoire. » [Ord. n° 86-1243 du 1er déc. 1986, art. 36]

Les 2°, 3°, 4° et 5° du I de l'art. L. 442-6 sont devenus respectivement les 3°, 4°, 5° et 6° du I (L. n° 2001-420 du 15 mai 2001, art. 56 (1°)).

Est considéré comme produit vendu sous marque de distributeur le produit dont les caractéristiques ont été définies par l'entreprise ou le groupe d'entreprises qui en assure la vente au détail et qui est le propriétaire de la marque sous laquelle il est vendu (art. L. 121-6, al. 2, C. consom.).

V. Avis CEPC n° 04-02 du 25 févr. 2004 (conformité de certaines pratiques à l'art. L. 442-6) ; n°s 04-04 et 04-05 du 7 juill. 2004 (conditions d'achat et conditions générales de vente, cités ss. art. L. 440-1.

RÉP. COM. v° Transparence tarifaire et pratiques restrictives, par ARHEL.

BIBL. ▸ VIRASSAMY, D. 1988. Chron. 113. – BRILL, Gaz. Pal. 1987. 2. Doctr. 775 (sanctions civiles). – PICASSOU, D. 1980. Chron. 103 (remises de fidélité). – J.-M. et M. MOUSSERON, Cah. dr. entr. 1995, n° 1 (concurrence commerciale et discrimination et refus de vente). – J.-M. MOUSSERON, ibid. 1998, n° 2, p. 15 (des paiements entre fournisseurs et distributeurs). – LEROUCHÉ, JCP E 1999, n° 12, p. 513 (euro, politique tarifaire et concurrence). – RETTERER, Cah. dr. entr. 1999, n° 2, p. 1 (contrat de référencement : du droit des obligations au droit de la concurrence). – DE GRAMONT, D. Affaires 1999. 1473 (le titre IV de l'ord. du 1er déc. 1986 et l'Eurolande du prix unique). – LAUSCH, ibid. 1476 (évolution des pratiques tarifaires et liberté contractuelle). – POSEY, Petites affiches 20 oct. 2000, p. 4 (conseil de la concurrence, juge du contrat). – ARHEL, Petites affiches 5 févr. 2001, p. 5 (lutte contre les discriminations abusives en Europe) ; ibid. 23 nov. 2001, p. 3 (même thème pour 2001). – LEFEBVRE, LEVY et MOTTIER, Dr. et patr. janv. 2003. 60 (coopération commerciale dans le secteur pharmaceutique). – POUILLE, Contrats Conc. Consom. 2004. Chron. 11 (plaidoyer pour un changement dans les rapports entre fournisseurs et distributeurs). – BOIZARD, Petites affiches 16 juin 2004, p. 5 (réception de la notion de violence économique en droit). – DECOCQ, JCP 1997. I. 3997 (même thème). – VILMART, Contrats Conc. Consom. 2005, n° 2, p. 39 (à la recherche d'une plus grande effectivité dans la lutte contre les pratiques restrictives). – TORT, RDC 2005. 497 (proposition d'inversion de la charge de la preuve sur la réalité des services rendus).

▸ Sur les modifications apportées par la loi du 1er juill. 1996 : VOGEL, Contrats Conc. Consom. 1996, n°s 139, 141, 142 ; D. Affaires 1999. 1464 (abus de puissance d'achat : du contrôle direct au contrôle indirect). – FERRIER, Cah. dr. entr. 1996, n° 5, p. 6 (déréférencement) ; Petites affiches 5 janv. 1998, p. 6 (conditions générales de vente et discrimination). – DEWOLF, Petites affiches 7 févr. 1997, p. 13 (même thème). – Cor., Cah. dr. entr. 1996, n° 5, p. 14 (suppression du refus de vente). – MALAURIE-VIGNAL, D. 1996. Chron. 361 ff. (art. 36 (4) de l'Ord. n° 86-1243 du 1er déc. 1986). – DECOCQ, JCP 1997. I. 3997 (même thème). – VILMART, Contrats Conc. Consom. 1996. Chron. 10 ; Gaz. Pal. 1997. 1. Doctr. 733 (protection des réseaux de distribution). – TRAN THIET, RAKOTOVAO, FRÉGET et VITAL-DURAND, Contrats Conc. Consom. 1996. Chron. 11. – VERGUCHT, RJ com. 1997. 129 (rupture brutale d'une relation commerciale établie). – REVÉ, Petites affiches 5 janv. 1998, p. 9 (coopération commerciale, référencement et services spécifiques). – BEAUCHARD, ibid. p. 14 (stabilisation des relations commerciales : la rupture des relations commerciales continues). – ARHEL, D. Affaires 1998. 97 (autodéfense et droit de la concurrence). – MAINGUY, Cah. dr. entr. 1998, n° 6, p. 23 (abus de droit dans les contrats soumis au droit de la concurrence). – BENOÎT, Dr. et patr. juin 2000. 62 (le droit de la concurrence est un droit de l'abus).

▸ Sur les modifications apportées par la loi n° 2001-420 du 15 mai 2001 : RAPP, AJDA 2001. 560. – VILMART, JCP E 2001, n° 50, p. 1994 (efficacité de la lutte contre les pratiques commerciales abusives dans la loi NRE). – PECNARD et VOISSET, Petites affiches 5 déc. 2001, p. 13 (la coopération commerciale est-elle illicite ?). – GRALL, Lamy droit économique, bull. janv. 2002 (distinction entre « relation de dépendance » et « état de dépendance économique »). – VAGUE, Dict. perm. dr. aff. 13 janv. 2002 (référencement et rupture des relations commerciales). –

# EXHIBIT 2

# *Legifrance*

**Court of Cassation**
**Commercial Division**
**Public Hearing of Tuesday, September 25, 2007**
**Appeal n°: 06-15517**
Not published in the official bulletin

**Chief Judge: Mr. TRICOT, Chief Judge**                    **Dismissal**

**The French Republic**
**in the name of the French People**

IN THE NAME OF THE FRENCH PEOPLE

THE COMMERCIAL, FINANCIAL & ECONOMIC DIVISION OF THE COURT OF CASSATION PRONOUNCED THE FOLLOWING DECISION:

On the sole grounds:

Whereas, according to the decision referred to the court (Douai, March 23, 2006), Mr. X..., "Peugeot Customer Service Representative" bound under various fixed term contracts, then by the last open-ended contract, to the Beaumont Automobiles Company, a Peugeot dealer, filed action against it claiming the prejudice he sustained due to the termination of the contract, without notice, pursuant to the defeasance clause it notified to him on January 2, 200 [sic];

Whereas the Beaumont automobiles company charges the decision with having sentenced it to pay to Mr. X...the amount of € 13,385 in damages, whereas, according to the grounds:

1/ if termination of established commercial relations must be preceded by a notice, an exception is made to this rule in the case of the contracting party's failure to meet his obligations; whereas in the case at issue, to decide that the Beaumont Automobiles Company had incurred its liability to its agent by applying the defeasance clause stipulating the possibility of cancelling the open-ended contract binding it to Mr. X, by right and without notice, in the event of his failure to meet his contractual obligations, the Court of Appeals ruled, on the contrary, that no exception can be made to the rule that established commercial relations cannot be terminated without notice, thereby violating, by refusing to apply it, Article L. 442-6 I 5 *in fine* of the Commercial Code.

2/ whereas a party who, in order to terminate contractual relations due to failures on the part of its co-contracting party to meet his contractual obligations, applies a defeasance clause stipulating the termination of the agreement by right and without notice when such failures are established, commits no fault; whereas in the case at issue, the Court of Appeals established that the open-ended contract signed between the Beaumont Automobiles Company and Mr. X...stipulated that it would be terminated by right and without notice in the event that the Peugeot customer representative failed to respect contractual standards prior to December 31, 2000; whereas it also ascertained Mr. X...'s failure to meet the commitments made; whereas by ruling that the Beaumont Automobiles Company committed a fault by terminating the customer representative's agreement despite the inclusion of the defeasance clause, the Court of Appeals violated Articles 1147 of the Civil Code, and by its refusal to apply them, Articles 1134 of the Civil Code and L. 442-6 I 5 of the Commercial Code;

3/ Whereas the burden of proving a fault in exercising the right to terminate stipulated in an agreement is incumbent upon the party invoking it;

Whereas, in the case at issue, in order to rule that the Beaumont automobiles company had incurred its liability by implementing the termination clause forthwith, the Court of Appeals ruled that it had not established the gravity of the failures with which it was charging Mr. X..., thereby reversing the burden of proof and violating Article 1315 of the Civil Code;

But whereas after having stated that the provisions of public policy set forth in Article L. 442-6 I 5 of the Commercial Code cannot be impeded by clauses permitting termination without notice, if the failure to execute the contract is not of sufficient seriousness, the decision notes that the dealer was entitled to terminate the contract forthwith, with immediate effect, without damages, in particular in the case of the failure to respect the manufacturer's methods, norms or standards or the provisions of Article 3 of appendix 1 concerning the identification and standards which the agent had undertaken to respect prior to December 31, 2000 at the latest, and notes that the agent had acknowledged that he had to comply with five of the twenty-two standards set by the manufacturer; whereas it also rules that certain former failures did not constitute an obstacle to the signing of the new contract, and whereas the dealer did not specify why an opacimeter was a device essential for maintaining contractual relations, or what the consequences were of the absence of a correspondent to the technical adviser who must have been Mr. X...'s son; whereas it concludes that it has not been proven that the established failures to meet the commitments made were of a seriousness such that they warranted immediate termination despite the seniority of commercial relations and the agent's efforts to adapt, while it adds that the charges contained in a letter of May 25, 2000 and in the letter of termination, have not been established; whereas thus, without reversing the burden of proof, the Court of Appeals applied the articles invoked precisely; whereas the grounds are not founded.

ON THESE GROUNDS:

DISMISSES the appeal;

Sentences the Beaumont automobiles company to costs;

Considering Article 700 of the New Code of Civil Procedure, sentences it to pay to Mr. X...the sum of € 2,000;

Tried and ruled by the Commercial, Financial & Economic Division of the Court of Cassation, and pronounced by Mrs. Garnier, senior judge of appeal who deliberated it, in the absence of the Chief Judge, in the public hearing of September twenty fifth two thousand and seven.

**Decision under attack:** Douai Court of Appeals (Division 2, Section 1) of March 23, 2006.

**Sections and outlines:**






**Cour de cassation**
**chambre commerciale**
**Audience publique du mardi 25 septembre 2007**
**N° de pourvoi : 06-15517**
Non publié au bulletin

Rejet

**Président : M. TRICOT, président**

## REPUBLIQUE FRANCAISE

## AU NOM DU PEUPLE FRANCAIS

AU NOM DU PEUPLE FRANCAIS

LA COUR DE CASSATION, CHAMBRE COMMERCIALE, FINANCIERE ET ECONOMIQUE, a rendu l'arrêt suivant :

Sur le moyen unique :

Attendu, selon l'arrêt déféré (Douai, 23 mars 2006), que M. X..., "agent de service Peugeot" lié par divers contrats à durée déterminée, puis par un dernier contrat à durée indéterminée, à la société Beaumont automobiles, concessionnaire Peugeot, l'a assignée en réparation du préjudice que lui a causé la rupture du contrat sans préavis par application de la clause résolutoire qu'elle lui a signifiée le 2 janvier 200 ;

Attendu que la société Beaumont automobiles reproche à l'arrêt de l'avoir condamnée à payer à M. X... une indemnité de 13 385 euros, alors, selon le moyen :

1 / que si la rupture de relations commerciales établies doit être précédée d'un préavis, il est dérogé à cette règle en cas d'inexécution par le contractant de ses obligations ; qu'en l'espèce, pour décider que la société Beaumont automobiles avait engagé sa responsabilité envers son agent en faisant application de la clause résolutoire stipulant la possibilité de résilier de plein droit et sans préavis le contrat à durée indéterminée la liant à M. X... en cas de manquement de ce dernier à ses obligations contractuelles, la cour d'appel a retenu au contraire qu'il ne pourrait être dérogé à la règle selon laquelle il ne peut être mis fin sans préavis à des relations commerciales établies, violant ainsi par refus d'application l'article L. 442-6 I 5 in fine du code de commerce ;

2 / que ne commet pas de faute la partie qui, pour mettre fin aux relations contractuelles du fait des manquements de son cocontractant à ses obligations contractuelles, applique une clause résolutoire stipulant la résiliation de la convention de plein droit et sans préavis lorsque ces manquements sont avérés ; qu'en l'espèce, la cour d'appel a constaté que le contrat à durée indéterminée conclu par la société Beaumont automobiles et M. X... stipulait qu'il serait résilié de plein droit et sans préavis en cas de non-respect par l'agent service Peugeot des standards contractuels avant le 31 décembre 2000 ; qu'elle a aussi constaté les manquements de M. X... aux engagements souscrits ; qu'en retenant que la société Beaumont automobiles avait commis une faute en résiliant la convention d'agent de service malgré l'acquisition de la clause résolutoire, la cour d'appel a violé les articles 1147 du code civil et, par refus d'application, les articles 1134 du code civil et L. 442-6 I 5 du code de commerce ;

3 / que la preuve d'une faute dans l'exercice de la faculté de résiliation stipulée dans une convention incombe à celui qui l'invoque ;

qu'en l'espèce, pour décider que la société Beaumont automobiles avait engagé sa responsabilité en mettant en oeuvre la clause de résiliation de plein droit, la cour d'appel a retenu qu'elle n'établissait pas la gravité des manquements qu'elle reprochait à M. X..., inversant ainsi la charge de la preuve et violant l'article 1315 du code civil ;

Mais attendu qu'après avoir énoncé qu'il ne peut être fait obstacle aux dispositions d'ordre public de l'article L. 442-6 I 5 du code de commerce par des clauses permettant une rupture sans préavis dès lors que l'inexécution du contrat n'a pas un degré de gravité suffisant, l'arrêt relève que le concessionnaire pouvait résilier le contrat de plein droit, à effet immédiat et sans indemnité, notamment en cas de non-respect des méthodes, normes ou standards du constructeur ou des dispositions de l'article 3 de l'annexe 1 relatives à l'identification et au standards que l'agent s'était engagé à respecter au plus tard avant le 31 décembre 2000,

et constate que l'agent avait reconnu devoir se mettre en conformité en ce qui concerne cinq standards sur les vingt-deux fixés par le constructeur ; qu'il retient encore que certains manquements, anciens, n'ont pas été un obstacle à la conclusion du nouveau contrat, et que le concessionnaire ne précisait pas en quoi un opacimètre était un appareil indispensable au maintien des relations contractuelles ni quelles étaient les conséquences de l'absence d'un correspondant au conseiller technique qui devait être le fils de M. X... ; qu'il en conclut qu'il n'est pas démontré que les manquements établis aux engagements souscrits étaient d'une gravité telle qu'ils justifiaient une rupture immédiate eu égard à l'ancienneté des relations commerciales et aux efforts d'adaptation de l'agent, tandis qu'il ajoute que les reproches contenus dans une lettre du 25 mai 2000 et dans la lettre de rupture, ne sont pas établis ; qu'ainsi, sans inverser la charge de la preuve, la cour d'appel a fait l'exacte application des textes invoqués ; que le moyen n'est pas fondé ;

PAR CES MOTIFS :

REJETTE le pourvoi ;

Condamne la société Beaumont automobiles aux dépens ;

Vu l'article 700 du nouveau code de procédure civile, la condamne à payer à M. X... la somme de 2 000 euros ;

Ainsi fait et jugé par la Cour de cassation, chambre commerciale, financière et économique, et prononcé par Mme Garnier, conseiller doyen qui en a délibéré, en remplacement du président, en l'audience publique du vingt-cinq septembre deux mille sept.

**Décision attaquée :** cour d'appel de Douai (chambre 2, section 1) du 23 mars 2006

**Titrages et résumés :**

[Stamp: LEGAL TRANSLATOR (H) P. BONNEFOUS, 30 bis, rue Émile Menier, 75116 PARIS - FRANCE, ☎ : 01 45 53 23 13, APPOINTED BY THE PARIS COURT OF APPEAL]